UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| ANTOINE RICHARD, DARRELL RICHARD, CHRIS MECHE, DERBY DOUCET, SR., KEVIN RABEAUX, AND MARK LOUVIERE, INDIVIDUALLY AND ON BEHALF OF ALL SIMILARLY SITUATED INDIVIDUALS,<br><br>Plaintiffs,<br><br>versus<br><br>FLOWERS FOODS, INC.; FLOWERS BAKING COMPANY OF LAFAYETTE, LLC; FLOWERS BAKING COMPANY OF BATON ROUGE, LLC; FLOWERS BAKING COMPANY OF ALEXANDRIA, LLC; FLOWERS BAKING COMPANY OF NEW ORLEANS, LLC; AND FLOWERS BAKING COMPANY OF TYLER, LLC,<br><br>Defendants. | ) | Civil Action No. 15cv2557<br><br>DISTRICT JUDGE RICHARD T. HAIK, SR<br><br>MAGISTRATE JUDGE CAROL B. WHITEHURST |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

**TABLE OF CONTENTS**

**I. INTRODUCTION** ........ 1

**II. FACTUAL BACKGROUND** ........ 2

**A. THE PARTIES, PLAINTIFFS AND OPT-INS** ........ 2

**B. THE DISTRIBUTOR MODEL UNDER WHICH PLAINTIFFS OPERATE CONTAINS NUMEROUS INDICIA OF IC STATUS.** ........ 4

**C. PLAINTIFFS' DEPOSITION TESTIMONY CONFIRMS THE INDIVIDUALIZED NATURE OF THEIR CLAIMS.** ........ 6

1. PLAINTIFFS' DIFFERENT ACCOUNTS CREATE DIFFERENT ENTREPRENEURIAL OPPORTUNITIES. ........ 6

2. DISTRIBUTORS TAKE ADVANTAGE OF ENTREPRENEURIAL OPPORTUNITIES DIFFERENTLY. ........ 7

3. PLAINTIFFS' EXPERIENCE SIGNIFICANTLY DIFFERENT "CONTROL," IF ANY. ........ 10

4. PLAINTIFFS ADMIT THEY DO NOT WANT THE RELIEF SOUGHT IN THIS LAWSUIT. ........ 11

**D. PLAINTIFFS ADMIT THEY HAVE NO PERSONAL KNOWLEDGE REGARDING DISTRIBUTORS THEY SEEK TO REPRESENT AT ANY OF THE OTHER WAREHOUSES.** ........ 11

**III. STANDARD OF REVIEW** ........ 12

A. THE CONDITIONAL CERTIFICATION STANDARD IS, WHILE LENIENT, "BY NO MEANS AUTOMATIC" AND REQUIRES EVIDENCE OF A COMMON **UNLAWFUL** POLICY. ........ 13

**B. THE COURT SHOULD CONSIDER ALL EVIDENCE BEFORE IT WHEN MAKING THIS DETERMINATION** ........ 14

**C. PLAINTIFFS' EVIDENCE MUST BE BASED ON PERSONAL KNOWLEDGE** ........ 15

**IV. ARGUMENT** ........ 16

A. **PLAINTIFFS' "EVIDENCE" IS INSUFFICIENT AND CONTRADICTED, IN LARGE PART, BY THEIR OWN DEPOSITION TESTIMONY** ........ 16

**B. PLAINTIFFS ADMITTED LACK OF PERSONAL KNOWLEDGE REGARDING OTHER WAREHOUSES IS FATAL TO THEIR MOTION** ........ 18

**C. THE INDIVIDUALIZED INQUIRIES REQUIRED TO ADJUDICATE PLAINTIFFS' CLAIMS ARE INCONSISTENT WITH COLLECTIVE ACTION TREATMENT.** ........ 19

1. COMMON CLASSIFICATION AS AN IC, STANDING ALONE, IS NOT SUFFICIENT. ........ 19

2. NUMEROUS INDIVIDUALIZED DETERMINATIONS ARE REQUIRED FOR EACH PLAINTIFF AND OPT-IN. ........ 21

3. THE INDIVIDUALIZED INQUIRIES NECESSARY TO ADJUDICATE MULTIPLE DEFENSES HERE PRECLUDE CONDITIONAL CERTIFICATION. ........ 23

D. **EVEN ASSUMING SOME NOTICE IS APPROPRIATE, WHICH IS DENIED, IT MUST BE LIMITED TO THE SEVEN WAREHOUSES FROM WHICH PLAINTIFFS FROM WHICH THE PLAINTIFFS OPERATED** ........ 24

**E. PLAINTIFFS' NOTICE IS INAPPROPRIATE** ........ 28

1. A 90-DAY NOTICE PERIOD IS TOO LONG ........ 28

2. REMINDER NOTICES TO THOSE WHO HAVE NOT RESPONDED ARE UNNECESSARY ........ 29

3. POSTING NOTICE IN THE WORKPLACE IS INAPPROPRIATE ........ 29

**V. CONCLUSION** ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. SBC Communs., Inc.*,
No. H-05-3198, 2007 WL 772756 (S.D. Tex. Mar. 12, 2007) ........................................14, 21

*Andel v. Patterson-UTI Drilling Co., LLC*,
280 FRD 287 (S.D. Tex. 2012)...................................................................16, 19, 20, 22

*Baldridge v. SBC Commc'ns, Inc.*,
404 F.3d 930 (5th Cir.2005) ...........................................................................................25

*Baroni v. BellSouth Telecommunications, Inc.*,
No. 02-009, 2004 WL 1687434 (E.D. La. 2004)..........................................................15, 27

*Botello v. Coi Telecom, LLC, et al*,
No. SA-10-CV-305-XR, 2010 WL 5464824 (W.D. Tex. Dec. 30, 2010)..............................22

*Busby v. Dauterive Contractors, Inc.*,
2016 WL 430608 (W.D. La. Feb. 3, 2016).......................................................................13

*Buttry v. Dollar Gen. Corp.*,
No. 3-13-0652, 2014 WL 1347178 (M.D. Tenn. Apr. 4, 2014) ...........................................22

*Christianson v. New Park Drilling*,
No. H-14-3235, 2015 WL 1268259 (S.D. Tex. 2015)....................................................16, 20

*In re Coastal Plains, Inc.*,
179 F.3d 197 (5th Cir. 1999) ..........................................................................................24

*Davis v. Josi Hosp., LLC*,
No. 15-00451-BAJ-RLB, 2016 WL 3023288 (M.D. La., May 24, 2016)..............................24

*Demauro v. Limo, Inc.*,
2011 WL 9191 (N.D.Fla. Jan. 3, 2011) ............................................................................22

*Green v. Plantation of Louisiana, LLC*,
No. CIV. 2:10-0364, 2010 WL 5256354 (W.D. La. Nov. 24, 2010).....................................25

*Hickson v. U.S. Postal Service*,
No. 5:09CV83, 2010 WL 3835885 (E.D. Tex. Sept. 28, 2010) ............................................27

*Holmes v. Quest Diagnostics*,
9:11-cv-80567-KMW (S.D. Fla. June 14, 2012) ..................................................................17

*Leyva v. 35 Bar and Grill, LLC*,
No. SA-15-CA-295-FB, 2015 WL 5751638 (W.D. Tex. Sept. 22, 2015)....29

*Lima v. Int'l Catastrophe Sols., Inc.*,
493 F. Supp. 2d 793 (E.D. La. 2007)....28

*Lusardi v. Xerox Corp*,
118 F.R.D. 351 (D.N.J. 1987)....13, 15

*Luvianos v. Gratis Cellular, Inc.*,
No. H-12-1067, 2012 WL 6737498 (S.D. Tex. Dec. 10, 2012)....25

*Martinez v. Cargill Meat Sols.*,
265 F.R.D. 490 (D. Neb. 2009)....28

*Martinez v. Flowers Foods, Inc.*,
No.15-5112, at *11-12 (C.D. Cal. Feb. 1, 2016)....21

*Meza v. Intelligent Mexican Mktg., Inc.*,
720 F.3d 577 (5th Cir. 2013)....24

*Mooney v. Aramco Servs. Co.*,
54 F.3d 1207 (5th Cir. 1995)....13, 14

*Potts v. Nashville Limo & Transp., LLC*,
No. 3:14-cv-1412, 2015 WL 4198793 (M.D. Tenn. July 10, 2015)....19

*Roberts v. S.B. S. Welding, LLC*,
No. 3:14-cv-3617-B, 2015 WL 8773610 (N.D. Tex. Dec. 15, 2015)....29

*Ross v. Sw. Louisiana Hosp. Ass'n*,
No. 2:12-CV-1250, 2013 WL 1818331 (W.D. La. Apr. 29, 2013)....25, 26

*Santinac v. Worldwide Labor Support of Illinois, Inc.*,
107 F. Supp. 3d 610, 619 (S.D. Miss. 2015)....29

*Simmons v. T-Mobile USA, Inc.*,
H-06-1820, 2007 WL 210008 (S.D.Tex.2007)....13

*Songer v. Dillon Res., Inc.*,
569 F. Supp. 2d 703 (N.D. Tex. 2008)....15, 17, 19

*Stewart v. Flowers Baking Co. of Batesville, LLC*,
1:15-cv-01162-JDB-egb (W.D. Tenn. August 12, 2016)....26

