# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

ANTOINE RICHARD, ET AL          CIVIL ACTION NUMBER 15-cv-2557

VERSUS          JUDGE HICKS

FLOWERS FOODS, INC., ET AL          MAGISTRATE JUDGE WHITEHURST

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

Respectfully submitted,

STEVEN G. DURIO (#05230)
RYAN M. GOUDELOCKE (#30525)
**Durio, McGoffin, Stagg & Ackermann**
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, LA   70505-1308
Phone:   (337) 233-0300
Fax:       (337) 233-0694
Email:   durio@dmsfirm.com
         ryan@dmsfirm.com
**Attorneys for Plaintiffs**

#373741

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES..................................................................... iii, iv, v, vi

MEMORANDUM ....................................................................................................... 1

I.  FACTUAL BACKGROUND................................................................... 3
   A.  Distributors Control  All Pricing and All Common Economic Realities ..........3
   B.  Defendants Exclusively Control All Sales and Marketing Efforts.................14

II.  ARGUMENT...................................................................................... 16
   A.  Standard for Decertification ................................................................ 16
      1.  No Individuality of Affected Distributors' Claims Because of a
          Uniform Policy .................................................................. 19
         a)  Common Evidence Establishes Defendants Uniformly Classify
             All Distributors as Independent Contractors ...........................20
         b)  The Evidence Shows Plaintiffs Are Similarly Situated because
             they are Subject to Uniform Control by Defendants ...............27
            i.  Degree of Control ........................................................30
            ii.  Relative Investments...................................................31
            iii.  Worker's Opportunity for Profit and Loss .................32
            iv.  Skill and Initiative .....................................................32
            v.  Permanency of the Relationship.................................34
      2.  No Individuality Regarding Defendants' Defenses............................36
         a)  Common Evidence Proves Plaintiffs are Not Subject to the
             Motor Carrier Act Exemption..................................................37
         b)  Common Evidence Proves Distributors are not subject to the
             Outside Sales Exemption of the FLSA...................................41
      3.  Fairness and Procedural Concerns Favor Denial of Decertification ...44
          A Judicially Efficient Alternative to Decertification...........................47
      4.  Under Identical Facts, the Rehberg Court Denied Flowers Motion to
          Decertify Class ................................................................49
   III.  CONCLUSION ......................................................................... 51

CERTIFICATE OF SERVICE...................................................................... 52

i

#373741

# TABLE OF AUTHORITIES

CASES:

*A.H. Philips v. Walling*, 324 U.S. 490 (1945) .......................................................................36, 40

*Acevedo v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516 (5th Cir.2010) ...............................17

*Aguilar v. Complete Landsculpture, Inc.,* 2004 WL 2293842, (N.D. Tex. 2004).........................48

*Aguirre v. SBC Communications, Inc.,* 05-3198 2006 WL 964554 (S.D. Tex. 2006) .................18

*Aikens v. Warrior Energy Services*, 2015 WL 1221255 (S.D. Tex. 2015)....................................40

*Allen v. Coiled Tubing Services*, 775 F.3d 279 (5th Cir. 2014).........................................36, 39, 40

*Anderson v. Cagle's, Inc.,* 488 F.3d 945 (11th Cir. 2007) ...........................................................18

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515
(1946)..........................................................................................................................................23

*Baker v. Flint Engineering & Construction Co.,* 137 F.3d 1436 (10th Cir. 1998).......................33

*Barefoot v. Mid-American Dairymen* 1994 WL 57686 (5th Cir. 1994) ...................................38, 39

*Basco v. Wal-Mart Stores, Inc.,* No. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) .........18

*Boudreaux v. Schlumberger Tech. Corp.* 2015 WL 796602 (W.D. La. 2015)..............................17

*Bradford v. Bed Bath and Beyond,* 184 F.Supp.2d 1342 (N.D.Ga.2002) ....................................45

*Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042 (5th Cir.1987) .......................................28, 29, 30

*Brown v. Body & Soul Services, Inc.,* 2017 WL 2198192 (W.D. La. 2017) .................................17

*Carrell v. Sunland Construction, Inc.,* 998 F.2d 330 (5th Cir. 1993) ...........................................31

*Clark v. Centene Co. of Tex., L.P.,* 44 F.Supp.3d 674 (W.D.Tex.2014) ..........................19, 25, 45

*Collins v. Sanderson Farms, Inc.,* 568 F.Supp.2d 714 (E.D. La. 2008).......................................48

*Crain v. Helmerich & Payne Int'l Drilling Co.,* No. 92–0043, 1992 WL 91946 (E.D. La. Apr. 16,
1992).............................................................................................................................................18

*Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)....................17

*Dole v. Snell,* 875 F.2d 802 (10th Cir. 1989)...............................................................................33

ii

#373741

*Donohue v. Francis Services., Inc.,* 2004 WL 1406080 (E.D. La. 2004) ..................................... 45

*Donovan v. Grim Hotel*, 747 F.2d 966 (5th Cir. 1984) ......................................... 16, 28

*Donovan v. Janitorial Services*, 672 F.2d 528 (5th Cir. 1982) ...................................... 16

*Donovan v. Sabine Irrigation*, 695 F.2d 190 (5th Cir. 1983) ......................................... 16

*Ebbs v. Orleans Parish School Board*, no. 04-1198 2014 WL 12717703 (E.D. La. March 31, 2014) .......................................................................................................... 19, 27, 44

*England v. New Century Financial Corporation,* 370 F. Supp. 2d 504 (M.D. La. 2005) ............. 20

*Escobedo v. Dynasty Insulation, Inc.,* 2009 WL 2382982 (W.D. Tex. 2009) ............................. 20

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) ............................... 48

*Falcon v. Starbucks Corp.,* 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008) ....................... 23, 45, 46

*Falk v. Brennan*, 414 U.S. 190, 195. 94 S.Ct. 427, 38 L.Ed.2d 406 (1973) ......................... 16, 28

*Frank v. Capital Cities Communications, Inc.,* No. 80–CIV–2188–CSH, 1983 WL 643 (S.D.N.Y. Oct. 11, 1983) ........................................................................................... 18

*Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 (D. Minn. Sept. 24, 2007) .................. 19

*Gray v. Powers*, 673 F.3d 352 (5th Cir. 2012) ...................................................... 16, 28

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299 (5th Cir.1998). 28, 31, 32, 46

*Hernandez v. Alpine Logistics*, 2011 WL 3800031 (W.D.N.Y. 2011) .......................................... 40

*Hill v. Muscogee County School Dist.,* 2005 WL 3526669, at \*2 (M.D.Ga.2005) ................. 18, 23

*Hoffmann–LaRoche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989) ...................................................................................................... 44

*Hopkins v. Cornerstone America*, 545 F.3d 338 (5th. Cir. 2008) ................... 28, 29, 30, 31, 32, 34

*In re Delta Air Lines*, 310 F.3d 953 (6th Cir. 2002) ..................................................... 49

*In re Pilgrim's Pride Fair Labor Standards Act Litigation.*, 2008 WL 4877239 at \*4 (W.D. Ark. Mar. 13, 2008) ........................................................................................... 48

*Johnson v. Big Lots Stores, Inc.,* 561 F. Supp. 2d 567 (E.D. La. 2008) ............................... 20, 27

*Johnson v. TGF Precision Haircutters, Inc.*, No. 03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) .......................................................................................................... 44

*Jones v. Colonial Nursing Home, Inc.,* 2017 WL 3175926 (W.D. La. 2017) .............................. 17

*Kelly v. Healthcare Services Group, Inc.,* 106 F. Supp. 3d 808 (E.D. Tx. May 18, 2015).............. ....................................................................................................... 19, 24, 26, 27, 45

*Lipnicki v. Meritage Homes Corp.,* 2014 WL 5620603 (S.D.Tex. Nov. 4, 2014) ....................... 27

*Lusardi v. Xerox Corp.,* 122 F.R.D. 463 (D.N.J. 1988) ................................................. 17

*Martin v. Selker Bros., Inc.,* 949 F.2d 1286 (3d Cir. 1991) .......................................... 33

*Mooney v. Aramco Servs. Co.,* 54 F.3d 1207 (5th Cir.1995) ...................................... 17, 18, 19, 36

*Moore, et al v. Performance Pressure Pumping, et al,* WL 1501436 *8 (W.D. Tex. 2017) ........ 40

*Moreau v. Klevenhagen,* 956 F.2d 516 (5th Cir.1992) ................................................. 23

*Moresi v. Res. Energy Ventures & Constr. Co.,* Civil Action No. 6:15-cv-2224 (W.D. La., 2017) .................................................................................................................... 48

*Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233 (11th Cir. 2008) .......................... 19, 20, 46

*Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)........................................................................................................... 28

*Nerland v. Caribou Coffee Co., Inc.,* 564 F.Supp. 2d 1010 (D. Minn. 2007) ................. 20, 43, 45

*Olivo v. GMAC Mortg. Corp.,* 374 F.Supp.2d 545 (E.D.Mich.2004) .......................... 18

*Prickett v. DeKalb County,* 349 F.3d 1294 (11th Cir. 2003)..................................... 44, 46

*Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278 (N.D. Tex. 2008) ........................ 20

*Rehberg v. Flowers Baking Company,* Docket No. 3:12-cv-00596 (W.D.N.C. 2015) .....21, 44, 50

*Reich v. Circle C. Investments, Inc.,* 998 F.2d 324 (5th Cir.1993)................................ 46

*Reich v. Priba Corp.,* 890 F. Supp. 586 (N.D. Tex. 1995)........................................... 30

*Rikard v. U.S. Auto Prot., LLC,* 2013 WL 5532688 (E.D. Mo. 2013) .......................... 48

*Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662 (5th Cir. 1983)............................ 34

*Roche, et al v. S-3 Pump Service,* 154 F.Supp.3d 441 (W.D. Tex. 2016) .............................. 19, 40

*Roussell v. Brinker International, Inc.,* 441 Fed. Appx. 222, 22 (5th Cir. 2011)............... 17, 19, 36

*Sandoz v. Cingular Wireless, LLC,* 553 F.3d 913 (5th Cir. 2008) ................................. 44

iv

*Simmons v. T–Mobile,* No. H–06–1820, 2007 WL 210008 (S.D.Tex. Jan. 24, 2007) ................. 18

*Singer v. City of Waco*, 324 F3d 813 (5th Cir. 2003) ...................................................... 38

*Smith v. Manhattan Management Co.,* Civil Action No. 14-2623, July 6, 2105, pg. 20 (E.D. La., 2015) ....................................................................................................................................... 23

*Songer v. Dillon Resources,* 618 F.3d 467 (5th Cir. 2010) .......................................... 36, 37, 39, 40

*Takacs v. Hahn Auto. Corp.*, 1999 WL 33127976 (S.D. Ohio 1999) ............................................ 49

*Thibault v. Bellsouth Telecommunications, Inc.,* 612 F.3d 843 (5th Cir. 2010) .......................... 31

*Thiebes v. Wal-Marts Stores, Inc.*, 1999 WL 1081357 (D. Ore. 1999) ........................................ 49

*Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ....................... 48, 49

*Thompson v. Bruister and Associates, Inc.*, 967 F.Supp.2d 1204 (M.D. Tenn. 2013) ........... 18, 19

*Tolentino v. C & J Spec-Rent Services, Inc.*, 716 F.Supp.2d 642 (S.D. Tex. 2010) .................... 18

*Usery v. Pilgrim Equip. Co., Inc.,* 527 F.2d 1308 (5th Cir. 1976) ................................................ 32

*Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp.2d 703 (January 31, 2014) ....... 26, 37, 38

*Wang v. Chines Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005) ............................................ 43

*White v. NTC Transportation*, 2013 WL 5874566 (N.D. Miss. 2013) .......................................... 48

*Wilks v. Pep Boys*, 2006 WL 2821700 (M.D. Tenn. 2006) ............................................... 46, 48, 49

*Williams v. Henagan*, 595 F.3d 610 (5th Cir. 2010) .............................................................. 16, 28

*Xavier v. Belfor USA Group, Inc.,* 585 F.Supp.2d 873 (E.D.La. Sep. 23, 2008) ........................ 17


STATUTES:

26 U.S.C. §3121 (d)(3) ................................................................................................... 7, 21, 22

26 C.F.R. §31.3121(d)-1(d) ................................................................................................ 7, 21

29 U.S.C. §207(a)(1) ............................................................................................................. 38

29 U.S.C. § 213(b)(1) ...................................................................................................... 37, 39

29 U.S.C. § 216(b) ................................................................................................................. 16

29 U.S.C. § 254(a) ................................................................................................................. 23

#373741

29 C.F.R. § 541.700(a) ...................................................................................41, 42

29 C.F.R. § 701 .....................................................................................................43

29 C.F.R. § 782.2(a) ............................................................................................39

49 U.S.C. § 31502(b)(2) ......................................................................................39

#373741

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION**

**MAY IT PLEASE THE COURT:**

Plaintiffs respectfully submit one trial on common evidence is exceedingly more efficient than 100 trials. One trial would avoid the inefficiencies of redundantly briefing the same issues, presenting redundant evidence, and asserting identical arguments. Additionally, one trial of these common issues will promote comity by eliminating the risk of conflicting opinions on the important issue of the Plaintiffs' employment classification. There has been no competent showing by Defendants that one trial on these common issues of law and fact would be "enormously unmanageable". Nor have they shown sufficiently individualized claims and/or defenses warranting a less efficient, less expedient, and simply unnecessary series of 114 trials. Instead, Plaintiffs respectfully submit they have sufficiently demonstrated competent "representative evidence" to proceed to trial as a certified collective action.

The "representative evidence" shows—and Defendants[1] have admitted—that Defendants uniformly classify all Distributors as independent contractors. This gigantic misclassification eclipses the miniscule, immaterial arguments advanced by Defendants. The type of accounts serviced, experience in the industry, or type of vehicle utilized are inconsequential. While these inquiries may have been made by counsel in discovery depositions in this case, Defendants ignored these considerations to misclassify the Plaintiffs. Similarly, Defendants uniformly classify Distributors as statutory employees for purposes of collecting FICA taxes, without such

---

[1] Flowers Foods, Inc. ("Flowers") and Flowers Baking Company of New Orleans ("FBC-New Orleans"), Flowers Baking Company of Baton Rouge ("FBC-Baton Rouge") and Flowers Baking Company of Tyler ("FBC-Tyler") (collectively "Defendants").

individualized inquires.  Simply put, Defendants saddle all the Distributors with the same economic harness.

The primary contract governing the relationship—the Distributor Contract—is essentially uniform. All Distributors signed the same Distributor Agreement under the same conditions. None of these important contracts are ever actually negotiated by any Distributor or even the bakery to whom the Distributor reports. Instead, since at least 1994 Chuck Rich, the Vice President of Distributor Operations for subsidiary Flowers Bakeries, LLC, has maintained control over the terms and preparation of the document for all 31 direct store delivery ("DSD") bakeries under Flowers Bakeries, LLC., including those made parties to this suit. When Defendants or any other of these 31 DSD bakeries contract with a new Distributor, Chuck Rich receives from the bakery the Distributors' information for insertion into the standard form Distributor Agreement.  This common contractual legal nexus is the primary evidence of the Defendants' control over the economic relationship.