*Thibault v. Bellsouth Telecommunications, Inc.*,
612 F.3d 843 (5th Cir.2010)....21

*Treme v. HKA Enterprises, Inc.*,
No. 07-1134, 2008 WL 941777 (W.D. La. Apr. 7, 2008) ....................................13, 14, 15, 19

*Vanzzini v. Action Meat Distributors, Inc.*,
No. H-11-4173, 2012 WL 1941763 (S.D. Tex. May 29, 2012).............................................25

*Vargas v. HEB Grocery Co.*,
2012 WL 4098996 (W.D. Tex. Sept. 17, 2012).........................................................................15

*Virgen v. Conrad*,
No. 6:15-cv-0465, 2015 WL 6692120 (W.D. L.A. 2015) ....................................13, 14, 15, 19

*Walters v. Am. Coach Lines of Miami, Inc.*,
575 F.3d 1221 (11th Cir. 2009) ...............................................................................................23

*West v. Lowes Homes Centers, Inc.*,
No. 6:09-1310, 2010 WL 5582941 (W.D. La. Dec. 16, 2010) ...............................................25

*White v. Integrated Electronics Technologies, Inc.*,
No. 11-2186, 2013 WL 2903070 ..............................................................................................27

*Xavier v. Belfor USA Group, Inc.*,
585 F. Supp. 2d 873 .........................................................................................13, 14, 20

**Statutes**

29 U.S.C. § 207(a) ..........................................................................................................12

29 U.S.C. § 213(b)(1) ......................................................................................................23

29 U.S.C. § 216(b) ...........................................................................................................13

49 U.S.C. § 31132.............................................................................................................23

FLSA.................................................................................................................... *passim*

Motor Carrier Act .............................................................................................................23

**Other Authorities**

29 CFR § 541.504.............................................................................................................24

## I. INTRODUCTION

Plaintiffs move for conditional certification under the FLSA of a diverse class of independent contractor distributors operating out of *24 different warehouse* in Louisiana who contracted with *three different* entities. In support, they offer only twelve cookie-cutter declarations from just four warehouses replete with conclusory allegations, noticeably omitting reference to: (1) their own extensive contradictory deposition testimony, and (2) authority from or within the Fifth Circuit. What is more, at deposition, Plaintiffs openly admit that they have no personal knowledge regarding how other distributors in this broad class operate their businesses and, at a minimum, that distributors are different. As Plaintiff Gordon[1] succinctly stated: "Every – every route is different, ma'am . . . Everybody is different. . . Everybody has different stores and different customers and it's not going to be the same..." (Gordon's Dep. Tr. at 22:4 - 24:17) (Attachment 1g to Exhibit A hereto, Declaration of Margaret Hanrahan).[2]

Furthermore, the extensive deposition testimony from the 9 Plaintiffs deposed establishes that even this small group *is not*, in fact, similarly situated to each other—let alone to the hundreds of other distributors they seek to represent. Rather, Plaintiffs operate their distributorship businesses in *materially different* ways. While one Plaintiff, Derby Doucet Sr., operates 4 separate businesses concurrently with his distributorship, grossing well over $5 million dollars a year in those independent businesses last year alone, others only operate their distributorships. And, while some Plaintiffs hire multiple helpers, including Kevin Rabeaux, who has hired over 18 or 19 different helpers and Doucet who hired an employee to run his territory for him on a full-time basis for close to a year, others are much different. These examples, which

---

1 The opt-in Plaintiffs and named Plaintiffs will collectively be referred to as "Plaintiffs" herein.

2 All subsequent references to Plaintiffs' deposition excerpts will be cited herein as (H. Decl., Att.__).

are directly relevant to critical legal factors here, are far from exhaustive. This, when combined with the inevitable individualized experiences of the other distributors, make it clear that the only thing "similar" about Plaintiffs and the putative class they seek to represent is the distinct lack of similarity between them.

In short, even at this first conditional certification stage, Plaintiffs' FLSA claims cannot proceed in a single action because there is no common glue joining their claims together—as demonstrated by the 9 Plaintiffs who were deposed alone. At best, the conditionally certified class must be limited to the seven Louisiana warehouses[3] from which they operated—the only locations for which they provided any evidence whatsoever— consistent with numerous other decisions from this Circuit and others.

## II. FACTUAL BACKGROUND

### A. The Parties, Plaintiffs and Opt-Ins.

Defendant Flowers Foods, Inc. ("Flowers Foods") is the parent company of numerous operating subsidiaries throughout the country, each of which is organized as a separate legal entity and responsible for its own day-to-day operations. Flowers Baking Company of Lafayette, LLC ("FBC Lafayette"); Flowers Baking Company of Baton Rouge, LLC ("FBC Baton Rouge"); Flowers Baking Company of Alexandria, LLC ("FBC Alexandria"); and Flowers Baking Company of Tyler, LLC (hereinafter "FBC Tyler")[4] are each subsidiaries of Flowers

---

[3] Plaintiffs seek to represent all distributors in Louisiana during the applicable limitations period. [Doc 5, ¶3].

[4] No Plaintiffs from Flowers Baking Company of New Orleans (hereinafter "FBC New Orleans") have opted in. A Motion to Dismiss FBC New Orleans is currently pending because Plaintiffs here do not have standing to represent these distributors. If the Court is inclined not to dismiss FBC New Orleans, which absent a current New Orleans opt-in Defendants believe would be improper, inclusion of FBC New Orleans distributors in the conditionally-certified class further supports why Plaintiffs' Motion must be denied. This is because FBC New Orleans has contracted with 84 current and former distributors operating in 5 different warehouses in Louisiana. At a minimum, FBC New Orleans distributors need to be carved out of any conditionally certified class because Plaintiffs have offered no evidence whatsoever regarding the practices there, nor have they shown that any FBC New Orleans distributors wish

Foods. Duane Ramon Decl ¶ 1 (Ex. B); Kirkland Decl ¶ 1 (Ex. C); Hymel Decl. ¶1. (Ex. D). FBC Tyler and FBC Baton Rouge contract with independent contractor ("IC") distributor franchisees who purchase distribution rights to sell and distribute different branded products, such as fresh breads, buns, rolls, snack cakes, and pastries, to customers in defined geographic territories. Ramon Decl ¶¶ 6-8 (Ex. B); Kirkland Decl ¶ 6 (Ex. C).

FBC Baton Rouge has a bakery in Baton Rouge, Louisiana and FBC Tyler has a bakery in Tyler, Texas where they each produce several bread and bun products. Ramon Decl ¶ 3 (Ex. B); Kirkland Decl ¶ 3 (Ex. C). Distributors pick up products for ultimate sale and distribution to end customers from various warehouses. FBC Baton Rouge has fifteen different warehouses throughout Louisiana,[5] and FBC Tyler has 4 warehouses in Louisiana.[6] Ramon Decl ¶ 3 (Ex. B); Kirkland Decl ¶ 3 (Ex. C). Each warehouse has its own branch sales manager(s), who usually serves as the primary point-of-contact for distributors. Ramon Decl ¶ 3 (Ex. B); Kirkland Decl ¶ 3 (Ex. C). Each bakery also has a number of Director of Sales, who are only occasionally involved in distributor-related issues. Ramon Decl ¶ 5 (Ex. B); Kirkland Decl ¶ 5 (Ex. C).

There are currently six named Plaintiffs[7] and thirty-five opt-in Plaintiffs in this case (24 from FBC Baton Rouge and 11 from FBC Tyler).[8] Ramon Decl ¶ 12 (Ex. B); Kirkland Decl ¶

---

to opt in, unlike FBC Tyler. (Doc. 83). Furthermore, distributors who originally contracted with FBC Lafayette had their territories transferred to FBC Baton Rouge in approximately June 2013. Ramon Decl ¶ 1 (Ex. B). In addition, FBC Alexandria has not engaged in the distribution of Flowers products via independent distributors or otherwise and is likewise subject to dismissal. (Doc. 83-3).

[5] FBC Baton Rouge currently has approximately 112 distributors in Louisiana. Ramon Decl. ¶¶ 3, 13 (Ex. B)

[6] FBC Tyler has approximately 31 distributors operating territories in Louisiana. Kirkland Decl. ¶¶ 3, 14 (Ex. C)

[7] Antoine Richard, Darrell Richard, Chris Meche, Derby Doucet, Sr., Kevin Rabeaux, and Mark Louviere.

[8] ***FBC Baton Rouge***: Aaron Bourque, Brennon Brown, Michael Coco, Casey Dohman, Bret Dommert, Cody Desormeaux, Anthony Dugas, Joey Frederick, Harold Johnson, James McConnell, Daryl Miller, Christopher Nash, Jordan Nelson, Kirby Porter, Lester Prejean, Steven Romero, Ted Shuff, and Ronnie Trosclair. ***FBC Tyler***: Jason Albritton, Mack Gordon, Carlton Grigsby, James Holcomb, Shegray Jones, Michael Lynch, Freddie Oliveaux, Timothy Randels, Jay Smith, Solomon Williams, and Austin Works.