Defendants' uniformly control all Plaintiffs' pricing. Defendants control the prices Distributors pay them as well as the prices paid by customers to Distributors for the same product.  None of the Plaintiffs or opt-ins have any control over the price. Instead, decisions regarding price are made by the management arms of the network of defendants, and particularly parent Flowers Foods, Inc. and non-party Flowers Bakeries, LLC. The same economic harness is strapped upon all Distributors.

Defendants embellish inconsequential differences among the Distributors.  Differences are sure to abound when one examines 114 Distributors' individual circumstances close enough; however, such matters are legally insignificant. Indeed, rare is the collective action where there are no subtle differences among a collective group. Defendants simply ignore this broader picture

2

#373741

that all Plaintiffs are subject to the same policies and control. Defendants distort the reality of the retail landscape.

For the following reasons, the Court should deny Defendants' motion to decertify the collective action.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    DISTRIBUTORS CONTROL ALL PRICING AND ALL COMMON ECONOMIC REALITIES.

The class members are essential to the operation of Defendants' business. Defendants rely almost exclusively on their Distributors to deliver their products to the ultimate consumer.[2] Any disruption in Defendants' DSD model would materially and uniformly affect Defendants' financial condition, operations and cash flow.[3]

Distributors' importance is underscored by the fact that they are first hired as "prospective Distributors" before becoming official Distributors.[4] The majority of them are first hired by Defendants through temporary employment agencies.[5] There are no educational requirements, work history or specific skills required to become a prospective Distributor.[6] Defendants recruit prospective distributors who are "dependable" with "stable work history," and caution that the "failure to recruit quality prospective distributors leads to more turnover, more wasted time and money, and more problems."[7]

---

[2] Deposition of Duane Ramon, (Exhibit 10) p. 53; Deposition of Randy Hymel, (Exhibit 11) p. 166-168; Deposition of Sam Houston, (Exhibit 12) p. 71.
[3] Response to Request for Admissions No. 19 for Flowers Foods, Inc. (Exhibit 3).
[4] Deposition of Sam Houston, (Exhibit 12) p. 146-147; Deposition of Duane Ramon, (Exhibit 10) p. 174; Deposition of Randy Hymel, (Exhibit 11) p. 146.
[5] Deposition of Sam Houston, (Exhibit 12) p. 76-77; Deposition of Larry Brock (Exhibit 13) p. 32-33; Deposition of John Lofton, (Exhibit 14) p. 90-92.
[6] Deposition of Duane Ramon, (Exhibit 10) p. 287-290; Deposition of Raymond Francis, (Exhibit 15) p. 28; Distributors need not even have a high school diploma to eligible to become a prospective distributor.
[7] Deposition of Ray Kirkland, (Exhibit 16) p. 34-35.

#373741

All prospective Distributors are required to complete the same training provided by Defendants.[8] There is no dispute that prospective Distributors are employees for purposes of the Fair Labor Standards Act and are paid an hourly rate, including overtime wages.[9]

Only after they complete training and become full-fledged Distributors are defendants regulated as "Independent Contractors."[10] In this process, all Distributors are required to sign the same Distributor Agreement, and to participate in the same distributorship program.[11] The total relationship between the Distributors and the Defendants is governed by the Distributor Agreement.[12] Since 1994 Defendants have made some minor revisions, but the contract has remained the same for each Plaintiff.[13] The Plaintiffs' job duties are the same whether you are looking at an old Distributor Agreement or a new one.[14] Defendants do not dispute that the Distributor Agreements are common to all of their Louisiana Distributors.

Each Distributor Agreement misclassifies each Distributor as a "common law independent contractor," not entitled to overtime pay but as a "statutory employee" for tax purposes.[15] This fact alone suffices for class certification: "classification of individuals as independent contractors is evidence of an overarching policy and points toward the conclusion that the putative members of the collective action were subject to a single plan.... applicable Distribution Agreements contained in the record are significantly similar, if not identical, in

---

[8] Deposition of Ray Kirkland, (Exhibit 16) p. 38-39; Deposition of Sam Houston, (Exhibit 12) p. 154; Deposition of Larry Brock, (Exhibit 13) p. 178; Deposition of Randy Hymel, (Exhibit 11) p. 146-148; Deposition of Duane Ramon, (Exhibit 10) p. 174-175.
[9] Deposition of Ray Kirkland, (Exhibit 16) p. 279-280; Deposition of Larry Brock, (Exhibit 13) p. 32-33; Deposition of John Lofton, (Exhibit 14) p. 93-94.
[10] Deposition of Ray Kirkland, (Exhibit 16) p. 40; Deposition of Mike Zeringue, (Exhibit 17) p. 188-189; Deposition of John Lofton, (Exhibit 14) p. 93.
[11] Deposition of Mike Zeringue, (Exhibit 17) p. 66; Deposition of Randy Hymel, (Exhibit 11) p. 156-157; Deposition of Sam Houston, (Exhibit 12) p. 45-46; See Response to Request for Admissions No. 1 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[12] 30(b)(6) Deposition of Ray Kirkland, (Exhibit 18) p. 12;
[13] Deposition of Ray Kirkland, (Exhibit 16) p. 35-37.
[14] Deposition of Ray Kirkland, (Exhibit 16) p. 35-37.
[15] See Distributor Agreement (Exhibit 1) paragraph 15.1.

#373741

material respects."[16]   Additionally, all other substantive and procedural provisions provided by the Distributor Agreement are applied by Defendants uniformly.

None of the Plaintiffs have been permitted to negotiate the Distributor Agreement. Instead, the document must be signed as written.[17]   The Distributor Agreement requires Distributors to use their "best efforts" to advance "good industry practice," two noticeably subjective provisions underscored in each and every Distributor Agreement. While enforcement of these pro-company provisions may understandably vary among the bakeries, the requirement that each Distributor properly observe each provision and the consequences for failing to so observe them remains the same.

Other provisions of the contract are indicative of an employee relationship. Among them are restrictions on the sale of stale products,[18] mandatory compliance with all promotions and feature pricing with respect to major and chain accounts,[19] approval by Defendants prior to disposition of any rights in a territory,[20] prohibition to carry or distribute products Defendants deem competitive products,[21] and control over termination of the Distributors' rights in and to a territory.[22]   The Distributor Agreement even includes a Covenant Not to Compete, which is further evidence of an employer/employee relationship and the control exercised by the Defendants over the alleged "independent" Distributors.[23]

---

[16] *Scott v. Bimbo Bakeries, USA, Inc.*, 2012 WL 645905 at *8 (E.D. Penn., 2012)(quoting *Westfall v. Kendle International*, 2007 WL 486606 at *9 (N.D. W. Va. 2007).

[17] Deposition of Artie Ferrill, (Exhibit 19) p. 31-32; Deposition of Randy Hymel, (Exhibit 11) p. 265-266.

[18] Distributor Agreement (Exhibit 1) paragraph 11.3; Response to Request for Admission Nos. 9 and 20 for Flowers Foods, Inc. (Exhibit 3).

[19] Distributor Agreement (Exhibit 1) paragraph 12.2.

[20] Distributor Agreement (Exhibit 1) paragraph 14.1;

[21] Distributor Agreement (Exhibit 1) paragraph 5.1

[22] Distributor Agreement (Exhibit 1) paragraphs 16.1-16.4; Deposition of Ray Kirkland, (Exhibit 16) p.176-178; Deposition of Mike Zeringue, (Exhibit 17) p. 98; Deposition of Bruce Naquin, (Exhibit 20)   p. 13-19, 52, 59; Deposition of John Lofton, (Exhibit 14) p. 122; Deposition of Cartrell Williams, (Exhibit 21) p. 83-84.

[23] Distributor Agreement (Exhibit 1) paragraph 20.8.

#373741

All Distributors are also required to execute a "Distributor Checklist."[24]  This document also permits Defendants to represent Distributors in the pursuit of business opportunities and the negotiation of prices with national accounts.   The Distributor Agreement and Distributor Checklist confirm that defendants are authorized agents for Plaintiffs in negotiating these business arrangements, and Defendants actually exercise that right to control the affairs that materially affect the Plaintiffs' bottom line.[25]  This actual authority is not merely limited to pricing, but includes restrictions on the ability of Distributors to independently operate their business and contains all terms necessary to obtain and keep the customer's business for Defendants' benefit.[26]  These documents are used by Defendants to ensure all Distributors uniformly perform their job duties.[27]

Defendants reclassify all Distributors from employees to "independent contractors" after they sign the Distributor Agreement.[28]  There is no change in job duties to support the reclassification, only a change in how Defendants pay the Distributors.[29]  Defendants continue to control Distributors' daily routines.  Defendants do not distinguish among Distributors based on the type of accounts they serve. Distributors are classified as independent contractors whether they are servicing "mom-and-pop" accounts or mostly large chain accounts.[30]

---

[24]  Deposition of Ray Kirkland, (Exhibit 16) p. 150; Deposition of Duane Ramon, (Exhibit 10) p. 218-219; Deposition of Randy Hymel, (Exhibit 11) p. 163.
[25]  The average Distributors' territory sales are 86% - 90% from authorized charge account.  See note 117 at page 29, *infra*, and Exhibit 8.
[26]  See Distributor Checklist (Exhibit 2).
[27]  See Distributor Checklist (Exhibit 2).
[28]  Deposition of Raymond Francis, (Exhibit 15) p. 144,
[29]  Deposition of John Lofton, (Exhibit 14) p. 33-37; Deposition of Jason Craven, (Exhibit 22) p. 17-18.
[30]  Deposition of Ray Kirkland, (Exhibit 16) p. 173-178; Deposition of Artie Ferrill, (Exhibit 19) p. 34-37; Deposition of Bruce Naquin, (Exhibit 20) p. 25-28; Deposition of Raymond Francis, (Exhibit 15) p. 98-99.

#373741

Defendants classify all distributors as "statutory employees".[31] Therefore, all Distributors receive a W-2 annually and not a form 1099. In making this designation, Defendants annual make the following required representations to the Internal Revenue Service (IRS) with respect to each and every Distributor:

- Distributors are agents of Defendants;

- Distributors are paid on a commission basis;

- Distributors **substantially perform personal services** (i.e. their work is not done by others);

- Distributors **do not have a substantial investment** in their equipment or property; and

- Distributors **perform services** for Defendant **on a continuing basis**.[32]

This fact alone belies any consequence of using a "helper" as discussed by Defendants in their Motion, and it contradicts Defendants' assertion that the Distributors have a "substantial investment in the business."[33] Nevertheless, despite years of these representations to the IRS and practical application in accordance with such representations, Defendants now advance assertions to the contrary for purposes of this suit.

According to Defendants' Answers to First Amended Class and Collective Action [Docs. 9, 11, 12 and 13], all of their Louisiana Distributors share the same job classification, are paid in the same manner and on the same terms (no overtime), and engage in essentially identical job

---

[31] In the 1980's Flowers asked for a "letter ruling" from the IRS certifying that its distributorship model resulted in distributors being classified as "independent contractors." After investigation, the IRS indicated it would deny Flowers's request. Upon receiving this information, Flowers withdrew its request for the letter ruling. The IRS then suggested that Flowers should classify its distributors as "statutory employees" based, in part, on the lack of investment in facilities by Distributors and Flowers agreed. See deposition of Jimmy Woodard (Exhibit 44). The deposition of Jimmy Woodward was taken in the *Rehberg* case August 25, 2015. Flowers produced Jimmy Woodward's deposition through discovery in the instant matter. See also discussion in this Memorandum on pages 21-22, *infra*.

[32] *See* 26 U.S.C. §3121(d)(3); 26 C.F.R. §31.3121(d)–1(d). [Emphasis added.]

[33] Flowers contests that distributors build up "equity" in the routes they run, neglecting to clarify that that "equity" is simply eventual, and often hypothetical, reimbursement to distributors for paying Flowers (at punitive interest rates) for the privilege of running those routes.

#373741

duties: "deliver and sell products to various customers, stock products on store shelves, and assemble promotional displays…"[34] Although their routes differ by size and customer mix, all Distributors share the same primary job responsibility of servicing retailers and restaurants with their "best efforts" and in accordance with "good industry practice.[35]

The Distributor Agreement defines "good industry practice" as including: maintaining an adequate and fresh supply of products in all outlets requesting service, properly rotating products, promptly removing all stale products, maintaining proper service and delivery to all outlets requesting service, and maintaining all equipment in a sanitary condition and in good, safe working order.[36] By enforcing these standards, Defendants control nearly every detail of the Distributors' work. Defendants' corporate testimony shows that "good industry practice" is applied broadly, and satisfactory performance depends on whether the non-party customer is satisfied with the service by each Distributor.[37] "So yeah, we [Flowers] determine if there's good industry practice that's breached there, or not."[38]

"Best efforts" is likewise subjective and subject to considerable discretion by Defendants.[39] If the Defendants decide a Distributor has not used his "best efforts" it is considered a "material

---

[34] See Paragraph 2 of Defendants' Answers for First Amended Class and Collective Action [Docs. 9, 11, 12 and 13].
[35] Deposition of Dennis Lewis, (Exhibit 24) p. 128; Deposition of Duane Ramon, (Exhibit 10) p. 180; Deposition of Randy Hymel, (Exhibit 11) p. 156-157. Although Defendants define "good industry practices" as "standards that have developed and are generally accepted and followed in the baking industry" no employee of the Defendants could testify as to the actual and customary standards and practices of Flowers competitors in the baking industry. See Deposition of Ray Kirkland, (Exhibit 16) p. 143-144; Deposition of Gary Davis, (Exhibit 23) p. 121-122; Deposition of Duane Ramon, (Exhibit 10) p. 179-181; Deposition of Mike Zeringue, (Exhibit 17) p. 225-226; Deposition of Randy Hymel, (Exhibit 11) p. 145; Deposition of Sam Houston, (Exhibit 12) p. 151-154.
[36] Distributor Agreement (Exhibit 1) paragraph 2.6; Deposition of Dennis Lewis, (Exhibit 23) p. 130-133; Deposition of Larry Brock, (Exhibit 13) p. 147-148; Deposition of John Lofton, (Exhibit 14) p. 123, Response to Request for Admission No. 20 for Flowers Foods, Inc. (Exhibit 3).
[37] Deposition of Duane Ramon, (Exhibit 10) p. 173; Deposition of John Lofton, (Exhibit 14) p. 155-156; Deposition of Dennis Lewis, (Exhibit 23) p. 128.
[38] Deposition of Ray Kirkland, (Exhibit 16) p. 146.
[39] Deposition of Duane Ramon, (Exhibit 10) p. 180; Deposition of John Lofton, (Exhibit 14) p. 144-147; Deposition of Ray Kirkland, (Exhibit 16) p. 146.