13 (Ex. C). Plaintiffs signed Distributor Agreements with either FBC Baton Rouge or FBC Tyler.[9] Ramon Decl ¶ 6-7; 10 (Ex. B); Kirkland Decl ¶ 6-7; 10 (Ex. C). Plaintiffs have been distributors for significantly varied periods of time. *Compare* Derby Doucet, who contracted on October 14, 1987 *with* Solomon Williams, who contracted on February 23, 2015. (Doc. 105-2, Page ID#s 880-911, Doc. 105-3, Page ID#s 1061-1101). Plaintiffs only operate(d) out of 7 of the 19 Louisiana warehouses they seek to include in their proposed class for FBC Baton Rouge and FBC Tyler (or 7 out of 24 warehouses total, including FBC New Orleans).[10] These warehouses include: Acadiana, Birdsong, Eunice, Lake Charles, Sulphur, Ruston, and West Monroe (FBC Baton Rogue) and Ruston and West Monroe (FBC Tyler). *See e.g.* Ramon Decl ¶ 12 (Ex. B); Kirkland Decl ¶ 13 (Ex. C).[11] Approximately 36 Louisiana distributors from FBC Baton Rouge and FBC Tyler also signed amendments to their Distributor Agreements containing an arbitration agreement with a class/collective action waiver. Ramon Decl ¶ 13 (Ex. B); Kirkland Decl ¶ 14 (Ex. C).

**B. <u>The Distributor Model Under Which Plaintiffs Operate Contains Numerous Indicia of IC Status.</u>**

The distributor model under which Plaintiffs operate contains numerous indicia of IC status, and decisions from multiple forums have upheld it as creating an IC relationship. Chuck Rich Decl ¶ 7 (Ex. E). The distributor model rests on the belief that independent distributors who own their distribution rights have more entrepreneurial incentive to develop business and generate additional sales based on their own individual efforts and sales strategies. Ramon Decl ¶

---

9 Some Baton Rouge distributors may have executed Distributor Agreements with FBC Lafayette prior to June 2013. Ramon Decl. ¶6 (Ex. B). No Plaintiff executed an agreement with FBC New Orleans.

10 *See* Hymel Dec. ¶¶3-4 (Ex. D).

11 Notably, with their motion, Plaintiffs only present evidence related to 4 warehouses (Acadiana, Birdsong, Ruston and W. Monroe).

11 (Ex. B); Kirkland Decl ¶ 11-12 (Ex. C). Specifically, distributors purchase different products from the bakery at a specified discount, which they sell and market to customers and potential customers in their respective territories. Ramon Decl ¶ 8 (Ex. B); Kirkland Decl ¶ 8 (Ex. C). Distributors determine which products to order for their customers and adjust suggested orders in their handheld computers based on the customers' individual needs. *Id.* Distributors can—and often do—make significant adjustments to the suggested orders based on various individualized factors such as the time of month, promotions, volume, weather, holidays, and competition pricing. Ramon Decl ¶ 8 (Ex. B); Kirkland Decl ¶ 8 (Ex. C); A. Richard Dep. Tr. at 84:17-85:21; 87:4-87:6; 160:5-7 (H. Decl., Att. 1a) (makes adjustments if the store sells more than expected and based on what he thinks the customers' need is at that time); Louviere Dep. Tr. at 144:25-146:12 (H. Decl., Att. 1f) ( "I do some form of adjustment every day."); Albritton Dep. Tr. at 125:6-127:1 (H. Decl., Att. 1h) (suggests orders and tries to order based on what he thinks his customers need, which "changes every day."); Meche Dep. Tr. at 171:11-172:21 (H. Decl., Att. 1c) (makes adjustments "daily" and does so based on what will sell best for his accounts or to "round up").[12] FBC Baton Rouge and FBC Tyler then produce products in response to these specific orders and ship them to warehouses for ultimate pick-up, distribution, and sale by distributors to the end customers for whom the products were ordered. Ramon Decl ¶ 8 (Ex. B); Kirkland Decl ¶ 8 (Ex. C). Many products ordered by FBC Baton Rouge and FBC Tyler distributors are also produced by bakeries out of state. Ramon Decl ¶ 9 (Ex. B); Kirkland Decl ¶ 9 (Ex. C).

---

[12] *See also* Meche Dep. Tr. at 171:11 to 172:21 (H. Decl., Att. 1c) ("There's a lot – there's a lot that goes into account to make an order. You know, holidays, storms, like you said, yes.")

### C. Plaintiffs' Deposition Testimony Confirms the Individualized Nature of Their Claims.

#### 1. Plaintiffs' Different Accounts Create Different Entrepreneurial Opportunities.

FBC Baton Rouge and FBC Tyler distributors have different account compositions and service different types of customers; these distinctions impact the operation of their distributorships and the entrepreneurial opportunities available. Specifically, distributors service cash, authorized charge, and national accounts. Ramon Decl ¶ 11 (Ex. B); Kirkland Decl ¶¶ 11-12 (Ex. C). Distributors collect cash for products sold to cash accounts directly. Louviere Dep. Tr. at 32:15-17; 117:17-119:9 (H. Decl., Att. 1f); Meche Dep. Tr. at 85:1-19 (H. Decl., Att. 1c) (has seven or eight cash accounts and is responsible for collecting the cash for products sold on these accounts.) Distributors can—and many do—extend credit to their cash accounts, setting the payment terms. Ramon Decl ¶ 11 (Ex. B); Kirkland Decl ¶ 12 (Ex. C); D. Richard Dep. Tr. at 46:9-25 (H. Decl., Att. 1b) ("Basically, one of them I decide when I'm going to collect, and the other one, they just pay me whenever."); Meche Dep. Tr. at 85:1-19 (H. Decl., Att. 1c) (has allowed two of his cash accounts to pay just once a week); Works Dep. Tr. At 91:5-18, 92:3-17 (H. Decl., Att. 1i) (decided when his cash accounts would pay).

While some distributors service a significant portion of national or charge accounts, others service several smaller cash accounts. *Compare* D. Richard Depo Tr. at 43:16-44:12 (H. Decl., Att, 1b) (he has "very few" cash accounts and about 80% of his accounts are charge accounts) *with* A. Richard Depo Tr. at 96:17-19 (H. Decl., Att. 1a) (he has several cash accounts); Meche Depo Tr. at 85:1-19 (H. Decl., Att. 1c) (he has seven or eight cash accounts); Doucet Depo Tr. at 70:22-71:25 (H. Decl., Att. 1d) (he has twelve cash accounts and "give[s] them weekly credit"). Distributors generally have more discretion in their cash accounts than

their national accounts. *See, e.g.*, Louviere Depo. Tr. at 96:19-98:2 (H. Decl., Att. 1f) (he has had two cash accounts with whom he was able to negotiate additional shelf space); Meche Depo. Tr. at 28:11-16 (H. Decl., Att. 1c) (admitting he can ask for displays in cash accounts.). *But see id.* at 95:3-96:8 (H. Decl., Att. 1f)) (He tried to negotiate displays in a certain Dollar General but was unable to do so).   Although, even in national accounts, various opportunities exist, this, too, varies by distributor and account.   For example, Gordon admitted that he got a display in Wal-Mart, which the store manager approached him about. He also admitted that he "determined what [he] wanted to put on there." Gordon Depo. Tr. at 15:25-16:18; 17:1-19:15(H. Decl., Att. 1g); *See also, e.g.,* Meche Dep. Tr. at 97:17-99:13; 100:21-101:10 (H. Decl., Att. 1c) ("He asks for displays at his independent accounts and he will also ask Walmart on special occasions.").

        2.     <u>Distributors Take Advantage of Entrepreneurial Opportunities Differently.</u>

There is significant variation in how distributors take advantage of available entrepreneurial opportunities. For example, some distributors regularly hire employees or helpers, including on a full-time basis, while others rarely if ever do. Specifically, Rabeaux admitted that at one time, he "had about 18 or 19 different helpers" and explained that sometimes he hires employees or helpers to work "on standby," while he hires others based on customer demand. Rabeaux Dep. Tr. at 22:25 – 25:24 (H. Decl., Att. 1e). He "always paid them cash" and determined the amount: "If they're just doing pull ups, it's one amount. But, if they're doing both morning and afternoon, it's a different amount." Rabeaux Dep. Tr. at 30:18-32:19 (H. Decl., Att. 1e).   He has his employees call him to report their hours and he logs them when he gets home. Rabeaux Dep. Tr. at 4-7; 8-13 (H. Decl., Att. 1e).   Doucet, for example, hired his step-son to service the distributorship for him on close to a full-time basis in 2012 and 2013 and paid him a salary of $650.00 a week. During that time, Doucet worked mostly for one of his other

businesses. The only work Doucet typically did for his distributorship during that time were pull-ups on Wednesdays and Sundays. Doucet Dep. Tr. at 91:14-92:7; 93:4-23 (H. Decl., Att. 1d). Meche has hired four different employees: two of them help him with Walmart in the mornings and the others help with different tasks. Meche Dep. Tr. at 118:16-20; 119:12-16; 121:5-11 (H. Decl., Att. 1c). Distributors do not need to have these helpers approved by the Company. ***See e.g.***, Gordon Dep. Tr. at 93:5-10; 99:3-5 (H. Decl., 1g). Some distributors, conversely, rarely hire helpers. D. Richard Dep Tr. at 58:19-60:20 (H. Decl., Att.1b) (he does not hire anyone to do pull ups; he currently only has one helper and his sons helped him with one account.)