#373741

breach" of the Distributor Agreement.[40] Satisfactory performance of this standard is not customer driven.[41] If the Defendants decide a Distributor has not used his "best efforts" it is considered a "material breach" of the Distributor Agreement.[42] Instead, in making this determination Defendants focus on their own business needs. Distributors must do whatever Defendants decide are "best efforts" and "good industry practice."[43]

Defendants uniformly apply control over these important contractual provisions. Flowers Foods, Inc.'s 2015 Form 10-K shows that **_all_** "independent distributors are responsible for ordering products, stocking shelves, maintaining special displays, and visiting customers frequently to ensure adequate inventory and removing unsold goods."[44]

Historically, Defendants have openly agreed that their largest sources of revenue are the ultimate customers with whom Defendants work closely to maximize sales.[45] Distributors merely deliver the bread! As explained by an annual report prepared by Flowers:

> We have national accounts for key trade customers, bakery teams that build relationships on a local level, and a business analysis and insights team that provides our trade partners with objective ideas that can benefit their overall bakery category. We also work with trade customers in other ways – from web based ordering to scan-based trading or pay-by-scan ("PBS"). In foodservice, we partner with national chains to develop customized bakery items that meet specific needs.[46]

Defendants further control Distributors through the equipment required to complete their jobs. This equipment is furnished by Defendants and required to be used by all Distributors. Such

---

[40] Distributor Agreement (Exhibit 1) paragraph 5.2.
[41] Deposition of Dennis Lewis, (Exhibit 24) p. 130-133; Deposition of Gary Davis, (Exhibit 23) p. 122-124; Deposition of John Lofton, (Exhibit 14) p. 141-142.
[42] Distributor Agreement (Exhibit 1) paragraph 5.2.
[43] Deposition of Gary Davis, (Exhibit 23) p. 137-141; Deposition of Randy Hymel, (Exhibit 11) p. 144-145; Deposition of John Lofton, (Exhibit 14) p. 149-151; Deposition of Ray Kirkland, (Exhibit 16) p. 146-148.
[44] Flowers Foods, Inc. SEC 10-K Annual Report, January 2, 2016, attached as Exhibit 5.
[45] Deposition of Ray Kirkland, (Exhibit 16) p. 214-215, 221; Deposition of Randy Hymel, (Exhibit 11) p. 199.
[46] Flowers Foods, Inc. Annual Report 2011, p. 4; 2012, p. 4; 2013, p. 5; 2014, p. 4; attached as Exhibit 6, *in globo*.

#373741

equipment includes handheld computers and operating procedures.[47] Distributors must use the handheld computers and the operating system that the Defendants provide, and Distributors cannot order products without the handheld computer.[48] Defendants use the handheld computers to track the Distributors' orders and each stop made by a Distributor on any given day.[49] While Distributors must supply their own delivery vehicles which may obviously vary, Defendants make financing available to all Distributors to help them purchase the "recommended" vehicles.[50]

All Plaintiffs generally follow the same daily and weekly routines. They begin their days by arriving at their respective warehouses to load product onto their trucks, which Defendants' employees have sorted, organized, and packed for each Distributor.[51] Distributors pick up and turn on the handheld computer the Defendants have assigned to him.[52] Distributors then proceed on their delivery routes as dictated by their Distributor Agreements.[53] Distributors must deliver only the products that the customers on their routes have requested or authorized through Flowers.[54] When they arrive at their outlets, Distributors unload their trucks and follow a predetermined

---

[47] Deposition of Ray Kirkland, (Exhibit 16) p. 41, 131; Deposition of Larry Brock, (Exhibit 13) p. 127; Deposition of Artie Ferrill, (Exhibit 19) p. 42-43; Deposition of Chris Meche, (Exhibit 25) p. 38-40; Response to Request for Admissions No. 14 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4); Response to Request for Admissions Nos. 10 and 11 for Flowers Foods, Inc.(Exhibit 3).

[48] Deposition of Ray Kirkland, (Exhibit 16) p. 41-42, 131-132; Deposition of Dennis Lewis, (Exhibit 24) p. 117; Deposition of Larry Brock, (Exhibit 13) p. 127; Deposition of Artie Ferrill, (Exhibit 19) p. 42-43; Response to Request for Admissions No. 12 for Flowers Foods, Inc. (Exhibit 3)("Distributors are unable to perform contractual duties that require the use of the handheld without it, such as product ordering and entering sales transactions.").

[49] Deposition of Ray Kirkland, (Exhibit 16) p. 133; Deposition of Mike Zeringue, (Exhibit 17) p. 93; Deposition of Larry Brock, (Exhibit 13) p. 138; Deposition of Artie Ferrill, (Exhibit 19) p. 36; Deposition of Dennis Lewis, (Exhibit 24) p. 118.

[50] Deposition of Sam Houston, (Exhibit 12) p. 130; Deposition of Gary Davis, (Exhibit 23) p. 185; Deposition of Bruce Naquin, (Exhibit 20) p. 40.

[51] Deposition of Artie Ferrill, (Exhibit 19) p. 68, 119, 157-158; Deposition of Mack Gordon, (Exhibit 26) p. 121-124.

[52] Deposition of Mack Gordon, (Exhibit 26) p. 121-124; Deposition of Earl Abadie, (Exhibit 27) p. 80-81.

[53] Deposition of Tim Pejsach, (Exhibit 28) p. 135-139.

[54] Deposition of Mike Zeringue, (Exhibit 17) p. 134; Deposition of John Lofton, (Exhibit 14) p. 168-169; Deposition of Ray Kirkland, (Exhibit 16) p. 128-129, 200, 218-219; Deposition of Gerald Breaux, (Exhibit 29) p. 47; Response to Request for Admissions No. 6 for Flowers Foods, Inc. (Exhibit 3).

#373741

planogram received from Defendants for stocking product—they do not have discretion in placing product on the shelves.[55]

All Distributors are required to rotate product and to remove stale product according to standards promulgated by Defendants.[56] No Distributors have any discretion to promulgate any such standards of their own, or to negotiate with the customer any such standards.[57] After they finish stocking, Distributors order products for the following week.[58] The required handheld computer allows Defendants to provide all Distributors with "suggested orders" for each retailer, but Defendants' sales teams' retain ultimate control over quantities ordered and discretion to adjust orders placed by any Distributor.[59] Indeed, Defendants admit that "during the applicable time period [Defendants have] had the ability to modify Distributor orders" and "may have ordered additional products for Distributors."[60]

All Distributors are required to return to Defendants stale product, or else Distributors will be penalized by not receiving credit for such items.[61] Defendants even dictate where in the

---

[55] Deposition of Ray Kirkland, (Exhibit 16) p. 199-200; Deposition of Mike Zeringue, (Exhibit 17) p. 82-87; Deposition of Tommy Trahan, (Exhibit 30) p. 132; Deposition of Randy Hymel, (Exhibit 11) p. 195-199; Deposition of Raymond Francis, (Exhibit 15) p. 63, 174-175; Deposition of Kenneth Seals, (Exhibit 31) p. 72-75 ("So I'm forced to put these English muffins and bagels in some country town . . . . A hundred percent stales.").
[56] Deposition of Mack Gordon, (Exhibit 26) p. 122; 30(b)(6) Deposition of Ray Kirkland, (Exhibit 18) p. 51-52, 66-67; Deposition of Ray Kirkland, (Exhibit 16) p. 170-172; Deposition of Mike Zeringue, (Exhibit 17) p. 64; Deposition of Randy Hymel, (Exhibit 11) p. 144.
[57] Deposition of Randy Hymel, (Exhibit 11) p. 42-43; Deposition of Mack Gordon, (Exhibit 26) p. 81-82; Deposition of Mike Normand, (Exhibit 32) p. 162-163; Deposition of Ray Kirkland, (Exhibit 16) p. 191 ("It is my responsibility to maintain the marketing program. . .").
[58] Deposition of Donnie Tellis, (Exhibit 33) p. 118.
[59] Deposition of Larry Brock, (Exhibit 13) p. 101, 138, 168-169; Deposition of Ray Kirkland, (Exhibit 16) p. 133; Deposition of Duane Ramon, (Exhibit 10) p. 241; Deposition of Gerald Breaux, (Exhibit 29) p. 49; Deposition of Raymond Francis, (Exhibit 15) p. 97-98; Deposition of Michael Normand, (Exhibit 32) p. 129; Deposition of Mack Gordon, (Exhibit 26) p. 27-29; Deposition of Chad Holcomb, (Exhibit 34) p. 122-123; Deposition of Earl Abadie, (Exhibit 27) p. 46-47, 56; Deposition of Jerry Bell, (Exhibit 35) p. 32-32; Deposition of Tim Pejsach, (Exhibit 28) p. 58-60; Deposition of Jeffrey Zelman, (Exhibit 36) p. 116-120; Deposition of Artie Ferrill, (Exhibit 19) p. 34-37 ("they can add or cut as much product as they want to your order. So they can change the order at anytime.").
[60] Response to Request for Admissions Nos. 18 and 19 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[61] Deposition of Sam Houston, (Exhibit 12) p. 281-282; 30(b)(6) Deposition of Ray Kirkland (Exhibit 18) p. 51-52, 66-67; Response to Request for Admission No. 9 for Flowers Foods, Inc. (Exhibit 3).

#373741

warehouses Distributors must return the product.[62] At the end of the day, Distributors dock their handheld computers in a cradle at the warehouse and the product orders are transmitted to the Defendants.[63]   Defendants review the orders and then send the orders to the bakeries for production.[64]

After the Distributor has serviced his route for the day, all Distributors are subject to and required to perform "call backs" for any account to deliver more products.[65]  Distributors are on 24 hour call, "it's 24/7, absolutely."[66] If a Distributor refuses to perform a "call back", Defendants intervene and arrange for the delivery and deduct from the Distributors' weekly earnings a delivery charge and related mileage costs.[67] On Wednesday and Sunday Distributors perform "pull ups" by returning to the customer's outlet to restock shelves from back room inventory.[68]  Distributors routinely use small personal vehicles for these purposes in an effort to mitigate their expenses.[69]

---

[62] Deposition of Sam Houston, (Exhibit 12) p. 281-282; 30(b)(6) Deposition of Ray Kirkland (Exhibit 18) p. 51-52, 66-67; Deposition of Bruce Naquin, (Exhibit 20) p. 52; Deposition of Mark Bueche, (Exhibit 37) p. 93.

[63] Deposition of Chuck Rich, (Exhibit 38) p. 150-153;  30(b)(6) Deposition of Chuck Rich (Exhibit 39) p. 175-176; Deposition of Ray Kirkland, (Exhibit 16) p. 133-134; Deposition of Bruce Naquin, (Exhibit 20) p. 48; Deposition of Earl Abadie, (Exhibit 27) p. 80, Deposition of Mack Gordon, (Exhibit 26) p. 104, 122-123, 136.

[64] 30(b)(6) Deposition of Chuck Rich, (Exhibit 39) p. 175-176; Deposition of Ray Kirkland, (Exhibit 16) p. 271-272; Deposition of Duane Ramon, (Exhibit 10) p. 58-60.

[65] Deposition of Chris Meche, (Exhibit 25) p. 72 ("this is what happens when you have call backs . . . it's a lot of times."); Deposition of Jeff Zelman, (Exhibit 36) p. 145-146; Deposition of Ray Kirkland, (Exhibit 16) p. 173-174; Deposition of Sam Houston, (Exhibit 12) p. 166-168.

[66] Deposition of Greg Trumbach, (Exhibit 40) p. 152; Deposition of Duane Ramon, (Exhibit 10) p. 241; Deposition of Ray Kirkland, (Exhibit 16) p. 174; Deposition of Jeff Zelman, (Exhibit 36) p. 145-156.

[67] Deposition of Tim Pejsach, (Exhibit 28) p. 118-119; Response to Request for Admissions No. 13 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).

[68] Deposition of Raymond Francis, (Exhibit 15) p. 32-33, 37-38, 47; Deposition of Tim Pejsach, (Exhibit 28) p. 109-110, 137-138; Deposition of Duane Ramon, (Exhibit 10) p. 195; Deposition of Chris Meche, (Exhibit 25) p. 26-27, 94-95; Deposition of Gerald Breaux, (Exhibit 29) p. 34-35; Deposition of Jeffrey Zelman, (Exhibit 36) p. 60, 105; Deposition of Benjamin Botos, (Exhibit 41) p. 74, 87; Deposition of Mark Bueche, (Exhibit 37) p. 89-90; Deposition of Eral Abadie, (Exhibit 27) p. 24-25; Deposition of Chris Riley, (Exhibit 42) p. 62, 111-112; Deposition of Michael Normand, (Exhibit 32) p. 72; Deposition of Mack Gordon, (Exhibit 26) p. 83-85, 123-124; Deposition of Cartrell Williams, (Exhibit 21) p. 51; Deposition of Artie Ferrill, (Exhibit 19) p. 116-118; Deposition of Bruce Naquin, (Exhibit 20) p. 65; Distributors usually perform 2 pull-ups per week on Wednesday and Sunday.

[69] Deposition of Mack Gordon, (Exhibit 26) p. 84-85; Deposition of Jeffrey Zelman, (Exhibit 36) p. 60; Deposition of Earl Abadie, (Exhibit 27) p. 75-76; Deposition of Chris Meche, (Exhibit 25) p. 75-77, 78-79; Deposition of Chris Riley, (Exhibit 42) p. 111-114; Deposition of Michael Normand, (Exhibit 32) p. 70-72; Deposition of Artie Ferrill, (Exhibit 19) p. 116-118; Deposition of Mack Gordon, (Exhibit 26) p. 85-86; Deposition of Bruce Naquin, (Exhibit 20)  p. 64-65; Deposition of Jerry Bell, (Exhibit 35) p. 87-89; Deposition of Mark Bueche, (Exhibit 37) p. 89-90.

#373741

Distributors place orders via the handheld computers supplied by the Defendants. Defendants sell products to Distributors at a discounted percentage off of the suggested wholesale price determined by the Defendants.[70] Distributors resell such products to customers for a higher amount.[71] In almost every case, this sales price is determined by Defendants to the exclusion of the Distributors.[72] Virtually all of the sales are generated by charge accounts authorized by the Defendants.[73] In these authorized charge accounts, Defendants receive the customer payments directly from the customer. Effectively, Defendants "buy[s] the accounts receivable from the Distributors and subsequently collect such accounts receivables from the authorized charge accounts."[74]

Each week there is a financial reconciliation prepared by Defendants for such product purchases, Distributor sales and other debits and credits between Defendants and Distributors.[75] By Friday of every week, all Distributors must provide Defendants with a full settlement of all products provided to Distributors in the preceding week.[76] Despite this burdensome requirement, Defendants actually compile this data from the Distributors' rented handheld computers to prepare a

---

[70] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[71] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[72] Deposition of Mack Gordon, (Exhibit 26) p. 82; Deposition of Earl Abadie, (Exhibit 27) p. 59, 84; Deposition of Mark Bueche, (Exhibit 37) p. 180-181; Deposition of Chris Meche, (Exhibit 25) p. 44-46; Deposition of Gerald Breaux, (Exhibit 29) p. 47; Response to Request for Admission No. 3 for Flowers Foods, Inc. (Exhibit 3)("Because of market dynamics, Flowers Foods . . . seeks to obtain the best price possible for products sold to the National Account. . . .a distributor cannot charge more than the suggested wholesale price . . .").
[73] Deposition of John Lofton, (Exhibit 14) p. 105; Deposition of Randy Hymel, (Exhibit 11) p. 89-90; Deposition of Chris Meche, (Exhibit 25) p. 44; Deposition of Donnie Tellis, (Exhibit 33) p. 58; Deposition of Gerald Breaux, (Exhibit 29) p. 22, Deposition of Earl Abadie, (Exhibit 27) p. 30; Deposition of Tim Pejsach, (Exhibit 28) p. 95; The average percentage of sales generated by authorized charge accounts (accounts which Distributors have no control) is 86% for Louisiana warehouses of FBC-Baton Rouge, 89% for Louisiana warehouses of FBC-New Orleans and 90% for Louisiana warehouses of FBC-Tyler. See Exhibit 8.
[74] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[75] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4); Deposition of Benjamin Botos, (Exhibit 41) p. 159-162.
[76] Distributor Agreement (Exhibit 1) paragraph 8.1.