Distributors also can—and some do—operate significant outside businesses concurrently with the operation of their distributorships. For example, Doucet currently owns and/or assists in operating four different businesses: (1) an independent construction site cleanup business, (2) a rental property business, (3) a cell phone sales business, and (4) a home health business, for which he is President. Doucet Dep. Tr. at 31:8-39:6; 129:2-129:6; 142:19-142:21 (H. Decl., Att. 1d). The health care business alone has "over 200 clients" and **grossed between $3.7 and $4.1 million** from 2012-2014, netting between $320,000-$564,182 per year. Doucet Dep. Tr. at 32:9-10; 142:11-145:23 (H. Decl., Att. 1d). Meche also operated two separate businesses apart from his distributorship, one of which had profits of over $23,000 in 2014. Meche Dep. Tr. at 132:21-134:4; 164:17-165:3 (H. Decl., Att. 1c).

Some distributors have also sold all or a portion of their distribution rights for significant profit. Darrell Richard, for example, sold his territory for $126,208.03 in 2010, pocketing all of this money because his territory was already paid off. D. Richard Dep. Tr. at 31:3-14 (H. Decl., Att. 1b); A. Richard Dep. Tr. at 102:12-20 (H. Decl., Att. 1a) (also admitting he sold a territory for $55,890.); Albritton Dep. Tr. at 94:19-95:18 (H. Decl., Att. 1h) (he sold a portion of his

territory for $12,061). *But compare* Doucet Dep. Tr. at 65:3-63:5 (H. Decl., Att. 1d) (he has never tried to purchase another portion a territory from another distributor.) Some distributors have significant equity in their territories and have paid off their territories in their entirety. Louviere Dep. Tr. at 109:13-110:20 (H. Decl., Att. 1f) (he has not had a note payment since 2007, he paid for his third territory without financing, and he probably has about $87,000 worth of equity in it.).[13] Some distributors engage in significant efforts to build their sales by soliciting new accounts,[14] asking for displays, and entertaining customers, among other things. A. Richard, for example, admits he has entertained customers by taking them out to dinner and invited them to a party at his home. He admits that selling some territory "freed up some of my time to do what needed to be done to grow any kind of sales in my market" as well as get to know customers better. A. Richard Dep. Tr. at 107:7-25; 134:15-25; 137:3-138:2 (H. Decl., Att. 1a). Gordon admits he solicited a new account because "[n]obody was working it" so he "went by and talked to the lady" and "picked up [the] account." Gordon Dep. Tr. at 38:22-40:12 (H. Decl., Att. 1g). *See also* Doucet Dep. Tr. at 72:1-74:1 (H. Decl., Att. 1d) ("If a new shop opened up, I'll check in." One example is LeBlanc's Grocery, "I stopped, and they're still buying stuff from me now."); Meche Dep. Tr, at 117:4-11 (H. Decl., Att. 1c) (he gives customers his cell phone number and his independent accounts contact him directly). Others do not. *Compare* Albritton Dep. Tr. at 148:24-149:13 (H. Decl., Att. 1h) (claiming he "really do[es]n't have the time" to pitch new products and do marketing). Other distributors recommend new products or change the product facings within their space. D. Richard, for example, admits that at "all stores

---

13 A. Richard Dep. Tr. at 44:21-45:9 (H. Decl., Att. 1a) (he built up equity in his business by himself).

14 *See, e.g.,* Gordon Depo. Tr. at 15:25-16:25; 17:1-19:15(H. Decl., Att. 1g) (has gotten displays in Walmart based on his good relationship with the store manager); Meche Dep. Tr. at 97:17-99:13; 100:21-101:10 (H. Decl., Att. 1c) ("He asks for displays at his independent accounts and he will also ask Walmart on special occasions.").

I've basically changed some – some product facings." D. Richard Dep. Tr. at 55:21-56:10 (H. Decl., Att. 1b). *See also, e.g.*, Meche Dep. Tr. at 88:5-18 (H. Decl., Att. 1c) (he recommends products to his account Super Foods "whenever new products come out".) Others do not. And, these examples are, by no means, exhaustive. *See also* D. Richard Dep. Tr. at 49:17-21; 50:9-10 (H. Decl., Att. 1b) (admitting that, at his independent charge account because he has a good relationship with the manager, he is "able to do pretty much, you know, whatever that we both deem is, you know, good for the store" and "can pretty much work it out directly with the store manager.").

3. Plaintiffs' Experience Significantly Different "Control," If Any.

Plaintiffs assert that they are uniformly "control[ed] [at] every level of the distribution process." (Doc. 105-1, Pg. ID# 668) But, their deposition testimony reveals otherwise or that "control," if any, varies. For example:

- **Plaintiffs report significantly varied interactions with sales management.** Louviere Dep. Tr. 59:12-61:2 (H. Decl., Att. 1f) (Sales Managers have not ridden along with him since he started; his Sales Manager only visited him in the field about 10 times since 2012.); Doucet Dep. Tr. 107:11-109:12; 110:13-14) (H. Decl., Att. 1d) (Sales Managers visited him in the field "every now and then" and he talks to the Director of Sales "[m]aybe once a week, [m]aybe less than that."); *Compare* D. Richard Dep. Tr. 70:22-71:19 (H. Decl., Att. 1b) ("He speaks to his Sales manager "pretty regularly" and sometimes talks to him daily about the job"); and Gordon Dep. Tr. 54:15-56:14 (H. Decl., Att. 1g) ("He talks to Sales Managers, Dennis and Robbie "almost every day" and "I call sometimes and just talk to them as friends, and I'll call and talk to them as business").

- **Plaintiffs report significantly varied experiences with regard to management changes to their orders.)** A. Richard Dep. Tr. 87:8-11 (H. Decl., Att. 1a) ("Sometimes when we got there, there was product added to us that we weren't expecting, and being as we were getting charged for it whether we cut it or not, then I would just take.")**;** Rabeaux Dep. Tr. 106:1-18 (H. Decl., Att. 1e) (product was added "weekly".) *But Compare* Albritton Dep. Tr. 127:2-10 (H. Decl., Att. 1h) (Flowers has never made changes to his orders "unless it was suggested by me."); D. Richard Dep. Tr. at 77:18; 79:17-80:4 (H. Decl., Att. 1b) (having product added is "an infrequent occurrence" that happens more to certain accounts.); Gordon Dep. Tr. at 23:8-23:11; 24:13-25:5; 25:13-25:22 (H. Decl., Att. 1g) (admits he was not sure how many times there may have been changes to orders because "Everybody is different. Every order is

different. Everybody has different stores and different customers and it's not going to be the same.").

- **Plaintiffs decide their own order of servicing customers.** Gordon Dep. Tr. 67:17-69:17 (H. Decl., Att. 1g) (no one at Flowers dictates the order he services customers rather "the way I work the accounts and the order I work them. That's how I determine how I'm going to set my schedule"; he also stated that "[T]he biggest stores have got to be serviced first. You get all your – you get the big stores off your truck so you can service the small stores."); Doucet Dep. Tr. at 83:18-84:7 (H. Decl., Att. 1d) (he determines the order he services customers and he sometimes switches up the order).

4. Plaintiffs Admit They Do Not Want The Relief Sought In This Lawsuit.

Plaintiffs assert they were misclassified as ICs and seek an order declaring them employees. *See Complaint – Prayer for Relief* (Doc. 1, Pg. ID# 18). But, many of them openly admit that they *do not* want to be employees. *See, e.g.,* A. Richard Dep. Tr. at 178:1-4 (H. Decl., Att. 1a) (he "absolutely do[es] not want to be an employee of Flowers."); Rabeaux Dep. Tr. at 130:10-16 (H. Decl., Att. 1e) ("I want to be an independent contractor. I want to be able to be – have an independent business and be able to be – have an independent business and be able to do what I want to do, when I want to do it".)

**D. Plaintiffs Admit They Have No Personal Knowledge Regarding Distributors They Seek To Represent At Any of The Other Warehouses.**

While Plaintiffs contend, in their Motion, that they are similarly situated to everyone in the broad class they seek to represent, they uniformly admit they have no personal knowledge of any distributors' practices beyond their own. For example:

- Gordon admits he does not know the hours other distributors work, what customers they have in their territory, efforts they take to solicit new accounts, whether they have ever changed the price of products sold to their accounts, how often they interact with sales management, whether other distributors use helpers, or how other distributors determine what products to order for their customers and admits "[e]very – every route is different, ma'am, and I have no knowledge of how they go about doing their order." (22:4-24:17, 31:12-32:22). (H. Decl., Att. 1g).

  He also admits he does not know whether sales management makes changes to other distributors' orders because "Everybody is different. Every order is

different. Everybody has different stores and different customers and it's not going to be the same. So I don't know – I don't know that answer." (24:23-25:5). (H. Decl., Att. 1g).

- Louviere admits he has no personal knowledge of how often Sales Managers at other warehouses speak to or ride along with the distributors. (59:6-14). Also admits he does not know of any common policy in which other distributors must service certain customers or how many hours they work. (92:24-93:1; 93:6-15). (H. Decl., Att., 1f).

- Rabeaux admits he does not have knowledge of other distributors' record keeping practices (34:4-6), of management practices at other warehouses (52:1-17), of how other warehouses other than Birdsong operate (49:7-12), or of how often sales management rides with distributors. (49:13-19) (H. Decl., Att. 1e).