#373741

settlement statement given to all Distributors weekly.[77] Defendants impose warehouse and administrative fees on all Distributors, which are deducted from their weekly settlement checks.[78]

Prior to January 1, 2018, Distributors could take time off from their weekly distribution routines. Defendants would charge each Distributor $50.00 per week for the first week and $250.00 for the second week to service the Distributor's route.[79] Defendants were required to approve the scheduling of any vacation time for Distributors.[80]

Defendants also routinely monitor all Distributors' performance and discipline to Distributors that "fail to perform."[81] This is done through physical market checks and from scrutiny of data from the hand-held computers.[82] Defendants discipline Distributors who do not conform to service standards.[83]   Defendants issue ten (10) day breach letters when Distributors have "failed to perform" their obligations under the Distributor Agreement, or to employ their "best efforts" to comply with "good industry practice."[84]

---

[77] See sample Weekly Settlement Sheet (Exhibit 7); Response to Request for Admissions No. 8 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4); Deposition of Gerald Breaux, (Exhibit 29) p. 58-67; Deposition of Jeffrey Zelman, (Exhibit 36) p. 53.

[78] See sample Weekly Settlement Sheet (Exhibit 7); Deposition of Larry Brock, (Exhibit 13) p. 132-138; Deposition of Gerald Breaux, (Exhibit 29) p. 54-55; Deposition of Jason Craven, (Exhibit 22) p. 69-70; Deposition of Tim Pejsach, (Exhibit 28) p. 150-151, 160; Deposition of Chris Meche, (Exhibit 25) p. 38.

[79] Deposition of Ray Kirkland, (Exhibit 16) p. 274-275; Deposition of Raymond Francis, (Exhibit 15) p. 31; Deposition of Jason Craven, (Exhibit 22) p. 46; Deposition of Mack Gordon, (Exhibit 26) p. 80-81; Response to Request for Admissions No. 10 for FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).

[80] Deposition of Ray Kirkland, (Exhibit 16) p. 274; Deposition of Randy Hymel, (Exhibit 11) p. 230.

[81] Distributor Agreement (Exhibit 1) paragraph 16.1; Deposition of Donnie Tellis, (Exhibit 33) p. 142; 30(b)(6) Deposition of Ray Kirkland, (Exhibit 16) p. 79; Deposition of Chris Meche, (Exhibit 25) p. 70-71.

[82] Deposition of Ray Kirkland, (Exhibit 16) p. 148-149; Deposition of Donnie Tellis, (Exhibit 33) p. 142; Deposition of Sam Houston, (Exhibit 12) p. 164-165.

[83] Deposition of Ray Kirkland, (Exhibit 16) p. 156, 160, 165, 176-178; Deposition of Sam Houston, (Exhibit 12) p. 159; Deposition of Mack Gordon, (Exhibit 26) p. 127 ("I was told to go to Texarkana to pick up bread . . . or Sam [Houston] was going to . . . give me three 10 day letters and run me off.").

[84] 30 (b)(6) Deposition of Ray Kirkland, (Exhibit 18) p. 79; Deposition for Ray Kirkland, (Exhibit 16) p. 143, 146, 156, 165-166; Deposition of Larry Brock, (Exhibit 13) p. 91-92, 147-148; Deposition of Mack Gordon, (Exhibit 26) p. 138; Deposition of Raymond Francis, (Exhibit 15) p. 15, 177-178, 180; Deposition Mike Normand, Exhibit 32) p. 161-162;   To underscore the control the Defendants have over the Distributors there is this exchange with Ray Kirkland, Vice President of FBC-Tyler: Q: [W]ho makes the final determination if there has, in fact, been a failure of performance? A: I do.  Flowers Baking of Tyler." See Deposition of Ray Kirkland, (Exhibit 16) p. 149.

#373741

All Distributors are required to cure the "breach" in a manner satisfactory to the Defendants within 10 days, or Defendants may terminate the Agreement.[85]   Even if the Distributor cures the breach, Defendants may still terminate the Agreement if the Defendant decides there has been a chronic failure to perform.[86] Defendants also control the performance by the enforcement of a stale cap[87] and in making charges against the Distributor's account.[88]   "With Distributors, hit their pockets.  That's how you - - that's how you get their attention."[89]

## B.   DEFENDANTS EXCLUSIVELY CONTROL ALL SALES AND MARKETING EFFORTS.

Defendants exclusively handle all marketing and sales activities with the ultimate consumer. Defendants claim this is demanded by the market[90] as a result of a substantial change in the market over the last thirty (30) years.[91]  As a result of this market shift, Defendants created a national accounts team to represent Defendants in negotiations with each retailer or restaurant.[92]

Defendants provide these customers with a single national account manager because these larger accounts demand, "one-point-of-contact type relationships."[93]   The national accounts managers initiate discussions with or respond to inquiries from national accounts regarding the type of Flowers products they will sell.[94] Defendants employ separate bread and cake marketing teams and utilize a consumer research company to forecast consumer trends for retailers to enable

---

[85] Distributor Agreement (Exhibit 1) paragraph 16.3; Deposition of Ray Kirkland, (Exhibit 16) p. 83-84, 119, 181-182, 192-193.

[86] Deposition of Ray Kirkland, (Exhibit 16) p. 165-166.

[87] A "stale cap" is a metric Flowers uses to determine how efficiently and accurately Distributors place product orders. See 30(b)(6) Deposition of Ray Kirkland, (Exhibit 18) p. 51-52; Deposition of Ray Kirkland, (Exhibit 16) p. 264-265, 268; Deposition of Cartrell Williams, (Exhibit 21) p. 69; Deposition of Mack Gordon, (Exhibit 26) p. 131-132, 144; Deposition of Carnell Williams, (Exhibit 43) p. 27-29; A mandatory stale cap was placed on all Louisiana Distributors beginning January 1, 2018.

[88] Deposition of Cartrell Williams, (Exhibit 21) p. 70; Deposition of Benjamin Botos, (Exhibit 41) p. 169-162.

[89] Deposition of Cartrell Williams, (Exhibit 21) p. 70.

[90] Deposition of Chuck Rich, (Exhibit 38) p. 38-44.

[91] Deposition of Chuck Rich, (Exhibit 38) p. 38-44. In the 1980s, Defendants' customers were local, independent supermarkets and "mom and pop" shops, whereas today, the majority of Defendants' sales are made to nationwide accounts like Wal-Mart, Family Dollar, and Burger King.

[92] Deposition of Chuck Rich, (Exhibit 38) p. 38-42, 184; Deposition of Randy Hymel, (Exhibit 11) p. 42

[93] Deposition of Chuck Rich, (Exhibit 38) p. 39-42; Deposition of Randy Hymel, (Exhibit 11) p. 52.

[94] Deposition of Randy Hymel, (Exhibit 11) p. 42; Response for Request for Admissions No. 1 for Flowers Foods, Inc. (Exhibit 3).

#373741

Defendants and retailers to make informed decisions on product selection.[95]   Defendants also prepare sales presentations to pitch new products, to initiate meetings with potential and existing customers, to lead proposal meetings, to bring samples of products to customers, and to offer suggested retail and wholesale pricing.[96]

Defendants' also interact with the Distributors' customers at the outlets.  Defendants' sales managers call on accounts, seek out new accounts, develop and maintain good relationships with store managers, solicit from retailers more shelf space for promotions,[97] and even present customers with opportunities for new products.[98] Defendants' sales teams are typically involved in store "resets" to obtain more shelf space.[99] Defendants regularly run reports on Distributors' route performance to identify opportunities to increase sales, but the company does not directly share such data with Distributors; rather, that information is used by Defendants exclusively to increase sales in retail outlets.[100]

No Distributors have the option or time to engage in these profit generating activities.[101] Distributors do not realistically have the opportunity to propose to retailers new products or pricing because retailers refuse to entertain product discussions with hundreds of individual Distributors.[102]  Similarly, Distributors cannot negotiate shelf space with national accounts (chain retailers).[103]  Nor are they involved in store resets to secure optimal product placement.[104]

---

[95] Deposition of Randy Hymel, (Exhibit 11) p. 42-43; Deposition of Raymond Francis, (Exhibit 15) p. 120;
[96] Deposition of Randy Hymel, (Exhibit 11) p. 42-43; Deposition of Raymond Francis, (Exhibit 15) p. 120; Deposition of Mack Gordon, (Exhibit 26) p. 81-82; Deposition of Chris Meche, (Exhibit 25) p. 58-59;
[97] Deposition of Duane Ramon, (Exhibit 10) p. 93, 237-239; Deposition of Jerry Bell, (Exhibit 35) p. 170; Deposition of Mike Zeringue, (Exhibit 17) p. 26, Deposition of Randy Hymel, (Exhibit 11) p. 203, 30(b)(6) Deposition of Ray Kirkland, (Exhibit 16) p.24-26, 79.
[98] Deposition of Duane Ramon, (Exhibit 10) p. 93, 237-239, Deposition of Ray Kirkland, (Exhibit 16) p. 22.
[99] Deposition of Raymond Francis, (Exhibit 15) p. 174-175; Deposition of Chris Meche, (Exhibit 25) p. 58-59, 83-84.
[100] Deposition of Michael Normand, (Exhibit 32) p. 108-109; Deposition of Gerald Breaux, (Exhibit 29) p. 51.
[101] Deposition of Michael Normand, (Exhibit 32) p. 163.
[102] Deposition of Duane Ramon, (Exhibit 10) p. 129; Deposition of Chuck Rich, (Exhibit 38) p. 42; Deposition of Michael Normand, (Exhibit 32) p. 163.
[103] Deposition of Mike Normand, (Exhibit 32) p. 162-163; Deposition of Ray Kirkland, (Exhibit 16) p. 200.

#373741

Instead, Distributors are merely responsible for delivering and maintaining products.[105] Defendants argue that Distributors have an opportunity to profit by selling their distribution rights. However, even this element of the distributorship is subject to the approval of the Defendants, pursuant to the Distributor Agreement signed by all Distributors.[106] For the following reasons, this case should proceed as a collective action.

## II.     ARGUMENT

### A.     STANDARD FOR DECERTIFICATION

Pursuant to the FLSA, a collective action for payment of unpaid overtime wages may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  The Supreme Court has held that the FLSA's employer definition is expansive and that "managerial responsibilities" and "substantial control of the terms and conditions" of the employee's work create employer status under the FLSA.[107] The Fifth Circuit employs an economic reality test to evaluate whether there is an employer/employee relationship.[108]  Under this analysis, courts must adhere to firmly-established jurisprudence that the FLSA must be liberally construed to effectuate Congress' intent.[109]  To determine whether an entity is an employer, the court should consider whether the alleged employer: (1) possessed the power to hire and fire the employees; (2) supervised or controlled employee work schedules or conditions or employment; (3) determined the rate or method of

---

[104] Deposition of Raymond Francis, (Exhibit 15) p. 174-175; Deposition of Chris Meche, (Exhibit 25) p. 58-59, 83-84.

[105] Deposition of Chris Meche, (Exhibit 25) p. 58-59.

[106] Distributor Agreement (Exhibit 1) paragraph 14.1.

[107] *Donovan v. Grim Hotel*, 747 F.2d 966, 971-972 (5th Cir. 1984) (citing *Falk v. Brennan*, 414 U.S. 190, 195. 94 S.Ct. 427, 38 L.Ed.2d 406 (1973).

[108] *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012).

[109] *Donovan v. Sabine Irrigation*, 695 F.2d 190, 194 (5th Cir. 1983) and *Donovan v. Janitorial Services*, 672 F.2d 528 (5th Cir. 1982).

#373741

payment; and (4) maintained employee records. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012); *Williams v. Henagan*, 595 F.3d 610, 615 (5th Cir. 2010).

The Fifth Circuit has not established a legal standard for collective-action certification. *Roussell v. Brinker International, Inc.*, 441 Fed. Appx. 222, 226 (5th Cir. 2011) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir.1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). The court has declined to select one of two standards, one involving a multi-factor "similarly situated" test, and the other akin to the standard for Rule 23 class actions. *Roussell*, 441 Fed. Appx. at 226 (citing *Mooney*, 54 F.3d at 1213-14 & n. 7). However, it is oft-noted that the prevailing standard in the Fifth Circuit is the "similarly situated" test promulgated in *Lusardi* v. Xerox Corp., 122 F.R.D. 463 (D.N.J. 1988), though this standard has not been endorsed by the Court. See e.g. *Xavier v. Belfor USA Group, Inc.*, 585 F.Supp.2d 873 (E.D. La. 2008)("[I]t is clear that the two-step ad hoc [*Lusardi* ] approach is the preferred....") *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 518–19 (5th Cir. 2010) ("We have not yet ruled on how district courts should determine whether plaintiffs are sufficiently 'similarly situated' to advance their claims together in a single § 216(b) action."); *Boudreaux v. Schlumberger Tech. Corp.* 2015 WL 796602, *2 (W.D. La. 2015); *Brown v. Body & Soul Services, Inc.*, 2017 WL 2198192, *1 (W.D. La. 2017); *Jones v. Colonial Nursing Home, Inc.*, 2017 WL 3175926 (W.D. La. 2017).

The first step under *Lusardi* usually results in the granting or denial of conditional certification. See *Mooney*, 54 F.3d at 1213-14 & n. 7. Indeed, this Court followed that analysis in granting conditional certification in this case. See [R. 136 at p. 7 citing *Mooney* and *Lusardi*]. At issue before the Court is the second step. According to the Fifth Circuit:

> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete

#373741

and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—[that is] the original plaintiffs—proceed to trial on their individual claims.

*Mooney*, 54 F.3d at 1213–14. This standard has been widely regarded as "less lenient". See e.g.

*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528 (S.D. Tx. 2008) (quoting *Anderson v. Cagle's,*

*Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)).

Courts have repeatedly stressed that "[s]imilarly situated does not mean identically situated." *Crain v. Helmerich & Payne Int'l Drilling Co.*, No. 92–0043, 1992 WL 91946, at *2 (E.D. La. Apr. 16, 1992); See *also Falcon v. Starbucks Corp.*, 580 F. Supp. 2d at 534  (citing *Hill v. Muscogee County School Dist.,* 2005 WL 3526669, at *2 (M.D.Ga.2005); *Basco v. Wal–Mart Stores, Inc.,* No. Civ. A. 00–3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004); *Frank v. Capital Cities Communications, Inc.,* No. 80–CIV–2188–CSH, 1983 WL 643, at *2 (S.D.N.Y. Oct. 11, 1983).

Rather, courts look to whether there are "meaningful identifiable facts or [a] legal nexus [that] binds the claims so that hearing the cases together furthers the purposes of section 216, is fair to both parties, and does not result in an unmanageable trial. *Falcon v. Starbucks Corp.*, 580 F. Supp. 2d at 535 citing *Simmons v. T–Mobile,* No. H–06–1820, 2007 WL 210008, at * 8 (S.D. Tex. Jan. 24, 2007) (citing *Aguirre v. SBC Communications, Inc.,* 05-3198 2006 WL 964554, at *5 (S.D. Tex. 2006), *Olivo v. GMAC Mortgage Corp.,* 374 F.Supp.2d 545, 548 n. 2 (E.D. Mich. 2004)).