- D. Richard admits he has no personal knowledge of how often other distributors ask for displays, recommend products or shelf space to other accounts. (54:1-14) (H. Decl., Att. 1b).

- Doucet admits he does not know the schedules of the other distributors: "Everyone comes at a time that they feel they need to come and do their route and go home." (42:11-43:7) (H. Decl., Att. 1d).

- Albittron admits he has not talked to any distributor outside of Tyler distributors in Ruston or West Monroe. (51:11-20). He also admits he has no way to compare if other distributors have the same primary job responsibilities, start of workday, service timeframes, input into sales or promotions. (137:13-144:1). (H. Decl., Att. 1h).

- Meche admits he does not know distributors from any other warehouse other than Birdsong or Acadiana (18:3-7) and has not personally seen any documents that describe what other distributors might be doing such as their job description or expectations. (29:10-22). He also admits he hasn't spoken to any distributors outside of Baton Rouge. (51:22-53:4). (H. Decl., Att. 1c).

- A. Richard admits he does not know how many cash or charge accounts other distributors have (99:10-12) and that his personal knowledge is limited to him and his distributorship—he has no personal knowledge outside of the West Monroe warehouse. (173:3-8). (H. Decl., Att. 1a).

And, these examples are far from exhaustive.

## III. STANDARD OF REVIEW

The FLSA requires employers to pay nonexempt employees overtime for any time worked beyond the statutory maximum number hours. 29 U.S.C. § 207(a). Pursuant to the

FLSA, a plaintiff may maintain an action to recover wages "on behalf of himself . . . and other employees similarly-situated." 29 U.S.C. § 216(b). The Fifth Circuit has not adopted a specific test to determine when a court should certify a class or grant notice in a § 216(b) collective action; however, most courts in this district have adopted the two-step process set forth in *Lusardi v. Xerox Corp*, 118 F.R.D. 351 (D.N.J. 1987). *See Mooney v. Aramco Servs. Co*., 54 F.3d 1207, 1214 (5th Cir. 1995); *Busby v. Dauterive Contractors, Inc*., 2016 WL 430608, at *2-3 (W.D. La. Feb. 3, 2016); *Virgen v. Conrad*, No. 6:15-cv-0465, 2015 WL 6692120, at *5 (W.D. L.A. 2015). At the first step, called the "notice" or "conditional certification" stage, the court decides whether to conditionally certify the collective action and give notice to potential collective action members. *Mooney*, 54 F.3d at 1214; *Busby*, 2016 WL 430608, at *2-3. To support their request for notice, Plaintiffs must make a preliminary showing that they are "similarly-situated" to the other individuals to whom they seek to represent. *See Busby*, 2016 WL 430608, at *2-3.

**A. The Conditional Certification Standard Is, While Lenient, "By No Means Automatic" And Requires Evidence Of A Common Unlawful Policy.**

The term "similarly-situated" is not statutorily defined; however, it at least requires a showing that the putative class members were "victims of a common policy or plan *that violated the law*." *Simmons v. T-Mobile USA, Inc.*, H-06-1820, 2007 WL 210008 (S.D.Tex.2007) (plaintiff must allege a common policy or plan and make a factual showing sufficient to demonstrate that he or she and potential plaintiffs together were victims of a common policy or plan **that violated the law**) (citations omitted) (emphasis added); *Xavier v. Belfor USA Group, Inc.*, 585 F. Supp. 2d 873, 878. In this Circuit, "[w]hile the burden imposed is not particularly heavy, conditional certification is by no means automatic." *Treme v. HKA Enterprises, Inc.*, No. 07-1134, 2008 WL 941777, at *2 (W.D. La. Apr. 7, 2008) (ultimately denying conditional

certification) (citation omitted). Indeed, as this Court has aptly noted, the lenient standard "is still by no means automatic" nor "is it invisible." *Virgen*, 2015 WL 6692120, at *5-6 (*citing Xavier*, 585 F. Supp. 2d at 878)). At a minimum, Plaintiffs must present "at least some evidence beyond unsupported factual assertions of a single decision, policy, or plan" to support their request for conditional certification. *Treme*, 2008 WL 941777, at *2 (citations omitted). And, as *Mooney* teaches, the policy or plan at issue must be one "infected by discrimination" (i.e. one that violated the law). *Mooney*, 54 F.3d at 1214 ("'the court still requires at least "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination.'").

### B. The Court Should Consider All Evidence Before It When Making This Determination.

When determining whether notice is appropriate, the court should consider *all* the evidence before it (not just that submitted by the plaintiffs) and is not required to accept the substance of plaintiffs' affidavits or depositions over that submitted by the defendants. *Aguirre v. SBC Communs., Inc.*, No. H-05-3198, 2007 WL 772756, at *9 (S.D. Tex. Mar. 12, 2007). This is particularly true when, as here, the parties have agreed to conduct limited discovery prior to conditional certification briefing, including depositions of nine Plaintiffs and opt-ins.

In deciding whether to conditionally certify, a court "has a responsibility to refrain from stirring up unwarranted litigation." *Xavier*, 585 F. Supp. 2d at 878. As this Court has already recognized, careful consideration of whether conditional certification is warranted, even at the notice stage, because it "'would be a waste of the Court's and litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.'" *Virgen*, 2015 WL 6692120, at *6 (*citing Freeman v. Wal-Mart, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)).

*See also Baroni v. BellSouth Telecommunications, Inc.*, No. 02-009, 2004 WL 1687434 (E.D. La. 2004) (citations omitted) ("To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification, would be an exercise in futility and wasted resources for all parties involved.")).

### C. Plaintiffs' Evidence Must Be Based On Personal Knowledge.

To support their motion for conditional certification, Plaintiffs must provide ***competent evidence*** of a "widespread discriminatory plan." *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 707-08 (N.D. Tex. 2008) (quotations omitted) (emphasis added). It is not sufficient to set forth "an unsupported restatement of the allegations contained in the Complaint." *Treme*, 2008 WL 941777, at *3 ("[t]hese uncorroborated assertions, without more, do not fulfill the plaintiff's burden under *Lusardi*"). Moreover, conclusory allegations that other employees are similarly situated, even when set forth in affidavits or declarations, are insufficient to justify conditional certification. *Vargas v. HEB Grocery Co.*, 2012 WL 4098996, at *4 (W.D. Tex. Sept. 17, 2012); *Treme*, 2008 WL 941777, at *2-3 (W.D. La. Apr. 7, 2008) (denying conditional certification because Plaintiffs' "bare and unsupported allegations are simply not enough to carry even the light burden imposed by *Lusardi*"); *Virgen*, 2015 WL 6692120, at *6 (rejecting "conclusory and vague statements" in declarations as being sufficient to justify notice when they lacked "enough facts to show that plaintiff and such other employees were similarly situated"). When, as here, Plaintiffs' allegations are virtually identical, and are based solely on conclusory assertions lacking personal knowledge, the "allegations can hardly be considered substantial." *Songer*, 569 F. Supp. 2d 703, 707–08. As discussed more fully below, Plaintiff's motion for conditional certification must be denied.

## IV. ARGUMENT

Here, Plaintiffs' Motion fails for several reasons, any of which is independently sufficient to deny their Motion. The arguments below and the facts above show that no common proof could settle in a single stroke whether the 9 Plaintiffs deposed alone are "employees" as a matter of "economic reality" under the FLSA[15]—let alone the hundreds of others in the class they seek to represent. This is especially true where Plaintiffs fail to cite a single case from within the Fifth Circuit and rely exclusively on-out-of Circuit authority.[16] Complicating this issue even more are Defendants' individualized, fact-based defenses and the numerous concomitant individualized inquiries necessary to resolve those claims and defenses. As such, collective treatment of Plaintiffs' claims would be completely *in*consistent with and impede—rather than facilitate—the economies of scale upon which collective actions are based. Finally, even if the Court finds the Plaintiffs' "evidence" sufficient to support *some conditionally-certified collective action,* which Defendants deny is appropriate, that conditionally-certified collective action should be limited to, at most, the seven Louisiana warehouses from which the Plaintiffs operated.

### A. Plaintiffs' "Evidence" Is Insufficient and Contradicted, In Large Part, By Their Own Deposition Testimony.

Here, Plaintiffs ask the Court to conditionally certify and send notice to over 200 distributors operating out of 19 (or 24 if you include New Orleans) different warehouses. But, in support, they offer only conclusory allegations and cookie-cutter declarations, which they admit are not based on

---

15 Courts in this Circuit have held Plaintiffs in independent contractor cases must show they are similarly situated with respect to the "economic realities" test under the FLSA. *See e.g., Christianson v. New Park Drilling*, No. H-14-3235, 2015 WL 1268259 at *5 (S.D. Tex. 2015) (denying conditional certification because resolution of whether plaintiffs were independent contractors "will require individual analysis as to each [plaintiff]."); *see also Andel v. Patterson-UTI Drilling Co., LLC,* 280 FRD 287, 289 (S.D. Tex. 2012) (holding individualized nature of determining "economic realities" test required denial of conditional certification),

16 A cursory review of the Plaintiffs' Motion makes it apparent that Plaintiffs cut and pasted portions of the briefing from the *Rehberg et al v. Flowers Foods et al.* matter in the Western District of North Carolina, as evidenced by, among other things, their large reliance on authority from North Carolina federal district courts.

any personal knowledge. *See* evidence cited and discussed in *Section* II(D), *supra.* This evidence fails, as a matter of law, to support their motion. *See Songer*, 569 F. Supp. 2d at 707–08 (denying conditional certification where supporting affidavits were virtually identical and contained conclusory/unsupported allegations). And, the shortcomings in this evidence are even more pronounced in light of their deposition testimony confirming that material differences do, in fact, exist on the factors relevant to independent contractor status. *See* Sections II(B) and (C), *supra.* *See* Order (D.E. 102), *Holmes v. Quest Diagnostics*, 9:11-cv-80567-KMW (S.D. Fla. June 14, 2012). (denying conditional certification, despite 29 opt-ins and 23 declarations from plaintiffs because plaintiffs' declarations were conclusory, 'cookie cutter,' and didn't 'successfully engage defendants' evidence to the contrary").