Flowers's arguments regarding inconsequential differences among Plaintiffs are of no moment. "Slight differences in job duties or functions do not run afoul of the similarly situated

#373741

requirement." *Tolentino v. C & J Spec-Rent Services, Inc.*, 716 F.Supp.2d 642, 652 (S.D. Tex. 2010). Indeed, 'if one zooms in close enough on anything, differences will abound.'" *Thompson v. Bruister and Associates, Inc.*, 967 F.Supp.2d 1204, 1220 (M.D. Tenn. 2013) (quoting *Frank v. Golden Plump Poultry, Inc.*, 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)). Most courts acknowledge that there will be "numerous differences" and "legitimate differences" in the plaintiffs' testimony. See *Kelly v. Healthcare Services Group, Inc.*, 106 F. Supp. 3d at 816 (citing *Clark v. Centene Co. of Tex., L.P.*, 44 F.Supp.3d 674, 688 (W.D.Tex.2014)). The question for the court, however, is whether these differences are "so material as to prevent [Plaintiffs] from being similarly situated to one another." *Kelly*, 106 F. Supp. 3d at 816; *see also Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1261 (11th Cir. 2008) (looking for "legally significant differences").

Decertification is generally appropriate ***only*** where "a collective action ... presents enormous manageability problems because there is no single decision, policy or plan at issue." *Ebbs v. Orleans Parish School Board*, no. 04-1198 2014 WL 12717703 at * 7 (E.D. La. March 31, 2014)(citing *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004))."  Defendants have not demonstrated "enormous manageability problems" in the event of decertification.

At step two, courts generally consider: " '(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.' " *Roussell v. Brinker Int'l, Inc.*, 441 Fed.Appx. 222, 226 (5th Cir. 2011) (quoting *Mooney*, 54 F.3d at 1213 n.7). Here, the evidence demonstrates that the relevant factors favor denial of Defendants' motion to decertify.

#373741

1.      **No Individuality of Affected Distributors' Claims Because of a Uniform Policy.**

The first factor of the decertification analysis involves an assessment of whether plaintiffs have provided evidence of a company-wide policy or policies which may violate the FLSA. *England v. New Century Financial Corporation,* 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *Johnson v. Big Lots Stores, Inc.,* 561 F. Supp. 2d 567, 574 (E.D. La. 2008); *Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 280 (N.D. Tex. 2008); *Escobedo v. Dynasty Insulation, Inc.,* 2009 WL 2382982 (W.D. Tex. 2009). Collective treatment is appropriate where the record reflects the plaintiffs have similar factual and employment settings such that their claims can be resolved through generalized proof or representative evidence. *See Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1263 (11th Cir. 2008) (upholding denial of decertification and noting "[j]ust because the inquiry is fact-intensive does not preclude a collective action where plaintiffs share common job traits."). "If there is sufficient evidence of an employer's pattern of subjecting employees to the same improper practice, that would be sufficient to warrant a finding of similarity justifying collective adjudication." *England v. New Century Financial Corporation,* 370 F. Supp. 2d 504, 507 (M.D. La. 2005);

Here, there is sufficient evidence to determine that Distributors are similarly situated and that the case should proceed to trial as a collective action.

(a)      *Common Evidence Establishes Defendants Uniformly Classify All Distributors as Independent Contractors.*

Defendants argue that the Court will have to engage in individualized analyses to make determinations on the proper classification of Distributors. However, this assertion is belied by the jurisprudence. Courts have opined that use of a common practice of classifying workers as independent contractors and exempt from overtime provisions is prima facie evidence that the plaintiffs are similarly situated for purposes of a collective action. *See Nerland v. Caribou Coffee*

#373741

*Co., Inc.*, 564 F.Supp. 2d 1010, 1012 (D. Minn. 2007) (finding that employer "Caribou has an internal company policy and practice of viewing its store managers as similarly situated for the purposes of making the FLSA exemption determination, and that this policy is applied uniformly to all Caribou store managers," thus making it "disingenuous for Caribou, on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming the plaintiffs cannot proceed collectively to challenge the exemption."). *Rehberg v. Flowers Baking Company*, Docket No. 3:12-cv-00596, March 23, 2015, pg. 31 (W.D.N.C. 2015) (in discussing Flowers Distributors in North Carolina the court "also notes that Defendants, who now argue that determining independent contractor status requires fact-intensive individualized inquiries, apparently had no difficulty in classifying all distributors as independent contractors when asking them to sign Distributor Agreements.")

Here, Defendants uniformly classify all Distributors as independent contractors. Defendants did not examine any alleged individual circumstances in making this blanket classification, but instead applied it to all Distributors, dismissing any alleged differences on which they now rely in their Motion.

Defendants' uniform classification is further evidenced by their current classification of all distributors as "statutory employees" under the Internal Revenue Code.[110] Section 3121(d)(3) of the Internal Revenue Code specifies that, for purposes of the Federal Insurance Contributions Act ("FICA"), an individual is a statutory employee if he provides services as an "agent-driver or

---

[110] In the 1980's Flowers asked for a "letter ruling" from the IRS certifying that its distributorship model resulted in distributors being classified as "independent contractors." After investigation, the IRS indicated it would deny Flowers's request. Upon receiving this information, Flowers withdrew its request for the letter ruling. Flowers then suggested it could classify its distributors as "statutory employees" instead of employees and the IRS agreed. Flowers has never asked that this designation be revisited. See deposition of Jimmy Woodard, Exhibit 44. The deposition of Jimmy Woodward was taken in the *Rehberg* case August 25, 2015. Flowers produced Jimmy Woodward's deposition through discovery in the instant matter.

#373741

commission-driver engaged in distributing … bakery products … for his principal." 26 U.S.C. § 3121.  In order to qualify as a statutory employee, the individual must meet certain criteria that are substantially similar to the criteria set out under the economic realities test. Defendants' IRS classification of all Distributors as statutory employees provides class wide proof that Flowers uniformly misclassifies its distributors throughout Louisiana.

In designating Distributors as "statutory employees," Defendants represent that the members of this collective action group substantially perform **personal services** for the Defendants **on a continuing basis**. See 26 U.S.C. §3121(d)(3); 26 C.F.R. §31.3121(d)–1(d).  As a result, any use of "helpers" by Distributors must be, and is, *de minimis*.  Each year, Defendants represents to the IRS that distributors uniformly personally perform the services and indicates distributors' economic dependence on Flowers.

Defendants' also represent to the IRS that Distributors do not have a "substantial investment in facilities used in connection with the performance of such services," 26 U.S.C. §3121(d)(3), which contradicts Defendants' assertion that Distributors have "substantial investment in the business."[111] Despite years of these perpetual representations to the IRS and conduct in conformity therewith, Defendants suggest to this Court that Distributors have a substantial investment in an independent business. Instead, however, any Distributor has, at best, a possibility of recovering *some* of the money paid to Defendants to "buy" the privilege of servicing a route. Moreover, Defendants have consistently paid the employer's share of FICA taxes on behalf of each Plaintiff.

---

[111] Flowers contests that distributors build up "equity" in the routes they run, neglecting to clarify that that "equity" is simply eventual, and often hypothetical, reimbursement to distributors for paying Flowers (at punitive interest rates) for the privilege of running those routes.

#373741

Defendants argue that "the evidence on whether Plaintiffs are independent contractors or employees is too widely varying, requiring highly-individualized inquiries for each Plaintiff." (R. 310-1, p. 5.)   In other words, the existence of a common policy should relieve concerns about Distributors otherwise varied circumstances. *Smith v. Manhattan Management Co.,* Civil Action No. 14-2623, July 6, 2105, pg. 20 (E.D. La., 2015)(Certification granted upon showing of a common policy and "nothing indicates inconsistency in treatment among individuals holding a particular job position.").

For instance, the Defendants argue that the Distributors cannot establish hours worked on a class wide basis. But the absence of a mechanism for employees to report self-study hours does not defeat class treatment. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded on other grounds by* 29 U.S.C. § 254(a) ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of ... the [FLSA]."). Many courts have found that class treatment is proper even when the number of overtime hours must be proven by the plaintiffs' testimony without the benefit of written records. *See, e.g., Moreau v. Klevenhagen,* 956 F.2d 516, 522-23 (5th Cir.1992) (remanding to allow deputy sheriffs to testify in damages proceeding as to the number of hours they spent in training for firearms qualifications); *Falcon v. Starbucks Corporation,* 580 F.Supp. 2d 528, 536-537 (S.D. Tex. 2008) (denying decertification of a class of Starbucks assistant managers who were given more than 40 hours worth of duties but discouraged from reporting overtime and who worked off the clock to compensate); *Hill v. Muscogee County School Dist.,* 2005 WL 3526669, at *4 (M.D. Ga. 2005) (denying motion to decertify class of teacher's assistants who were given more duties than could be completed in an eight-hour day but told not to record more than eight

#373741

hours on their time sheets). Here, there is sufficient evidence to establish that all Distributors were subject to the same policies of being classified as an independent contractor for overtime qualification, but a statutory employee for IRS purposes. These overarching policies supersede any alleged nominal differences in Distributors' individual circumstances.

In a highly thoughtful opinion concerning almost identical facts, the court in *Kelly v. Healthcare Services Group, Inc.*, 106 F. Supp. 3d 808 (E.D. Tx. May 18, 2015), sifted through the Defendant's misdirection and wrote the following which Distributors hereby adopt in its entirety:

> **\*817** HSG attempts to highlight certain differences between the actual events that occurred on the ground at each facility by pointing to differences in the opt-in Plaintiffs' testimony. A common theme to HSG's citations, however, is that they tend to not tell the whole story. The opening citations of HSG's motion present a good example. There, HSG believed it had found two contradictory statements to present to the Court. (Mot. at 2). On the one hand is the testimony of opt-in Plaintiff John Stevens, who HSG alleges "regularly performed numerous managerial tasks, including hiring, firing, interviewing, managing supplies, disciplining, retraining," etc. (Mot. at 2). "On the other hand," alleges HSG, is the testimony of "another Plaintiff [—Kendrah Hollanquest—who] claimed manual labor comprised all of her workday—'every day'—for around ninety hours a week." (Mot. at 2). While HSG would have the Court believe that the testimony of these two opt-in Plaintiffs is so different in nature that class certification is impossible, the Court's review of the testimony reveals otherwise. The Court has extensively reviewed the testimony of John Stevens and disagrees with HSG's characterization of Stevens' testimony. For example, HSG alleges that Stevens "regularly performed numerous managerial tasks, including ... promoting." (Mot. at 2). When the Court looked to the portion of the testimony cited by HSG, it became apparent that Stevens was only asked whether he had ever *recommended* anyone for a promotion. He replied, "Once." (Stevens Depo. 139:14, Mot. Ex. 103 & Resp. Ex. 50). "Once" is not "regularly," and recommending an employee for a promotion is not the same as promoting an employee. HSG alleges that Stevens "regularly performed numerous managerial tasks, including ... quality control inspections." (Mot. at 2). When asked how often he did quality control inspections, Stevens said "very rarely." (Stevens Depo. 79:21–23). He did not have the time. (*Id.*) HSG alleges that Stevens "regularly ... ensur[ed] employees stayed on task." (Mot. at 2). When asked whether he was able to keep "an eye on the staff, the hourly employees, on a day-to-day basis," Stevens bluntly said, "No," he "[d]idn't have time." (Stevens Depo. 140:13–18). HSG alleges that Stevens "regularly performed numerous managerial tasks, including ... managing

25

supplies." (Mot. at 2). When asked about managing supplies, Stevens said he would "do it real quick because you didn't have a whole lot of time to spend dealing with that stuff." (Stevens Depo. 78:9–11). When asked about ordering inventory, Stevens said he would "do inventory every month, try to anyway." (Stevens Depo. 77:1–25). These examples do not show that Stevens regularly engaged in what HSG claims; they show just the contrary. In fact, the only "regular" task Stevens testified to was manual labor, saying that he spent "[a]t least 90 percent of" his day, every day, performing manual labor. (Sevens Depo. 143:4–7).

As a comparator to Stevens, HSG highlights the testimony of Kendrah Hollanquest. However, while the Court notes that there are some differences in the employees' combined 500 pages of testimony, the Court finds that none of the differences are "so material as to prevent [these two Plaintiffs] from being similarly situated to one another." *Clark v. Centene Co. of Tex., L.P.,* 44 F.Supp.3d 674, 688 (W.D.Tex.2014) (Sparks, J.). The Court finds that the differences between Stevens' and Hollanquest's testimony is not factual but results principally from HSG's differing characterizations. For example, HSG alleges that Hollanquest "did not supervise employees." (Mot. at 2). Just like John Stevens, however, Hollanquest said, "I wasn't managing [the employees] because I was cleaning." (Hollanquest Depo. **\*818** 180:21–22, Mot. Ex. 71 & Resp. Ex. 102). Next, HSG alleges that Hollanquest did not order supplies. (Mot at 2). Yet, Hollanquest said that she would call her district manager and say "hey, we need this, hey, we need that" when supplies were running out. (Hollanquest Depo. at 119:7–8). In substance, Hollanquest's testimony sounds much like Stevens' testimony. Stevens said he did inventory once a month, or tried to anyway. (Stevens Depo. 77:1–25). When asked about quality control inspections, Hollanquest testified that she knew she was supposed to do them but "didn't have time to do them" because she was cleaning. (Hollanquest Depo. 198:6–25). In substance, this echoes Stevens' testimony, who knew he was supposed to do quality control inspections but "very rarely" did them because he didn't have time. (Sevens Depo. 79:1–25). HSG alleges that Stevens hired new applicants and that Hollanquest did not. (Mot. at 2). However, the testimony reveals—despite HSG's assertion to the contrary—that it was the district manager who hired new applicants in both cases, not the account managers. (Hollanquest Depo. 194:7–11); (Stevens Depo. 45:10).[7] Much of the same applies to the areas of discipline and firing: It was the district managers who made these decisions, not the account managers.[8] Hollanquest also testified that she never promoted an employee, much like Stevens who testified he had only once recommended an employee for a promotion.[9] (Hollanquest Depo. 197:1–3); (Stevens Depo. 139:14). The Court's review of these two opt-in Plaintiff's testimony—whose alleged differences represent the most powerful example HSG muster—reveals, in fact, vast swaths of uniformity with only minimal, immaterial differences. The most striking similarity with respect to the character of both employees' jobs as a whole, however, is the fact that both employees' primary job was to the clean the facility while only secondarily dealing with tangential management issues.

#373741

> **\*819** The fact that opt-in Plaintiffs spent the majority of their days doing manual labor is a common similarity that runs through all of the opt-in Plaintiff's testimony. While the amount of time spent doing manual labor is not dispositive of the exemption issue under the second factor[10] or the resolution of the employment settings factor, similarity of the facts "on the ground" (and whether these facts match the prescribed job duties and requirements) is what the Court looks to in conducting the similarity situated analysis. Having sorted through the thousands of pages of testimony, the Court finds that the overwhelming evidence shows substantial similarity in the character and extent of the employees' jobs as a whole, which matches the account managers' prescribed non-managerial job duties.

*Kelly*, 106 F. Supp. 3d at 817-19.   The same is true in this case.   At page two of their memorandum, for example, Defendants highlight testimony from nine witnesses on five different "topics" purporting to show claims that are individualized.   Only two Plaintiffs and/or opt-in Plaintiffs were used for each individual topic.   Two of the five topics—ownership of an outside business and receipt of a breach letter—are wholly irrelevant and immaterial to any of the inquiries before the Court. This testimony is hardly demonstrative of representative evidence among 114 opt-in Plaintiffs showing the claims asserted by Plaintiffs are individualized.