What is more, Plaintiffs' declarations are, in large part, contradicted by their own deposition testimony—citations to which are noticeably missing from their brief. Tellingly, while nine Plaintiffs were deposed,[17] Plaintiffs do not cite one iota of evidence or testimony from their depositions—instead they rely exclusively upon their uniformly-worded declarations. A comparison of Plaintiffs' declaration testimony, with just a few portions of their *actual deposition* testimony, is telling:

| **Plaintiff's Declaration Testimony** | **Contradictory Deposition Testimony** |
|---|---|
| "I am required to use Flowers' hand held computer and utilize Flowers' computer system, which Flowers provides to me. The hand held computer system tells me the price I must charge for the products, the quantity to deliver . . . ." Louviere Aff ¶ 3 Doc. 105-3, Pg. ID# 1402); Meche Aff ¶ 3 (Doc. 105-3, Pg. ID# 1398); Albritton Aff ¶ 3 (Doc. 105-3, Pg. ID# 1430); Gordon Aff ¶ 4 (Doc. 105-3, Pg. ID# | Louviere Dep. Tr. at 33:4-11; 142:21-146:12 (H. Decl., Att. 1f) (admits "I might not do what the computer's telling me to do" if the previous year was a "flop".)<br><br>Meche Dep. Tr. at 171:11-172:21 (H. Decl., Att. 1c) (he uses a handheld which makes suggestions to order and then he makes adjustments based on what will sell best for |

[17] Pursuant to an agreement between the parties, Defendants deposed two additional plaintiffs after Plaintiffs filed their motion for conditional certification.

| | |
|---|---|
| 1422) | his accounts). *See also* testimony cited in Sections IIB and IIC above.<br><br>Gordon Dep. Tr. at 36:15-37:8 (H. Decl., Att. 1g) (he changed the price of products to a cash account for St. Francis hospital one time.). |
| "I also use the hand held system to place orders for products from Flowers, and Flowers reserve the right to-and regularly do--add and cut product to be delivered without my consent." Albritton Aff ¶ 3 (Doc. 105-3, Pg. ID# 1430)<br><br>"Flowers reserves the right to change the orders I place without my consent and Flowers has historically made changes to my orders without my consent." Richard Aff ¶ 3 (Doc. 105-3, Pg. ID#1414) | Albritton Dep. Tr. at 127:2-10 (H. Decl., Att. 1h) (Flowers has never made changes to his orders "unless it was suggested by me.").<br><br>D. Richard Dep. Tr. at 77:18; 79:17-80:4 (H. Decl., Att. 1b) (having product added is "an infrequent occurrence" that happens more to certain accounts.); |
| "Flowers negotiates directly with customers to determine which products will be sold, how much shelf space is allocated to each product, sales or promotional prices and terms of payment." Albritton, Richard, Meche Affl ¶ 4 (Doc. 105-3, Pg. ID#s 1399, 1414-1415, 1431) ) | Albriton Dep. Tr. at 120:10-121:13 (H. Decl., Att. 1h) (he asks for extra shelf space or displays and "I just put them up if I want them.")<br><br>D. Richard Dep. Tr. at 55:21-56:10 (H. Decl., Att. 1b) (at "all stores I've basically changed some – some product facings.");<br><br>Meche Dep. Tr. at 88:5-18 (H. Decl., Att. 1c) (he recommends products to his account Super Foods "whenever new products come out".) |

**B. <u>Plaintiffs Admitted Lack of Personal Knowledge Regarding Other Warehouses Is Fatal To Their Motion.</u>**

While Plaintiffs attempt to send notice to more than 200 distributors at over twenty-four warehouses in all of Louisiana, as discussed in Section II(D) above, they openly admit, in depositions, that they have no personal knowledge of how distributors in other warehouses—and sometimes even in their own warehouses—operate their businesses. In fact, that admit they lack personal knowledge regarding *fundamental* facts, regarding: (1) hours worked by other

distributors; (2) extent of interaction with sales management; (3) extent of sales activities; (4) account compositions; (5) use of helpers, and many more. *See* Section II(D), *supra.*

Indeed, courts in this Circuit and across this country routinely deny or limit conditional certification where the plaintiffs lack personal knowledge of the others in the putative class. *See e.g., Treme,* 2008 WL 941777, at *2 ("Plaintiffs' bare and unsupported allegations are simply not enough to carry even the light burden imposed by Lusardi"); *Virgen*, 2015 WL 6692120, at *6; *Songer*, 569 F. Supp. 2d 703, 707–08 (same); *Potts v. Nashville Limo & Transp., LLC*, No. 3:14-cv-1412, 2015 WL 4198793, at *6 n.7 (M.D. Tenn. July 10, 2015) ("[T]he court would likely give the [hearsay] statement little to no weight because it is . . . not based on the affiant's own workplace-related observations."). This Court should do the same.

**C. <u>The Individualized Inquiries Required To Adjudicate Plaintiffs' Claims Are Inconsistent With Collective Action Treatment.</u>**

Even if Plaintiffs' "evidence" could be considered competent evidence here (and it cannot), the individualized inquiries necessary to adjudicate their claims independently supports denial of their Motion here.

1. <u>Common Classification As IC, Standing Alone, Is Not Sufficient</u>.

Plaintiffs argue that the IC classification is, in and of itself, a "common plan" sufficient to justify their bid for conditional certification. This argument, however, fails. *See Andel*, 280 F.R.D. at 290 (citing *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 846 (5th Cir.2010)) (internal citations omitted) (rejecting Plaintiffs' argument "that the common 'decision, policy, or plan' to support conditional certification was Defendant's uniform

classification of the Plaintiffs and putative plaintiffs as ICs instead of employees").[18] Rather, instead of merely looking at common classification, the Court "must determine whether the proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole." *Andel*, 280 F.R.D. at 290 *citing Thibault*, 612 F.3d at 846)) (internal citations omitted). Indeed, if common classification was enough—and it is not—every alleged misclassification collective action would be automatically certified.

Here, as discussed above, the model under which Plaintiffs operated, on its face, establishes an IC relationship and contains numerous indicia of IC status. As Plaintiffs admit, they have taken advantage of many of the entrepreneurial opportunities inherent in the model including, for example, owning and operating multiple other businesses, hiring employees, including on a full-time basis, buying and selling portions of their territories, and many others. *See* Section II(C) *supra.* Given this, Plaintiffs are arguing that as a *matter of fact*—as opposed to based upon a formal job description—they were "employed" by Defendants under the "economic realities" test under the FLSA, which necessarily makes individualized practices the central inquiry. And, as discussed below, the individualized inquiries necessary to make this determination are completely inconsistent with collective action treatment and warrant denial of Plaintiffs' Motion here. *See Christianson*, 2015 WL 1268259 at *4-5 (finding putative class members dissimilar with regard to the economic realities test that that "[t]his need for individualized analysis 'eviscerates all notions of judicial economy that would otherwise be served by conditional class certification.'") (*quoting Demauro v. Limo, Inc*., 2011 WL 9191,*3–*4 (N.D.Fla. Jan. 3, 2011)); *see also Andel*, 280 FRD at 290 (due to significant variance in the

---

18 *Xavier*, 585 F. Supp. 2d at 877 (E.D.La.2008) (*quoting Barron v. Henry County Sch. Sys.*, 242 F.Supp.2d 1096, 1104 (M.D.Ala.2003)) ("[T]he mere fact that violations occurred cannot be enough to establish similarity...")

hours worked, pattern of invoice submission, ability to control opportunities for profit and loss, among other things, "the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot be applied to the class as a whole.").[19]

2. Numerous Individualized Determinations Are Required For Each Plaintiff And Opt-In.

It is well-established that "[t]he determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented." *Thibault,* 612 F.3d at 848. The non-exhaustive factors most often considered by the courts are: (1) the degree of control exercised by the alleged employer; (2) the skill and initiative required in performing the job; (3) the extent of the relative investments of the worker and the alleged employer; (4) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; and (5) the permanency of the relationship. *Id.* at 846. Thus, the substantive law centers the Court's focus on individualized inquiries about what each putative class member *actually did* on a daily basis as part of that individual's ownership of an independent business which, as discussed above, can and does vary significantly between those in the putative class. *See Aguirre*, 2007 WL 772756, at *12 ("[T]he plaintiffs are arguing that as a matter of fact, rather than of formal job description, they perform nonmanagerial duties for the majority of their