Defendants grossly overstate the notion of 114 "mini trials".   Their arguments are supported by hyperbole of counsel, not representative evidence among the Plaintiffs and opt-in Plaintiffs.   See *Vanzinni*, 995 F. Supp. 2d at 721 ("With regard to the second factor, addressing individualized defenses, courts are concerned with whether representative evidence can be used to make class-wide determinations and the extent to which resolution 'requires such individualized inquiries that the case cannot proceed collectively.") Defendants have not been able to demonstrate a "parade of witnesses"[112] showing highly individualized claims on their Motion, so the idea that suddenly this evidence will appear at trial resulting "in a series of 114 mini trials" is not factual but results merely from Defendants' characterizations and hyperbole.

---

[112] See [Rec. 310-1, p. 9].

#373741

Defendants have also suggested that this Court should avoid the result in *Johnson vs. Big Lot Stores, Inc.*[113] But *Big Lots* is easily distinguishable. In *Big Lots* all plaintiffs and opt-ins were employees. The issue before the Court was whether a particular employee qualified as an exempt employee under the FLSA because they were executive/management employees. Therefore, the actual responsibilities undertaken by each Plaintiff was critical to the analysis before the Court. Here, the threshold question—whether the Distributors are truly employees under the FLSA—is central to the inquiry before the Court. Moreover, in *Big Lots* there was no employment agreement or any other contracts outlining the duties and responsibilities of each plaintiff.

Furthermore, in addressing the question of whether there are disparate factual and employment settings for each of the affected employees, courts have found it useful to consider the nature of each affected employee's job duties, supervision, location, and salary. *Ebbs v. Orleans Parish School Board,* 2014 WL 12717703 at * 3 *(citing Johnson v. Big Lots Stores, Inc.,* 2007 WL 5200224 at *6).* These courts have explained that "looking to what occurred 'on the ground' at the actual facilities" is very relevant to this inquiry. See e.g. *Kelly v. Healthcare Services Group, Inc.,* 106 F. Supp. 3d 808, 812 (E.D. Tex. May 18, 2015) (citing *Lipnicki v. Meritage Homes Corp.,* 2014 WL 5620603 at *3, 5 (S.D. Tex. Nov. 4, 2014)).

### (b)     Common Evidence Shows Plaintiffs Are Similarly Situated because they are Subject to Uniform Control by Defendants.

Common evidence shows uniformly applied control over all Distributors. The Supreme Court has held that the FLSA's employer definition is expansive and that "managerial responsibilities" and "substantial control of the terms and conditions" of the employers work

---

[113] 561 F. Supp.2d 567 (E.D. La. 2008).

#373741

create employer status under the FLSA.[114]   Among the factors considered are whether the alleged employer: (1) possessed the power to hire and fire the employees; (2) supervised or controlled employee work schedules or conditions or employment; (3) determined the rate or method of payment; and (4) maintained employee records. *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012); see also *Williams v. Henagan*, 595 F.3d 610, 615 (5th Cir. 2010).

The definition of employee under the FLSA is particularly broad. The FLSA "stretches the meaning of `employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles". *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). To determine if a worker qualifies as an employee, courts focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself. *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th. Cir. 2008);  *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir.1998). To aid this inquiry, courts consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th. Cir. 2008);  *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir.1998).   No single factor is determinative. *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th. Cir. 2008);  *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043-44 (5th Cir.1987). Rather, each factor is a tool used to gauge the ***economic dependence*** of the alleged employee, and each must be applied with this

---

[114] *Donovan v. Grim Hotel*, 747 F.2d 966, 971-972 (5th Cir. 1984) (citing *Falk v. Brennan*, 414 U.S. 190, 195. 94 S.Ct. 427, 38 L.Ed.2d 406 (1973).

#373741

ultimate concept in mind. *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th. Cir. 2008);

*Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043-44 (5th Cir.1987) [Emphasis by the court].

The common evidence shows Defendants control virtually every aspect of the economic relationship for all Plaintiffs alike. This includes total control over the price Distributors pay defendants to purchase the product and also the price at which Distributors sell the products to customers. Defendants also control the service levels, sales, advertisements, promotions, marketing, stale product handling, delivery procedures, discipline, and customer service requirements. Distributors place orders via the handheld computers supplied by the Defendants. Defendants sell products to Distributors at a discounted percentage off of the suggested wholesale price determined by the Defendants.[115] Distributors resell such products to customers for a higher amount.[116] In almost every case, this sales price is determined by Defendants to the exclusion of the Distributors.[117] Virtually all of the sales are generated by charge accounts authorized by the Defendants.[118] In these authorized charge accounts, Defendants receive the customer payments directly from the customer. Effectively, Defendants "buy[s] the accounts receivable from the Distributors and subsequently collect such accounts receivables from the authorized charge accounts."[119] Each week there is a financial reconciliation prepared by Defendants for such product purchases, Distributor sales and other debits and credits between

---

[115] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[116] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).
[117] Deposition of Mack Gordon, (Exhibit 26) p. 82; Deposition of Earl Abadie, (Exhibit 27) p. 59, 84; Deposition of Mark Bueche, (Exhibit 37) p. 180-181; Deposition of Chris Meche, (Exhibit 25) p. 44-46; Deposition of Gerald Breaux, (Exhibit 29) p. 47; Response to Request for Admission No. 3 for Flowers Foods, Inc. (Exhibit 3) ("Because of market dynamics, Flowers Foods . . . seeks to obtain the best price possible for products sold to the National Account. . . .a distributor cannot charge more than the suggested wholesale price . . .").
[118] Deposition of John Lofton, (Exhibit 14) p. 105; Deposition of Randy Hymel, (Exhibit 11) p. 89-90; Deposition of Chris Meche, (Exhibit 25) p. 44; Deposition of Donnie Tellis, (Exhibit 33) p. 58; Deposition of Gerald Breaux, (Exhibit 29) p. 22, Deposition of Earl Abadie, (Exhibit 27) p. 30; Deposition of Tim Pejsach, (Exhibit 28) p. 95; The average percentage of sales generated by authorized charge accounts (accounts which Distributors have no control) is 86% for Louisiana warehouses of FBC-Baton Rouge, 89% for Louisiana warehouses of FBC-New Orleans and 90% for Louisiana warehouses of FBC-Tyler. See Exhibit 8.
[119] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).

#373741

Defendants and Distributors.[120] Defendants apply these policies uniformly amongst Distributors, stripping them of their independence and leaving no doubt that Distributors are economically dependent on Defendants.

As discussed, *infra*, there is common evidence upon which this Court can rely at trial in assessing each of these five factors.

### i.      Degree of Control

Degree of control refers to whether the plaintiff possesses "real independence" in the economic relationship. *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008). The Fifth Circuit has recognized that "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Id.* (citing *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1049 (5th Cir. 1987)); *see also Reich v. Priba Corp.,* 890 F. Supp. 586, 592 (N.D. Tex. 1995). When a defendant requires workers to work whatever hours it demands, even if those demands are driven by customer needs, workers cannot be said to exercise such a degree of control that they stand as separate economic entities. *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008).

Pursuant to their Agreements, all Distributors must use their "best efforts" And perform their job in accordance with "good industry practice," standards that Defendants define and enforce. Distributors are reprimanded for not performing their jobs according to Defendants' standards and customer service requirements. Defendants control the service levels, sales, product pricing, advertisements, promotions, marketing, stale product handling, delivery procedures, discipline, and customer service requirements. To force compliance, Defendants issue 10 day letters and threaten to terminate their distributorships. Defendants' sales managers conduct market checks to assess Distributors' performance at different outlets.  Flowers national accounts managers and Defendants

---

[120] See Response to Request for Admissions No. 8 to FBC-Baton Rouge, FBC-New Orleans and FBC-Tyler (Exhibit 4).

#373741

sales managers control the entrepreneurial and profit-generating activities. More specifically, members of the national accounts team are the single point of contact and develop business connections, negotiate pricing, products and promotions, and nurture existing relationships. Sales managers call on accounts, seek new accounts, maintain good relationships with store managers, solicit more shelf space, present customers with product opportunities, and handle store resets to try and secure the most opportune placement for Flowers' products. Distributors, on the other hand, cannot propose pricing or products to accounts, pitch promotions, or negotiate shelf space with national accounts.   For a more complete discussion of the control Defendants exercise over Distributors see discussion on pages 9-16, *supra*, of this Memorandum.

### ii.      Relative Investments

"In applying the relative-investment factor, [courts] compare each worker's *individual* investment to that of the alleged employer. *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 344 (5th Cir. 2008) (citing *Express Sixty-Minutes,* 161 F.3d at 304) (emphasis in original). In analyzing this factor, courts consider "the amount the alleged employer and employee each contribute to the specific job the employee undertakes." *Thibault v. Bellsouth Telecommunications, Inc.,* 612 F.3d 843, 847 (5th Cir. 2010); *see also Carrell v. Sunland Construction, Inc.,* 998 F.2d 330, 334 (5th Cir. 1993) citing *Herman v. Express Sixty-Minutes Delivery Services, Inc.,* 161 F.3d 299, 303 (5th Cir. 1998)).

All Distributors must purchase their own vehicle for delivering Defendants' products, however, Flowers makes financing available to assist Distributors with this purchase. By being classified as a "statutory employee," Defendants have certified that Distributors' investments in their distributorship do not qualify as a "substantial investment in their equipment or property." Defendants on the other hand, provide Defendants the warehouse space, handheld computers and

#373741

proprietary software which Distributors must use to perform their jobs.  For a more complete discussion of the relative investments made see the discussion on pages 6-7 and 9, *supra*, of this Memorandum.

### iii.      Worker's Opportunity for Profit and Loss

The Court next considers who "controlled the major determinants of the amount of profit which the worker could make." *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 344 (5th Cir. 2008) (citing *Usery v. Pilgrim Equip. Co., Inc.,* 527 F.2d 1308, 1313 (5th Cir. 1976)).

Defendants control virtually aspect of the economic relationship with the Defendants. Defendants not only control the price Distributors pay them to purchase the product but also control the price which the customers pay Distributors for the same product.  In almost every case, this sales price is determined by Defendants to the exclusion of the Distributors.  Most of the sales are generated by charge accounts authorized by the Defendants.  Defendants provide all major customers with a single national account manager because these larger accounts demand, "one-point-of-contact type relationships." Distributors do not realistically have the opportunity to propose to customers new products or pricing Distributors cannot negotiate shelf space with national accounts.  For a more complete discussion of the Distributor's opportunity for profit and loss made see the discussion on pages 12 and 14-16, *supra*, of this Memorandum.

### iv.      Skill and Initiative

Courts next consider "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status." *Hopkins,* 545 F.3d at 345 (citing *Usery,* 527 F.2d at 1314). "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Express Sixty-Minutes,* 161 F.3d at 305 (citing *Usery,* 527 F.2d at 1314). Furthermore, although "[t]he lack of the requirement of specialized skills is indicative of

33

employee status, the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way." *Baker v. Flint Engineering & Construction Co.,* 137 F.3d 1436, 1443 (10th Cir. 1998) (citing *Dole v. Snell,* 875 F.2d 802, 811 (10th Cir. 1989) and *Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1295 (3d Cir. 1991)).

The job of a Distributor does not require advanced knowledge or skill. The qualification for all Distributors is the same—namely, a good hard-working attitude and ability to work seven days a week, if necessary, at any time during any 24 hour day. There are no educational requirements, job experience, or specific skills required to become a Distributor. All of Defendants' Distributors go through the same prospective Distributor training before they are hired as full-fledged Distributors.

### v.    Permanency of the Relationship

The final factor courts in the Fifth Circuit typically evaluate is "the permanency of the working relationship." *Hopkins,* 545 F.3d at 345 (citing *Mr. W Fireworks,* 814 F.2d at 1047). Some considerations that bear on this factor include the length of the relationship between the parties, whether the worker provides similar services to other companies, and the worker's ability to terminate the relationship. *Id.*; *Hickey v. Arkla Industries, ,* 699 F.2d 748, 752 (5th Cir. 1983). The current members of the collective action have varying lengths of service to the Defendants. The following is a chart showing the lengths of service for 112 of the current class members:

| | |
|---|---|
| Zero to 1 year service | 7 |
| 1 to 3 years service | 11 |
| 3 to 5 years service | 16 |
| 5 to 10 years service | 41 |
| 10 to 15 years service | 15 |
| 15 to 20 years service | 6 |
| 20 to 25 years service | 6 |
| 25 years or more service | 10 |

#373741

The Fifth Circuit has suggested that, where a plaintiff works for a defendant for ten months, the engagement begins to resemble an employment relationship. *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 697 (5th Cir. 1983) (characterizing relationships between plaintiffs and defendant which spanned from ten months to three years as lasting a "substantial period of time").

In this case, the Distributor is also contractually restrained from "carrying outside merchandise which is competitive" with Defendants products.[121]  The Distributor is also contractually restrained from selling any competitive product to any of his prior customers for one year after the Distributor Agreement is terminated.[122] Distributors can terminate the agreement at any time but would be responsible for the costs associated with servicing the route until the route is transferred, assigned or sold.[123]  This common evidence will enable the Court to determine on a collective basis whether Distributors are properly classified as independent contractors, and there will be no variance among the Distributors.

The common evidence shows Plaintiffs are classified the same, "whether they're dealing with a lot of mom-and-pop type accounts or whether they're dealing with mostly chain accounts."[124] Furthermore, neither Chuck Rich nor anyone else employed by Defendants have challenged the IRS's 1980's ruling that Plaintiffs are statutory employees despite shifts in the market. Defendants cannot logically and fairly argue that the differences among accounts serviced by Distributors dictate separate analyses on the proper classification when their policies and practices provide otherwise.

---

[121] Distributor Agreement (Exhibit 1) paragraph 5.1.
[122] Distributor Agreement (Exhibit 1) paragraph 20.8
[123] Distributor Agreement (Exhibit 1) paragraph 3.1, 3.2, 16.4
[124] Deposition of Ray Kirkland, (Exhibit 16) p. 173-178; Deposition of Artie Ferrill, (Exhibit19) p. 34-37; Deposition of Bruce Naquin, (Exhibit 20) p. 25-28; Deposition of Raymond Francis, (Exhibit 15) p. 98-99.

#373741

Defendants also over generalize limited examples of participation by Distributors promotional and/or other sales-related activities. This is illogical and inconsistent with Defendants' business practices. The very reason Flowers employs hundreds of national account managers, vice presidents of sales, directors of sales, and sales managers is to manage the accounts through sales presentations, product offerings, pricing proposals and negotiations, and general business development and maintenance. Defendants' immaterial examples of Distributors pitching a promotion or obtaining additional shelf space are neither common among the Plaintiffs nor demonstrative of any independence.  On the contrary, the common evidence shows Distributors are primarily responsible for fulfilling orders for products that were agreed to by Flowers and the customer representative at the national account, and that Defendants have and will exercise control over all aspects of the national account relationship.

Finally, Defendants' argue that individualized analyses are required because only certain Distributors were disciplined or had their products changed by management. However, this assertion is irrelevant. What *is* relevant is that at all times Defendants had the authority to control, and did control, the material aspects of the Distributors' day to day activities. Therefore, all Distributors' economic realities were subject to Defendants' exclusive control.