---

[19] While Plaintiffs may argue that this Court should merely follow the Rehberg decision, Rehberg involved a different subsidiary, different plaintiffs, and different facts. Moreover, Defendants respectfully disagree with Judge Cogburn's ruling, including his undue reliance on a common Distributor Agreement and classification as an IC alone as being sufficient to justify conditional certification, when the underlying model, on its face, creates numerous indicia of IC status. Indeed, as Judge Klausner in the Central District of California aptly noted, in a case involving another Flowers' subsidiary and misclassification claims, the Agreement and many of the provisions cited in Rehberg contained broad standards "not actually mandate[ing] any specific behavior" but merely "set[ting] forth a general framework within which variations abound depending on the practical reality in a given situation." *Martinez v. Flowers Foods, Inc*., No.15-5112, at *11-12 (C.D. Cal. Feb. 1, 2016). Thus, to determine if an employment relationship actually exists, it is necessary to examine individualized, actual practice.

working hours. This requires an analysis of each employee's job responsibilities *under the relevant exemption criteria*.") (emphasis added)[20]

Indeed, numerous courts have already recognized that the individualized inquiries necessarily required to assess IC status under the economic realities test are unavoidable and wholly inconsistent with collective action treatment. *See e.g., Andel*, 280 F.R.D. at 290 (certification denied in IC case because individualized inquiries eliminate the economies of scale envisioned by the FLSA.); *Buttry v. Dollar Gen. Corp.*, No. 3-13-0652, 2014 WL 1347178, at * 3 (M.D. Tenn. Apr. 4, 2014) (unique, individualized analyses of and defenses to plaintiff's claim and each opt-in made proceeding on a collective basis inappropriate); *Demauro v. The Limo, Inc.*, No. 8:10-cv-413-T-33AEP, 2011 WL 9191, at *3-4 (M.D. Fla. Jan. 3, 2011) (certification in IC case inappropriate given the individualized inquiries that are required under economic realities test).

In this case, the determination of independent contractor status requires the Court to consider whether and to what extent each Plaintiff, as a matter of "economic reality" and after balancing all such factors:

- was subject to control over the manner, method, and means of performance;
- took advantage of the various entrepreneurial opportunities available, such as incorporation, hiring a helper, buying or selling portions of territory, and soliciting new accounts;
- realized the opportunity for profit or loss through individualized sales efforts and other opportunities;
- had a substantial investment in the business; and
- worked elsewhere or operated additional businesses.

And, as even the limited deposition testimony taken to date establishes, these factors can and do vary, even among just the few Plaintiffs deposed alone. For example, some distributors hire helpers,

---

[20] *See also Botello v. Coi Telecom, LLC, et al*, No. SA-10-CV-305-XR, 2010 WL 5464824 (W.D. Tex. Dec. 30, 2010) (plaintiffs who were ICs didn't establish they were similarly situated to those in putative class).

some solicit new customers and ask for displays, some buy and sell portions of their territories and/or have built significant equity in their territories, some entertain customers, and some recommend new products, among others. Others do not. *See* Section II(C), *supra*.

3. The Individualized Inquiries Necessary To Adjudicate Multiple Defenses Here Preclude Conditional Certification.

The additional individualized defenses also further weigh against conditional certification here. For example, application of the highly fact-intensive Motor Carrier Act[21] exemption would require determining whether, over what time period, and how long each Plaintiff and opt-in: (1) drove a vehicle with a Gross Vehicle Weight Rating or gross vehicle weight of at least 10,001 pounds or more; (2) drove—or was subject to driving—across state lines; and (3) ordered products for customers that were produced out-of-state and remained in the "practical continuity" of interstate commerce (i.e., they left the warehouse shortly after being ordered). Plaintiffs' alleged personal vehicle use renders this inquiry even more unmanageable and unsuitable for collective adjudication because Plaintiffs typically do not record when, how long, or for what purpose they use their personal vehicles.[22] Thus, individualized testimony from each putative class member is necessary to determine how long and why someone used a personal vehicle each week. Meche's Dep. Tr. at 153:16-156:20; 159:2-13 (H. Decl., Att. 1c) ("Yeah, I mean there's a

[21] To establish the MCA exemption, Defendants must prove that the employee's duties involved the safe operation of motor vehicles weighing at least 10,001 pounds in interstate commerce. *See* 49 U.S.C. § 31132; 29 U.S.C. § 213(b)(1). Individuals driving wholly intrastate routes can be exempt under the MCA exemption if the goods they deliver remain in the "'practical continuity of movement' between the interstate segment and the overall interstate flow." *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009).

[22] Even if the Court accepts the position that occasional use of a personal vehicle is sufficient to render the exemption inapplicable, which Defendants deny, the individualized inquiries present here remain because the Court still has to determine whether personal vehicle use is *de minimis*—an extremely fact-intensive inquiry in and of itself. Meche openly admits that "[t]here's a lot of variables that go into this. There's no said this is what it is, is why everybody's doing it. That's not no way of pinpointing that." Meche Dep. Tr. at 153:9-156:20; 159:2-13 (H. Decl., Att. 1c).

lot of variance...” and due to all of the variables, you would need to talk to each distributor to know how often they use their personal vehicle.).

Second, complicating this analysis even more is the outside sales exemption. 29 CFR § 541.504. To apply this exemption, the Court must also consider several other individualized factors, including, but not limited to: (1) whether sales is their primary duty and what efforts they are making to increase sales; (2) whether the distributor has a customary or contractual arrangement regarding product amounts to be delivered; (3) a comparison of the driver's duties with those of others engaged as truck drivers and as salespersons; and (4) proportion of earnings directly attributable to sales, among others. *See e.g., Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577 (5th Cir. 2013). As discussed above, this, too, can and does vary by distributor and account.

Third, some distributors in the putative class have signed arbitration agreements with class action waivers, and therefore, cannot pursue their claims here. Ramon Decl ¶ 13 (Ex. B); Kirkland Decl ¶ 14 (Ex. C); Murphy Oil U.S.A., Inc. v. NLRB, 808 F.3d 1013 (5th Cir. 2015); *D.R. Horton, Inc. v.* Nat'l Labor Relations Bd, 737 F.3d 344 (5th Cir. 2013). Finally, Plaintiffs’ claims may be barred to the extent they have filed for bankruptcy and did not disclose the claims asserted as assets of the bankruptcy estate. *Davis v. Josi Hosp., LLC*, No. 15-00451-BAJ-RLB, 2016 WL 3023288 at *5-6 (M.D. La., May 24, 2016); *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999).

**D. Even Assuming Some Notice Is Appropriate, Which Is Denied, It Must Be Limited To The Seven Warehouses From Which Plaintiffs From Which The Plaintiffs Operated.**

Should this Court find that some conditionally certified class is appropriate (and it should not), the Court should limit the Notice to distributors in Tyler and Baton Rouge operating out of the seven warehouses from which the Plaintiffs operated: Acadiana, Birdson, Eunice, Lake

Charles (FBC Baton Rouge) and Ruston and West Monroe (FBC Tyler).[23] Limiting notice in this fashion is consistent with the Court's inherent ability and clearly appropriate here. *Green v. Plantation of Louisiana, LLC*, No. CIV. 2:10-0364, 2010 WL 5256354, at *10 (W.D. La. Nov. 24, 2010) ("As in the class-action context, this court has the power to modify an FLSA collective action definition on its own.") (citations omitted); *Baldridge v. SBC Commc'ns, Inc*., 404 F.3d 930, 931–32 (5th Cir.2005) (noting the court's power to "limit the scope" of a proposed FLSA collective action)).

Indeed, district courts in the Fifth Circuit and elsewhere have limited conditional certification in a similar manner where, as here, Plaintiffs' evidence does not support conditional certification of the broad class initially requested:

- *West v. Lowes Homes Centers, Inc*., No. 6:09-1310, 2010 WL 5582941, at *7 (W.D. La. Dec. 16, 2010) ("the collective action should be limited to external MTP candidates only, reserving the plaintiffs' right to request re-certification with respect to internal managers in training after additional discovery.")

- *Vanzzini v. Action Meat Distributors, Inc*., No. H-11-4173, 2012 WL 1941763, at *3 (S.D. Tex. May 29, 2012) ("the Court finds that Plaintiff has satisfied his initial burden with respect to not all hourly workers, but all hourly workers who were classified as contract workers and thus not on the payroll.")

- *Luvianos v. Gratis Cellular, Inc*., No. H-12-1067, 2012 WL 6737498, at *9 (S.D. Tex. Dec. 10, 2012) ("Plaintiffs have provided sufficient evidence, in the form of declaration testimony, that potential class members were treated similarly at locations in Texas and Maryland. The defined class will be limited to reflect only those locations.")

- In *Ross v. Sw. Louisiana Hosp. Ass'n*, No. 2:12-CV-1250, 2013 WL 1818331, at *3 (W.D. La. Apr. 29, 2013) (granting motion to certify collective action but only to the limited extent that plaintiffs sought certification of employees at the company's Cincinnati office, and not the other office locations).