Because common evidence shows that Distributors were all subject to Defendants' policy of uniformly classifying them as independent contractors in violation of the FLSA, Distributors respectfully submit they satisfy the first prong of the decertification analysis.

### 2.    No Individuality Regarding Defendants' Defenses.

The second factor in the decertification analysis the court should assess "the various defenses available to defendant which appear to be individual to each plaintiff." *Roussell v. Brinker International, Inc.*, 441 Fed.Appx. 222, 226 (5th Cir. 2011) (quoting *Mooney*, 54 F.3d at

#373741

1213 n.7). Defendants have raised the MCA exemption and the Outside Sales exemption as defenses in this lawsuit. Exemptions under the FLSA are construed narrowly against the employer seeking to assert them, and the employer bears the burden to establish a claimed exemption. *A.H. Philips v. Walling*, 324 U.S. 490, 493 (1945); *Allen v. Coiled Tubing Services*, 775 F.3d 279. 283 (5th Cir. 2014); and *Songer v. Dillon Resources*, 618 F.3d 467, 472 (5th Cir. 2010).

Defendants assert that these defenses will require individualized analyses, precluding a collective action. However, there is common evidence that pertains to both defenses, and any individualized differences are not consequential to the ultimate determination of either defense. Additionally, there is an overarching issue of law that applies uniformly to all class members, which can *and should* be resolved on a collective basis.

> **(a)      Common Evidence Proves Plaintiffs are Not Subject to the Motor Carrier Act Exemption.**

To establish applicability of the MCA exemption, Defendants "must show that [they] are motor carrier[s] under the MCA and that plaintiffs' employment duties involved the safety of operation of motor vehicles weighing at least 10,001 pounds in interstate commerce." 29 U.S.C. § 213(b)(1). Importantly, it is Defendants' burden to prove applicability of the exemption; Plaintiffs do not have to prove a negative.

First, Defendants must prove that the Distributors deliver goods in interstate commerce. *See Vanzinni*, 995 F. Supp. 2d at 714 (citing *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010)). Any evidence demonstrating their ability to carry that burden is conspicuously absent from Defendants' Motion. Indeed, Defendants contend that "the factfinder would . . . have to determine, for each Plaintiff: (1) whether, to what extent, and over what time period each Plaintiff was involved in interstate commerce . . ." [R. 310-1 p. 30], but Defendants' make no evidentiary showing on this point. Instead, Defendants purport to skip this threshold burden immediately to "[t]he [purported]

stark differences in Plaintiffs' testimony on the frequency with which they used their personal vehicles . . ." [R. 310-1, p. 30].

The common evidence shows Plaintiffs are not engaged in interstate commerce. All Distributors order products that are manufactured out of state, shipped to a central sorting facility owned and operated by the Defendants, unpacked and repackaged with other products by Defendants' employees, shipped with other products by Defendants to warehouses owned by Defendants, unpacked, sorted and packed with other products for the Distributor, and placed on a pallet behind the Distributors work bay.[125] No member of the Distributor class has crossed state lines in order to transport or deliver any product. By letter dated February 19, 2016, the U.S. Department of Transportation, Federal Motor Carrier Safety Administration determined that a Louisiana Flowers Distributor was not subject to DOT registration or regulation because "his truck does not cross the state line because he only does business in the State of Louisiana."[126] These facts are uniform to all Distributors and can be decided on a collective group wide basis.

Defendants have not demonstrated a scintilla of evidence showing the MCA may apply. Some factors that courts in the Fifth Circuit consider in determining whether the employees are drivers subject to DOT requirements include: whether drivers maintain DOT log books that record time driving; whether drivers must pass DOT written and driving tests; whether drivers must undergo DOT physical and drug tests; whether the drivers need to meet DOT and Federal Motor Carrier Safety Regulations (FMCSR) qualifications in order to drive; whether drivers participate in a program reviewing those regulations; and whether drivers complete FMCSR vehicle inspection reports. See *Vanzinni*, 995 F. Supp. 2d at 714 (citing *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1050 (N.D. Tex. 1993), aff'd, 16 F.3d 1216 (5th Cir. 1994)). Defendants have made

---

[125] Deposition of Ray Kirkland, (Exhibit 16) p. 121-127, 281-282; Deposition of Sam Houston, (Exhibit 12) p. 121-124.
[126] Letter dated February 19, 2016 (Exhibit 9).

#373741

no mention of any such evidence. Because Defendants cannot make the threshold showing of applicability, it follows that they cannot demonstrate that their defenses will require highly individualized inquiries warranting decertification.

Even assuming *arguendo* that Distributors employment duties do involve interstate commerce, the Motor Carrier Act ("MCA") exemption would not apply to this Distributor class. Section 207 of the FLSA requires an employer to pay overtime compensation to any employee working more than 40 hours in a workweek. See 29 U.S.C. §207(a)(1); *Singer v. City of Waco*, 324 F3d 813, 818 (5th Cir. 2003) and *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 444 (W.D. Tex. 2016). The FLSA provisions do not apply "with respect to . . .any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213.

Section 31502 provides the DOT "may prescribe requirements for maximum hours of service of employees of  . . . a motor private carrier, when needed to promote safety of operation". 49 U.S.C. § 31502(b)(2). The DOT may establish these requirements for employees who: (1) are employed by carriers whose transportation by motor vehicle is subject to jurisdiction under the MCA, and (2) engage in activities affecting the safety of operation of motor vehicles in transportation of property in interstate commerce within the meaning of the MCA. 29 C.F.R. § 782.2(a); *Allen v. Coiled Tubing Services*, 775 F.3d 279. 283 (5th Cir. 2014); *Songer v. Dillon Resources,* 618 F.3d 467, 472 (5th Cir. 2010). For the motor carrier exemption to apply the employees must meet both requirements. *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 444 (W.D. Tex. 2016); *Barefoot v. Mid-American Dairymen* 1994 WL 57686 at *2 (5th Cir. 1994).

#373741

Under the Technical Corrections Act of 2008 ("TAC"), a "covered employee", that is, one eligible for overtime wages, is defined as: (1) an individual who is employed by a motor carrier, (2) whose work, in whole or in part, is a driver affecting the safety of operation of motor vehicles and (3) who performs duties on motor vehicles weighing 10,000 pounds or less.[127] In other words, under the TAC, if a driver's duties, in whole or in part, are performed in vehicles weighing less than 10,000, that driver must be paid overtime in compliance with the FLSA. Those employees are "covered employees" under the FLSA notwithstanding the MCA exemption. This is commonly known as the Small Vehicle Exception.[128]

Exemptions under the FLSA are construed narrowly against the employer seeking to assert them, and the employer bears the burden to establish a claimed exemption. *A.H. Philips v. Walling*, 324 U.S. 490, 493 (1945); *Allen v. Coiled Tubing Services*, 775 F.3d 279. 283 (5th Cir. 2014); and *Songer v. Dillon Resources,* 618 F.3d 467, 472 (5th Cir. 2010). Accordingly, an employer has the burden of establishing the applicability of the MCA exception, including the effect of the TCA amendments. *Songer v. Dillon Resources,* 618 F.3d 467, 472 (5th Cir. 2010); *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 446 (W.D. Tex. 2016).

In order to be owed overtime wages notwithstanding the MCA, an employee must both (1) perform some work that affects the safety of operations of smaller vehicles, and (2) it must be part of the employees duties to do so.[129] Even in weeks where employees worked in vehicles weighing more than 10,000 pounds, those employees would still be entitled to overtime if they also worked in vehicles weighing less than 10,000 pounds.[130] Given the above "in whole or in

---

[127] SAFETEA-LU Technical Corrections Act of 2008, PL110-244, June 6, 2008, 122 Stat 1572, 1620
[128] *Moore, et al v. Performance Pressure Pumping, et al,* WL 1501436 *8 (W.D. Tex. 2017)
[129] *Aikens v. Warrior Energy Services*, 2015 WL 1221255 (S.D. Tex. 2015), *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 444 and *Moore, et al v. Performance Pressure Pumping, et al,* WL 1501436 *8 (W.D. Tex. 2017).
[130] *Hernandez v. Alpine Logistics*, 2011 WL 3800031, at *5 (W.D.N.Y. 2011), *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 444 discussing Department of Labor, Wage & Hour Division, Fact Sheet # 19 (November 2009) available at http://www.dol.gov/whd/regs/compliance/whdfs19.pdf.

#373741

part" language of the Small Vehicle Exception, it is the employer's burden to demonstrate that the employees exclusively drove vehicles greater than 10,000 pounds during a workweek.[131]

Here, there is evidence that shows Distributors do not make deliveries on Wednesdays and Sundays but, instead, perform pull-ups.[132]  In addition, Distributors are on 24 hour call and subject to requests by customers for product delivery outside of normal work hours.[133]  In these situations, there is no need for Distributors to use their larger, heavier trucks. Instead, Distributors use their smaller, personal vehicles on these days to travel to and from retail outlets to restock shelves, to rotate product on the shelves, or to deliver product to customers outside of normal delivery times. This common evidence reveals that most, if not all, Distributors make use of a personal vehicle, weighing 10,000 pounds or less, at least once per week. Accordingly, the issue of whether the MCA exemption applies can be determined on a collective group wide basis.

### (b)     *Common Evidence Proves Distributors are not subject to the Outside Sales Exemption of the FLSA.*

The same is true for the "outside sales exemption". The common evidence shows that all Distributors share the same duties of servicing accounts, while Defendants handle all sales-oriented activities.

According to the federal regulations adopted pursuant to the FLSA, "Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a **primary** duty of making sales." 29 C.F.R. § 541.504(a) [Emphasis added]. An employee's primary duty "means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). According to the regulations, the following types of drivers generally do not qualify as exempt outside sales employees:

---

[131] *Roche, et al v. S-3 Pump Service*, 154 F.Supp.3d 441, 448 (W.D. Tex. 2016)
[132] Deposition of Raymond Francis, (Exhibit 15) p. 32-33; Deposition of Tim Pejsach, (Exhibit 28) p. 109-110; Deposition of Duane Ramon, (Exhibit 10) p. 195;
[133] Deposition of Greg Trumbach, (Exhibit 40) p. 152; Deposition of Duane Ramon, (Exhibit 10) p. 241; Deposition of Ray Kirkland, (Exhibit 16) p. 174.

#373741

...

(2)   A driver who often calls on established customers day after day or week after week, delivering a quantity of the employer's products at each call when the sale was not significantly affected by solicitations of the customer by the delivering driver or ***the amount of the sale is determined by the volume of the customer's sales since the previous delivery.***

(3)   A driver primarily engaged in making deliveries to customers and performing activities intended to promote sales by customers (including placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or in cabinets, rotating stock according to date, and cleaning and otherwise servicing display cases), unless such work is in furtherance of the driver's own sales efforts.[134]

Here, there is representative evidence that establishes all Distributors have the same primary job duty. The Distributor Agreement, which every Distributor has signed, explicitly states that Distributors must service their territories (deliver Defendants' products) in accordance with "good industry practice," a broad standard that Defendants have defined. Distributors' job duties are largely service-oriented because they are primarily responsible for ordering replacement product, stocking and restocking shelves, and rotating product. Although Distributors engage in a financial transaction (which is ultimately performed or facilitated by Defendants) when they deliver products to retailers and restaurants, they are merely fulfilling product requests according to agreements made between Defendants and the customer, wherein Defendants have agreed to sell, and the customer has agreed to buy, specific products.

Furthermore, Defendants handle all sales and marketing activities to the exclusion of Distributors.  This is evident through the use of the national account manager. This individual initiates discussions with or responds to inquiries from national accounts regarding the type of Flowers products they will sell. Furthermore, national account managers engage in all promotional activity including pitching new products, meeting with potential and existing

---

[134] 29 C.F.R. § 541.504(d) (2013) [Emphasis added].

#373741

customers, leading proposal meetings, and bringing samples of products to customers. Likewise, Defendants' sales managers seek out new accounts, maintain good relationships with store managers, and go out to stores to solicit more shelf space for promotions. As a result, only Defendants enter agreements to sell products to outlets; Distributors do not.

Therefore, when a Distributor places or fulfills an order, he is not making a sale, but is instead acting as an agent for his employers who have already formed the relationship and negotiated nearly every aspect of the transaction. Even if a Distributor once engaged in a semi-sales oriented activity, like securing an additional end-cap display, this activity was isolated and does not change the fact that a Distributor's *primary* job duty is to deliver Defendants' products and service Defendants customers on a daily basis. Work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.[135]

It is disingenuous for Defendants, on one hand, to collectively and generally classify all Distributors as independent contractors and exempt from over time compensation pursuant to the outside sales exemption, while on the other hand claiming that plaintiffs cannot proceed collectively to challenge the exemption from the FLSA.[136]  In *Wang v. Chines Daily News, Inc.*,[137] the Court, interpreting California labor laws, stated:

> Defendant cannot, on the one hand, argue that all reporters and account executives are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each reporter and account executive in order to determine whether the individual is "Exempt."

*Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp. 2d 1010, 1012 (D. Minn. 2007) (finding that employer "Caribou has an internal company policy and practice of viewing its store

---

[135] *See* 29 C.F.R. § 701.
[136] *See Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1024 (D. Minn. 2007).
[137] 231 F.R.D. 602, 613 (C.D. Cal. 2005).

#373741

managers as similarly situated for the purposes of making the FLSA exemption determination, and that this policy is applied uniformly to all Caribou store managers," thus making it "disingenuous for Caribou, on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming the plaintiffs cannot proceed collectively to challenge the exemption."). *Rehberg v. Flowers Baking Company*, Docket No. 3:12-cv-00596, March 23, 2015 (W.D.N.C. 2015) (in discussing Flowers Distributors in North Carolina the court "also notes that Defendants, who now argue that determining independent contractor status requires fact-intensive individualized inquiries, apparently had no difficulty in classifying all distributors as independent contractors when asking them to sign Distributor Agreements.")

In making this classification, Defendants do not examine the alleged individualized factual circumstances of Distributors, which they argue in their brief are controlling and require decertification. Defendants should not be permitted to advance in court a theory that is contrary to their actual practices.

Because there is common evidence upon which Defendants can rely in asserting their defenses, Distributors satisfy the second factor for denying the motion to decertify.

### 3.   Fairness and Procedural Concerns Favor Denial of Decertification.

Fairness and procedural concerns weigh against decertification. "In assessing these concerns, a court considers the FLSA's objectives with regard to collective actions, specifically lowering the costs of plaintiffs through aggregation and consolidating common issues of law and fact arising from the same alleged activity." *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 721-22 (January 31, 2014) (citing *Hoffmann–LaRoche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989)); *see also Ebbs,* 2014 WL 12717703 at * 4 (citing *Johnson v. TGF Precision Haircutters, Inc.*, No. 03-3641, 2005 WL 1994286, at *7 (S.D.