---

23 Tellingly, Plaintiffs did not submit affidavits or testimony in their brief from one their own named Plaintiffs (Antoine Richard) and more than half of their opt ins they had at of the time of their submission. Most importantly, these affidavits are from individuals who only contracted with four warehouses: Birdsong, Acadiana, Ruston and West Monroe. Accordingly, Plaintiffs arguably do not even have testimony to support the limited seven warehouses which Plaintiffs currently comprise.

The *Ross* case is illustrative. In *Ross,* the court was also called upon to decide the proper scope of the conditional class. *Ross*, 2013 WL 1818331 at *3. The plaintiffs in that matter requested conditional certification of "all current and former employees at LCMH, from any time from April 20, 2009 to the present, who worked over forty hours a week and who worked more hours than shown on their pay stubs." *Id.* Defendants in opposition argued that the "plaintiffs' request is overly broad, since, based on the affidavits provided, only employees of the Psychiatry Department at the LCMH Oak Park campus appear to be affected by the alleged FLSA violations." *Id.* In making its determination, the court noted that plaintiffs' evidence was limited because they "only provided affidavits from" two "employees of the LCMH Oak Park campus's Department of Psychiatry." *Id.* In addition, Plaintiffs did not present HR with evidence to reflect the asserted similar "payroll discrepancies". *Id.* Accordingly, Defendants' asserted that the conditional certification "should be limited to employees of the LCMH Oak Park campus's Psychiatry Department." *Id.* The Court agreed, limiting the conditionally-certified class to the locations from which plaintiffs presented evidence.

This approach is consistent with the approach adopted by the Western District of Tennessee in a case involving another Flowers' subsidiary. When faced with a similar situation involving a putative collective action challenging independent contractor status of distributors who contracted with another Flowers' subsidiary, the U.S. District Court for the Western District of Tennessee limited conditional certification to the four warehouses from which Plaintiffs presented evidence. *See* Order (D.E. 81)*, Stewart v. Flowers Baking Co. of Batesville, LLC,* 1:15-cv-01162-JDB-egb (W.D. Tenn. August 12, 2016). <u>This Court should do the same</u>.

While Plaintiffs may argue that the Court should just conditionally certify because it can always decertify later, this argument must fail; it ignores the *practical realities* of what happens

after conditional certification. In sum, conditional certification is not a "no-harm, no-foul" proposition. Rather, if the Court grants conditional certification and authorizes notice to distributors at all fifteen of FBC Baton Rouge's warehouses and at all four of FBC Tyler's Louisiana warehouses, the Court will trigger extensive discovery obligations for Defendants. This discovery (particularly electronic discovery) can be extremely expensive and a burden that Defendants will mostly bear alone. Defendants will incur a significant portion of these discovery-related expenses for naught if (as Defendants expect) the Court ultimately decertifies this case.

The better approach, as discussed above and as adopted by numerous courts in this Circuit, limits conditional certification only to those locations from which Plaintiffs presented evidence and denies their broader request for notice. Indeed, this fair approach will avoid the "stirring up of litigation through unwarranted solicitation" that would occur if the Court conditionally certifies all Louisiana distributors despite Plaintiffs' repeated admissions establishing that they do not know whether they are truly similarly situated. *See e.g., Hickson v. U.S. Postal Service*, No. 5:09CV83, 2010 WL 3835885, at *4 (E.D. Tex. Sept. 28, 2010) (denying a motion to conditionally certify and rejecting Plaintiffs' contentions that manageability considerations were premature at the first stage, noting that "the Court is not convinced the Magistrate Judge gave undue consideration to the manageability issue at this stage. Plaintiffs' objections are without merit."). Indeed, at the conditional certification stage, the Court must also ensure that Defendants are not unduly burdened by frivolous "fishing expeditions"—particularly as the Court's conditional certification decision is not immediately appealable. *See White v. Integrated Electronics Technologies, Inc.*, No. 11-2186, 2013 WL 2903070, at *6. *See also Baroni*, 2004 WL 1687434 at *10 (citations omitted) ("To create a collective action class,

including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification, would be an exercise in futility and wasted resources for all parties involved.”)).

**E. <u>Plaintiffs’ Notice Is Inappropriate.</u>**

Should the Court order notice, which Defendants deny is appropriate, it should require the parties to meet and confer regarding the terms of the notice and reject their request for an unreasonably long opt-in period and duplicative notices. Defendants set forth several non-exhaustive defects with the notice below:

1. <u>A 90-Day Notice Period Is Too Long.</u>

First, Plaintiffs’ request for a 90-day notice period is unreasonable here. Rather, the Court should approve a 45-day notice period instead, consistent with the approach adopted by numerous other district court cases in the Fifth Circuit. While longer opt-in periods have been permitted in certain circumstances, they typically “involve cases where potential plaintiffs are hard to contact due to their migration or dispersal” or where there was a language barrier that may make notice especially cumbersome. *See e.g. Marshall*, 2016 WL 279003, at *12 (*distinguishing Lima v. Int'l Catastrophe Sols., Inc.*, 493 F. Supp. 2d 793, 804 (E.D. La. 2007) (a 45-day opt-in period would be more appropriate in this matter because “[l]onger opt-in periods have been granted in cases where potential plaintiffs are hard to contact due to their migration or dispersal.”); *Martinez v. Cargill Meat Sols*., 265 F.R.D. 490, 501 (D. Neb. 2009) (“There is no evidence the putative plaintiffs are a transient population, or that due to vocation, they may not timely receive their mail… Forty-five days is sufficient time for putative plaintiffs to consider their options…”). Plaintiffs have failed to establish that any of these circumstances are present here to warrant extended notice. As such, a 45-day notice period is more than appropriate here.

2. Reminder Notices To Those Who Have Not Responded Are Unnecessary.

Further, Plaintiffs' request for reminder notices must be denied. Plaintiffs have failed to present any facts to justify why multiple notices are appropriate. Absent any such reason, one notice is appropriate. *Roberts v. S.B. S. Welding, LLC*, No. 3:14-cv-3617-B, 2015 WL 8773610, at *3 (N.D. Tex. Dec. 15, 2015) (sustaining Defendants' objection and not allowing reminder notices because "he [plaintiff] has not provided any specific information regarding these workers' travel schedules, or explained why sending multiple notices to the same address combats the problem that no one may be home."); *see also Santinac v. Worldwide Labor Support of Illinois, Inc.*, 107 F. Supp. 3d 610, 619 (S.D. Miss. 2015) (denying request without prejudice until presentation of a "compelling reason" to issue such reminder.)[24] Moreover, sending reminder notices could also have the unintended consequence of being "interpreted as encouragement by the [C]ourt to join the lawsuit." *Roberts v. S.B. S. Welding, LLC*, 2015 WL 8773610, at *3 (N.D. Tex. Dec. 15, 2015) (*citing Witteman v. Wis. Bell, Inc.*, 2010 WL 446033, at *3 (W.D. Wis. Feb. 2, 2010)).[25]

3. Posting Notice In The Workplace Is Inappropriate.

Posting notice in the workplace is also unnecessary here, as Plaintiffs have provided no evidence to establish that mail, alone, would be insufficient. See, e.g., *DeKeyser v. Thyssenkrupp Waupaca*, Inc., No. 08-c-483, 2008 WL 5263750, at *6 (E.D. Wis. Dec. 18, 2008)) ("Because it is unclear why transmitting the notice by first class mail and publishing it

---

24 While there is a split on this issue in the district courts, the reminder notice here is clearly not warranted as Plaintiffs proffered no facts in support.

25 Indeed, district courts in the Fifth Circuit are hesitant to order reminder notices to go out based on speculation alone. *Leyva v. 35 Bar and Grill, LLC*, No. SA-15-CA-295-FB, 2015 WL 5751638, at *7 (W.D. Tex. Sept. 22, 2015) ("Plaintiff has not cited authority, or provided argument, to show that it is appropriate to incur costs relating to the sending of a second notice to persons simply based on the speculation that the person must have lost the original notice or forgot about its contents. The United States District Court for the Southern District of Texas has denied a plaintiffs' request for a reminder notice as unnecessary and inappropriate.").

through newspapers would be insufficient, I will not order Waupaca to post the notice in its plants").

## V. CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' Motion in its entirety. Alternatively, if the Court determines some class is appropriate, the Court should limit the scope of conditional certification to the seven warehouses from which Plaintiffs and opt-ins operated.

Respectfully submitted,

/s/ *Matthew M. McCluer*
Gregory Guidry, LA Bar No. 06489
Matthew M. McCluer, LA Bar No. 33970
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
603 Silverstone Road, Suite 102A
Lafayette, LA 70508
Telephone: 337.769.6583
701 Poydras Street, Suite 3500
New Orleans, LA 70139
Telephone: 504.648.3852
Facsimile: 504.648.3859
Email: greg.guidry@ogletreedeakins.com
matthew.mccluer@ogletreedeakins.com

* Margaret Santen Hanrahan, GA Bar No. 578314
* Michael Ray, IL Bar No. 6285109
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379
Email: maggie.hanrahan@ogletreedeakins.com
michael.ray@ogletreedeakins.com

** Admitted Pro Hac Vice*

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Defendants' Response in Opposition to Plaintiffs' Motion For Conditional Certification has been served on all counsel of record via the Court's Electronic Filing System.

This 3rd day of October, 2016.

/s/ *Matthew M. McCluer* ____________________
Matthew M. McCluer

26395745.1