#373741

Tex. Aug. 17, 2005)). These objectives are "intended to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer." *Sandoz v. Cingular Wireless, LLC*, 553 F.3d 913, 919 (5th Cir. 2008)(quoting *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003)). "A collective action allows...plaintiffs the advantage of lower individual costs to vindicate rights by pooling resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the alleged...activity." *Hoffman v. LaRoche*, 493 U.S. 165, 170 (1989). As explained in *Falcon v. Starbucks Corporation*, 580 F. Supp. 2d 528 (S.D.Tx. 2008), "To a certain extent, any large class of employees working for a nationwide employer alleging FLSA overtime violations will encounter [difficulties of proceeding collectively where there are factual differences], and there is no indication that Congress intended section 216 to only allow small collective actions involving unpaid overtime to proceed." *Falcon*, 580 F. Supp. 2d at 539-40 (citing *Donohue v. Francis Services., Inc.*, 2004 WL 1406080 at *1 (E.D. La. 2004) (refusing to decertify a collective action on allegations that the class was too large and noting that "[a]dopting defendants' reasoning would lead to the absurd result that employers could escape FLSA liability by making sure to underpay vast numbers (rather than smaller numbers) of their employees.")).[138]

For many plaintiffs, a collective action is the only practical method of adjudicating their FLSA claims." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1025 (D. Minn. 2007). Courts routinely understand that FLSA plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence

---

[138] Courts acknowledge that "[p]roceeding collectively always poses certain logistical challenges.... But the alternative—more than two dozen individual trials litigating largely the same liability issues and defenses—is less efficient, less expedient, and simply unnecessary." Kelly, 106 F. Supp. 3d at 830 (citing *Clark v. Centene Co. of Tex., L.P.*, 44 F.Supp.3d 674, 691 (W.D.Tex.2014)).

#373741

of a collective action." *Vanzzini*, 995 F. Supp. 2d at 722 (citing *Bradford v. Bed Bath and Beyond*, 184 F.Supp.2d 1342, 1351 (N.D.Ga.2002) and *Pendlebury v. Starbucks Coffee Co.,* 518 F.Supp.2d 1345, 1363 (noting that "Defendant's suggestion that few Plaintiffs would re-file is the precise reason Congress authorized class action treatment for these types of cases.")).

Further, the "court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Vanzzini*, 995 F. Supp. 2d at 721. "Although the defendant contends that decertification is necessary to protect its due process rights ... these rights must be balanced with the rights of the plaintiffs." *Falcon v. Starbucks Corp.,* 580 F. Supp. 2d 528, 541 (S.D. Tex. 2008) (citing *Wilks v. Pep Boys*, 2006 WL 2821700, at *8 (M.D.Tenn.2006). Because the FLSA is a remedial statute, courts are required to construe it broadly. *Vanzzini*, 995 F. Supp. 2d at 721 (citing *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 329 (5th Cir.1993) (recognizing FLSA's remedial purposes) and *Prickett v. DeKalb Cnty.,* 349 F.3d 1294, 1296 (11th Cir.2003) ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction." (internal citations omitted)). Furthermore, because it is remedial, "it . . . at least suggest[s] that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification." *Vanzzini*, 995 F. Supp. 2d at 722 (citing *Falcon,* 580 F.Supp.2d at 541).

As detailed above, the relevant facts are common to all Distributors. Not only would 114 separate trials hinder judicial economy, it could lead to inconsistent and unfair results. As other courts have observed, granting decertification will prompt the same issue to be litigated in over 100 separate cases, wasting limited judicial time and resources. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1265 (11th Cir. 2008) (holding the interests of judicial economy would not be served if the court had to conduct individual trials regarding substantially similar

#373741

overtime claims); Indeed, all Distributors have expressed their willingness to proceed on an individual basis, if the Court decertifies the collective group. However, if this case is decertified, multiple courts will be deciding the exact same issues which will likely lead to inconsistent results and multiple appeals.

Furthermore, Defendants have already received extensive written and deposition discovery from Distributors and therefore have the necessary evidence to proceed to trial. Phase II Discovery in this matter has lasted approximately 7 months during which Defendants deposed 32 Distributors, while Distributors took 14 depositions, responded to 41 sets of written discovery (requests for production of documents, interrogatories, and requests for admissions), and served a set of discovery on each Defendant. It is unclear how decertification would be fairer than permitting Distributors to proceed on the record of common evidence which has been painstakingly established here. Decertification will cause Distributors to file new lawsuits in this and other Louisiana District Courts and restart what has already been lengthy and extensive discovery with its attendant discovery disputes. For all of the reasons, policy and fairness considerations also dictate that the Court deny Defendants' motion for decertification.

Distributors have proven that there is common evidence to demonstrate all Distributors were subject to an identical, unlawful policy, there is common evidence upon which Distributors can rely in overcoming Defendants' defenses to Distributors' claims, and finally, that policy and fairness considerations weigh in favor of a single, collective action trial. Accordingly, the Court should deny Defendants' motion to decertify.

### (a)    A Judicially Efficient Alternative to Decertification

In the event the Court agrees with Defendants that resolution of the collective action will call for individualized analyses of certain elements of the claims or defenses, Distributors propose

#373741

an alternative to decertification. Instead, Distributors request the Court permit the case to proceed to trial as a collective action with respect to those issues in which the collective group is similarly situated, and divide the group into sub-groups for determination of the more particularized issues which the Court opines are not suitable for determination on a class-wide basis.

District courts retain significant discretion to manage collective action cases in a manner that promotes justice and judicial economy. *Collins v. Sanderson Farms, Inc.*, 568 F.Supp.2d 714, 721 (E.D. La. 2008). ("A district court has significant discretion to fashion the appropriate procedures in collective actions brought under § 216(b)."). *Aguilar v. Complete Landsculpture, Inc.*, 2004 WL 2293842, at *3 (N.D. Tex. 2004) (noting that if discovery reveals that some plaintiffs are not similarly situated on some issues, the court can create subclasses.) *See Moresi v. Res. Energy Ventures & Constr. Co.,* Civil Action No. 6:15-cv-2224 (W.D. La., 2017). *White v. NTC Transportation*, 2013 WL 5874566, at *7 (N.D. Miss. 2013) (granting motion for bifurcation to separately determine liability and damages). See *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (holding that district court abused its discretion in decertifying collective action where bifurcation was available).

Courts across the country have approved this alternative approach to complete decertification. The court can "consider bifurcation of the case into a liability stage, where the parties could address the alleged existence of an impermissible policy or practice, and a damages one, where they could, if necessary, debate the impact of that policy or practice on individual plaintiffs." *Rikard v. U.S. Auto Prot., LLC*, 2013 WL 5532688, at *3 (E.D. Mo. 2013) (quoting *Wilks v. Pep Boys*, 2006 WL 2821700, at *7 (M.D. Tenn. 2006)). *In re Pilgrim's Pride Fair Labor Standards Act Litigation.*, 2008 WL 4877239 at *4 (W.D. Ark. Mar. 13, 2008) ("If, [after conditional certification], the Court finds that the case is not manageable as a collective action,

#373741

the Court has the discretion to create subclasses or to dismantle the collective action."). S*ee also Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) ("Bifurcation would not eliminate variance in damages across class members, but once liability is established damages claims can usually be settled with the aid of a special master, and trials thus avoided."); *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (holding that district court abused its discretion in decertifying collective action where bifurcation was available); In *Rawls v. Augustine Home Health Care*, 244 F.R.D. 298 (D. Md. 2007) the court permitted the collective action to proceed but divided the collective group into subgroups according to the different facilities at which the Plaintiffs worked. *Rawls*, 244 F.R.D. at 302. Similarly, in *Wilks v. Pep Boys, 2006 WL 2821700 *7 (M.D. Tenn. 2006), aff'd 278 F. App'x 488 (6th Cir. 2008)*, the court noted "factually disparate plaintiffs are often divided into subclasses for the purposes of judicial efficiency at trial" and later in *Wilks*, 2006 WL 2821700 at *7 (citing *In re Delta Air Lines*, 310 F.3d 953, 956 (6th Cir. 2002) (describing the district court's division of the plaintiffs into various subclasses in a class-action case); *Thiebes v. Wal-Marts Stores, Inc.*, 1999 WL 1081357, at *3 (D. Ore. 1999) (noting that the court could "divide the class into subgroups" in a FLSA action); *Takacs v. Hahn Auto. Corp.*, 1999 WL 33127976 at *1-3 (S.D. Ohio 1999) (finding that, where plaintiff-employees in a FLSA case could be divided into several job categories, they could attempt to prove their damages by presenting testimony from representatives of each of the categories)).

Rather than dismiss the claims of all Distributors and force them to litigate individual cases, the Court can create sub-groups as it deems fit. This approach would resolve Defendants' concerns while allowing the case to proceed in the most judicially efficient manner as a collective action.

#373741

4.    **Under Identical Facts, the *Rehberg* Court Denied Flowers Motion to Decertify Class.**

As this Court is aware there was an almost identical collective action pending in the United States District Court for the Western District of North Carolina whereby Flowers Distributors sued Flowers and its local affiliates under the FLSA for Flowers misclassification of Distributors as "independent contractors" and for violating state wage and hour statutes.    The facts and the arguments made in *Rehberg vs. Flowers Baking Company of Jamestown, et al*, Docket No. 3:12-00596, March 12, 2015 (W.D. N.C. 2015)[139] are indistinguishable from the facts and arguments now made before this Court. In *Rehberg*, the Court granted conditional certification of the FLSA class and, after the completion of discovery, Flowers moved for decertification of the Distributor class. In its opinion denying Flowers motion for decertification the Court made many observations about the relationship between Flowers and its affiliates and Distributors. The court held on page 15:

> Here, all distributors were instructed to carry out their jobs subject to the Distributor Agreement, had substantially similar job duties, were subject to a common policy of being classified as independent contractors.

The court opined on page 29:

> Here, all distributors signed essentially the same agreement classifying them as independent contractors. They have substantially similar job duties, as described in the agreement. Most tellingly, all distributors are subject to the same common classification by Defendants as independent contractors, and thus, not entitled to overtime pay. The court finds that Plaintiffs have provided sufficient evidence of a company-wide policy which may violate the FLSA.

After considering the same evidence and arguments raised in this Louisiana class action, the *Rehberg* court held on Page 30-31:

---

[139] *Rehberg* is the bellwether case alleging the misclassification of Flowers distributors as independent contractors. There have been twenty-six (26) such actions pending in various jurisdictions throughout the United States.

#373741

The court finds that significant common evidence exists here to enable the court to determine, on a collective basis, whether all distributors are employees or independent contractors.

. . . .

Defendants exaggerate isolated differences among the distributors and ignore the larger picture of the issue at hand—that all distributors are subject to Defendants' uniform policies. Given that Defendants have a well-established company policy of classifying all distributors as independent contractors, the court is less concerned by the variations in Plaintiffs' employment circumstances. The court also notes that Defendants, who now argue that determining independent contractor status requires fact-intensive individualized inquiries, apparently had no difficulty in classifying all distributors as independent contractors when asking them to sign Distributor Agreements.

Regarding the FSLA exemptions raised by the Defendants, the court on page 33 said:

The court finds, however, that these exemptions, if applicable to any distributors, do not overwhelm the "similarly situated" analysis. Moreover, the primary inquiry for the court at this point is to determine whether or not all distributors were misclassified as independent contractors and whether they are truly employees within the meaning of the FLSA. The issue of whether the distributors are entitled to overtime pay, all exemptions considered, can be dealt with after the court makes its initial decision as to whether they are "employees" within the meaning of the FLSA.

Under identical facts, the *Rehberg* court denied the Flowers motion to decertify the Distributors' collective action in North Carolina and this Court should do the same.

## III.   CONCLUSION

The Plaintiffs and the opt-in collective group have demonstrated that they are substantially similar pursuant to the FLSA. Accordingly, Plaintiffs respectfully request this Court deny Defendants' motion to decertify and allow the case to proceed to trial as a collective action.

#373741

Respectfully submitted,


/s/ Steven G. Durio
STEVEN G. DURIO (#05230)
RYAN M. GOUDELOCKE (#30525)
**Durio, McGoffin, Stagg & Ackermann**
220 Heymann Boulevard (70503)
Post Office Box 51308
Lafayette, LA   70505-1308
Phone:   (337) 233-0300
Fax:       (337) 233-0694
Email:   durio@dmsfirm.com
              ryan@dmsfirm.com
**Attorneys for Plaintiffs**


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of **Plaintiffs' Memorandum in Opposition to Defendants' Motion for Decertification of Collective Action** was electronically filed with the Clerk of the Court using the CM/ECF system which sent a notice of electronic filing to counsel as indicated by the Court.

Lafayette, Louisiana, this 5th day of February, 2018.


_____ /s/ Steven G. Durio _____
STEVEN G. DURIO

#373741

| | EXHIBIT LIST |
|---|---|
| 1 | Typewritten Distribution Agreement |
| 2 | Distributor Checklist |
| 3 | Flowers Foods, Inc. Responses to Plaintiffs' Request for Admissions |
| 4 | Flowers Baking Company of Baton Rouge Responses to Plaintiffs' Request for Admissions, Flowers Baking Company of New Orleans Responses to Plaintiffs' Request for Admissions and Flowers Baking Company of Tyler Responses to Plaintiffs' Request for Admissions |
| 5 | Flowers Foods, Inc. SEC 10-K Annual Report for January 2, 2016 |
| 6 | Flowers Foods, Inc. Annual Report for 2001, 2012, 2013, 2014 |
| 7 | Sample Weekly Settlement Sheet |
| 8 | Flo-Rich 0072924 - Excel Spreadsheet, Route Total by Account Type |
| 9 | Letter from Lisa Hough to Alanna Williams on 2/19/16 regarding DOT |
| 10 | Duane Ramon Deposition Excerpts |
| 11 | Randy Hymel Deposition Excerpts |
| 12 | Sam Houston Deposition Excerpts |
| 13 | Larry Brock Deposition Excerpts |
| 14 | John Lofton Deposition Excerpts |
| 15 | Raymond Francis Deposition Excerpts |
| 16 | Ray Kirkland Phase II Deposition Excerpts |
| 17 | Mike Zeringue Deposition Excerpts |
| 18 | Ray Kirkland 30(B)(6) Deposition Excerpts |
| 19 | Artie Ferrill Deposition Excerpts |
| 20 | Bruce Naquin Deposition Excerpts |

#373741

| 21 | Cartrell Williams Deposition Excerpts |
| 22 | Jason Craven Deposition Excerpts |
| 23 | Gary Davis Deposition Excerpts |
| 24 | Dennis Lewis Deposition Excerpts |
| 25 | Chris Meche Deposition Excerpts |
| 26 | Mack Gordon Deposition Excerpts |
| 27 | Earl Abadie Deposition Excerpts |
| 28 | Tim Pejsach Deposition Excerpts |
| 29 | Gerald Breaux Deposition Excerpts |
| 30 | Tommy Trahan Deposition Excerpts |
| 31 | Kenneth Seals Deposition Excerpts |
| 32 | Michael Normand Deposition Excerpts |
| 33 | Donnie Tellis Deposition Excerpts |
| 34 | Chad Holcomb Deposition Excerpts |
| 35 | Jerry Bell Deposition Excerpts |
| 36 | Jeffrey Zelman Deposition Excerpts |
| 37 | Mark Bueche Deposition Excerpts |
| 38 | Chuck Rich Phase II Deposition Excerpts |
| 39 | Chuck Rich 30(B)(6) Deposition Excerpts |
| 40 | Greg Trumbach Deposition Excerpts |
| 41 | Benjamin Botos Deposition Excerpts |
| 42 | Christopher Riley Deposition Excerpts |
| 43 | Carnell Williams Deposition Excerpts |

#373741

| 44 | Jimmy Woodard Deposition (dated August 25, 2015) |
| 45 | Unpublished Case Law |
| 46 | Unpublished Case Law |

#373741