**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

**ANTOINE RICHARD, DARRELL RICHARD, CHRIS MECHE, DERBY DOUCET, SR., KEVIN RABEAUX, and MARK LOUVIERE, individually and on behalf of all similarly situated individuals,**

**Plaintiffs,**

**VERSUS**

**FLOWERS FOODS, INC.; FLOWERS BAKING COMPANY OF LAFAYETTE, LLC; FLOWERS BAKING COMPANY OF BATON ROUGE, LLC; FLOWERS BAKING COMPANY OF NEW ORLEANS, LLC and FLOWERS BAKING COMPANY OF TYLER, LLC,**

**Defendants.**

**CIVIL ACTION NO. 15-cv-2557**

**DISTRICT JUDGE S. MAURICE HICKS**

**MAGISTRATE JUDGE CAROL B. WHITEHURST**

**MEMORANDUM IN SUPPORT OF DEFENDANTS'[1] OBJECTIONS TO MAGISTRATE JUDGE WHITEHURST'S AMENDED REPORT AND RECOMMENDATION**

[1] "Defendants" collectively refers to Defendant Flowers Foods, Inc., Flowers Baking Co. of Lafayette, LLC, Flowers Baking Co. of Baton Rouge, LLC, Flowers Baking Co. of New Orleans, LLC, and Flowers Baking Co. of Tyler.

## TABLE OF CONTENTS

Page

**I. BACKGROUND AND PROCEDURAL POSTURE ... 4**

**II. ARGUMENT ... 5**

**A. Fifth Circuit Precedent Requires the AR&R To Be Set Aside ... 6**

**B. The AR&R Must Also Be Reversed Because Plaintiffs Did Not—And Cannot—Support the Rule 23 Requirements with Competent Proof ... 8**

**1. The AR&R's "Evidence" of Commonality Fails as a Matter of Law ... 9**

**2. The Varying IC Tests and Facts Necessarily Negate Commonality ... 11**

**3. Plaintiffs Cannot Prove Their LWPA Claims With Common Evidence ... 12**

**4. Plaintiffs Cannot Establish Adequacy ... 14**

**5. Individual Evidence Overwhelms and Predominance is Not Met ... 15**

**6. A Class Action is Not Superior, and Typicality Fails ... 16**

**7. The Rule 23(b)(2) Class Cannot Stand ... 16**

**C. The AR&R Improperly Applied the Facts and Law to the FLSA Claims ... 17**

**1. Decertification Must Issue Under Governing Law ... 18**

**a. Common Classification Is Irrelevant, Let Alone Dispositive ... 19**

**b. The AR&R Continues to Misapply the Facts And Law ... 21**

**c. The AR&R Fails Entirely to Review the Individualized Defenses ... 21**

**d. Fairness and Procedural Considerations Likewise Require Decertification ... 24**

**III. CONCLUSION ... 25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. Citgo*,
151 F.3d 402 (5th Cir. 1998) ....................17

*Altier v. Worley Catastrophe Response, LLC*,
2011 WL 3205229 (E.D. La. 2011) ....................17

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ....................15

*Carley v. Crest Pumping Techs., LLC*,
890 F.3d 575 (5th Cir. 2018) ....................24

*Carrell v. Sunland Constr., Inc.*,
998 F.2d 330 (5th Cir. 1993) ....................20, 21

*Chavez v. Plan Benefit Svcs., Inc.*,
957 F. 3d 542 (5th Cir. 2020) ....................2, 6, 10

*Clay v. New Tech Global Ventures, LLC*,
2019 WL 1028532 (W.D.La. Mar. 3, 2019) .................... *passim*

*Comcast v. Behrend*,
569 U.S. 27 (2013) ....................9

*Dukes v. Wal-Mart*,
564 U.S. 338 ....................17

*Faludi v. U.S. Shale Solutions, LLC*,
950 F.3d 269 (5th Cir. 2020) ....................22

*In re FedEx Ground Package System, Inc., Employment Practices Litigation*,
662 F.Supp.2d 1069 ....................13, 14

*Flecha v. Mericredit*,
946 F.3d 762 (5th Cir. 2020) ....................6, 16

*Garcia v. Vasilia*,
2019 WL 3555266 (S.D. Tex. Aug. 5, 2019) ....................18, 21

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ....................9

*Hobbs v. Petroplex Pipe & Construction*,
2020 WL 113990, __ F.3d __ (5th Cir. Jan. 10, 2020) ..... 20

*Hopkins v. Cornerstone Am.*,
545 F.3d 388 (5th Cir. 2008) ..... 20

*Hulbert v. Democratic State Central Committee of La.*,
68 So.3d 667 (La. Ct. App., 1st Cir. 2011) ..... 12

*In re Hydrogen Peroxide Antitrust Litigation*,
552 F.3d at 318 ..... 1, 8

*Johnson v. Big Lots, Inc.*,
561 F.Supp.2d 567 (E.D. La. 2008) ..... 18, 25

*Langbecker v. Elec. Data Sys. Corp.*,
476 F.3d 299 (5th Cir. 2007) ..... 15

*Lipnicki v. Meritage Homes Corp.*,
2014 WL 5620603 (S.D.Tex. 2014) ..... 20, 23

*M.D. Claims Group, LLC v. Anchor Specialty Ins. Co.*,
2018 WL 6739066 (M.D.La. Dec. 24, 2018) ..... 11, 18

*Madison v. Chalmette Refining*,
637 F.3d 551 (5th Cir. 2011) ..... 6, 15, 16

*Mario v. UPS, Inc.*,
639 F.3d 942 (9th Cir. 2011) ..... 16

*MD Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012) ..... *passim*

*Moody v. Assoc. Wholesale Grocers, Inc.*,
2019 WL 6036707 (E.D.La. Nov. 14, 2019) ..... 20

*Moresi v. Resource Energy Ventures and Construction Co.*,
2019 WL 2565634 (W.D. La. June 18, 2019) ..... 19

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) ..... 9

*Noll v. Flowers Foods, Inc., et al.*,
2020 WL 4457769, __ F.3d __ (D. Me. Aug. 3, 2020) ..... 23, 24

*Ocampo v. Maronge*,
2017 WL 6603925 (La.Ct. App. 2017) ..... 12

*Parrish v. Premier Directional Drilling, LP*,
917 F.3d 369 (5th Cir. 2019) ....................20, 21

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................8

*Radford v. Pevator Companies, Ltd.*,
2019 WL 7282110 (S.D.Tex. Dec. 27, 2019)....................22, 23, 25

*Rychorcewicz v. Welltec, Inc.*,
2018 WL 3559131 (S.D.Tex. 2018) ....................24

*Samson v. Apollo Resources, Inc.*,
242 F.3d 629 (5th Cir. 2001) ....................14

*Sanchez v. Schlumberger Tech. Corp.*,
2019 WL 7879956 (S.D. Tex. Nov. 21, 2019) ....................18

*Sanders v. Latshaw Drilling Company, LLC*,
2019 WL 1209769 (N.D.Tex. Mar. 14, 2019)....................20

*Scales v. Huntleigh USA Corp.*,
2012 WL 860381 (E.D.La. 2012)....................14

*Slaughter v. Board of Supervisors S. Univ.*,
76 So.3d 438 (La. Ct. App. 2011)....................14

*Thibault v. Bellsouth Telecomm., Inc.*,
612 F.3d 843 (5th Cir. 2010) ....................16, 18, 20, 21

*Tyson Foods v. Bouaphakeo*,
136 S.Ct. 1036 (2016)....................15

*Vinole v. Countrywide Home Loans, Inc.*,
*571* F.3d 935 (9th Cir. 2009) ....................9

*Wang v. Chinese Daily News, Inc.*,
737 F.3d 538 (9th Cir. 2013) ....................9

*Ward v. Hellerstedt*,
753 Fed.Appx. 236 (5th Cir. Oct. 16, 2018).................... *passim*

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009) ....................9, 10

*Yates v. Collier*,
868 F.3d 354 (5th Cir. 2017) ....................6

**Statutes**

28 U.S.C. § 636(b)(1) ....................5

219 U.S.C. § 213(a) ....................22

Fair Labor Standards Act ....................4

LA. REV. STAT. §23:921(F)(2)-(3) ....................11

LA. STAT. ANN. §23:635 ....................12

**Other Authorities**

29 CFR § 541.500 ....................22

Rule 23(a) ....................9, 14, 17

Respectfully, the Amended Report and Recommendation ("AR&R") issued by Magistrate Judge Whitehurst on November 6, 2020 must be rejected in its entirety. First, the AR&R erroneously finds that the commonality and predominance requirements of Rule 23 are met and recommends a class be certified, yet at the same time states that there are, in fact, dissimilarities between class members—including on "dispositive issues." [Doc. 404, p. 34]. The AR&R resolves this contradiction by concluding that these differences between class members are "not the focus of the inquiry before the Court" and can be resolved "more appropriately … through motion practice," which "will remove the individuals who are, in fact, dissimilar before the class trial." [Doc. 404, pp. 14-15]. However, there is no opportunity through discovery or motion practice going forward to sort out and then dismiss those class members who are dissimilar.[2] That is why the Court is required to closely analyze these differences *now* at class certification. More to the point, "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."[3] In other words, if, as the AR&R states, there are dissimilarities on dispositive issues within the class, then there is no commonality, and individualized issues predominate, which requires that class certification be *denied*.[4]

The second and even more important reason that the AR&R must be rejected is the "rigorous analysis" that Fifth Circuit and Supreme Court precedent requires before certifying a Rule 23 class has not been done. Indeed, the whole point of class certification is for the court to rigorously analyze the claims, defenses, substantive law and the facts—including *and most*

---

[2] Newberg on Class Actions § 9:11 (5th ed.) (requiring discovery from absent class members is contrary to the structure of and undermines the efficiency embodied in a Rule 23 class action).

[3] Fed. R. Civ. P. 23 adv. comm. notes (2003).

[4] *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 318 (3rd Cir. 2008) ("[W]here the court finds, on the basis of substantial evidence as here, that there are some serious problems now appearing, it should not certify the class merely on the assurance of counsel that some solution will be found.").

*importantly* any dissimilarities between class members—to make a "meaningful determination" that the Rule 23 requirements are satisfied and the case can properly proceed as a class action.[5] As the Fifth Circuit recently reiterated, this rigorous analysis is not only the crux of the class-certification determination, but it is also how courts ensure that the requirements of due process are not violated:

> This 'rigorous analysis' mandate is not some pointless exercise that we foist on this circuit's hardworking and conscientious district judges .... It matters. **A 'class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,' and creative uses are perilous.' And the existence of a class fundamentally alters the rights of present and absent members, particularly for mandatory classes such as the one here. No less than due process is implicated, so a careful look is necessary**."[6]

Time and time again, this Circuit has vacated class certification orders when the court did not rigorously analyze whether the class certification requirements were met.[7]

Here, the AR&R does not rigorously analyze the facts on each of the specific elements of each of the legal claims and defenses against the facts *in this case,* as required by Fifth Circuit precedent. Further, when looking carefully at the elements of the claims and defenses against the facts *in this case*, it is clear Plaintiffs have not and cannot meet their burden for class certification or the stricter standard to avoid decertification. Rather, as the AR&R acknowledges, differences between putative class members abound on facts that are material to the claims and defenses. Trying the claims of all 341-plus class members (and 98 opt-in collective members) together, against these widely varying facts, will inevitably violate the due process rights of absent class

[5] *Ward v. Hellerstedt*, 753 Fed.Appx. 236, 244 (5th Cir. Oct. 16, 2018).

[6] *Chavez v. Plan Benefit Svcs., Inc.*, 957 F. 3d 542, 547 (5th Cir. 2020) (citing *Unger v. Amedisys Inc*., 401 F.3d 316, 320 (5th Cir. 2005)) (emphasis added). While *Chavez* was an ERISA case, the Fifth Circuit's reasoning on the rigorous analysis requirement equally applies.

[7] *See* Section II(A) below and cases cited therein.

members, certain plaintiffs, and Defendants. If the AR&R is adopted, the jury will have to reach one determination that will apply across the board to a hodgepodge of a class, including:

- Distributors like Doucet, who did not even service his distributorship for over a year while he worked for one of his other businesses, and Rabeaux, who hired between 18-19 different employees, *lumped in with* distributors like Naquin, who never hired anyone and did all of the work himself;[8]

- Distributors like Bueche and Normand, who sold another bakery's products while owning their distributorships  and Doucet, who owned three outside businesses, grossing between $3.7 and $4.1 million from 2012-2014, netting between $320,000 and $564,182 per year *lumped in with* distributors like Breaux and A. Richard, who never owned any outside businesses or had any other sources of income;[9]

- Distributors like Bedoya who owned eight territories, which he operated out of three separate warehouses, and hired eight employees to do all of the work while he focused on managing the business, *lumped in with* distributors like Tellis, who did everything himself and doesn't feel he could hire anyone;[10] and

- Distributors like D. Richard whose sales manager calls him "pretty much every day" *lumped in with* distributors like Naquin who would go "months" without seeing his sales manager.[11]

These differences—which address material facts and are far from exhaustive[12]—are all the more significant when extrapolated out to the putative class of 341-plus as a whole, raising significant due process concerns with class-wide adjudication of these claims.  Plaintiffs' superficial efforts to show otherwise by pointing to things like "common classification" and undue reliance on an inapposite case (*Rehberg*) involving a different subsidiary, claims, plaintiffs, and facts fail as a matter of law.  For these reasons and those discussed below, the AR&R should be rejected.

---

[8] *Compare* [Doc. 310-5, p. 254 (Doucet Dep. II 47:4-15)] *and* [Doc. 118-1, pp. 131-132 (Rabeaux Dep. I 23:1-24:5)] *with* [Doc. 310-5, p. 483 (Naquin Dep. 24:20-21).]

[9] *Compare* [Doc. 310-5, pp. 136-143 (Bueche Dep. 61:14-20-68:11)] & [*Id.* at pp. 491-493 (Normand Dep. 52:8-54:16)] *and* [*Id.* pp. 228-236, 248-50 (Doucet Dep. I 31:8-39:13; 129:2-6; 142:19-21; 145:17-23)] *with* [*Id.* p. 120 (Breaux Dep. 52:4-6 (no outside businesses)) & [*Id.* at p. 586 (A. Richard Dep. II 29:5-16 (no other sources of income)].

[10] *Compare* [Doc. 317-6, p. 65 (Decl. of Duane Ramon, ¶ 17)] *with* [Doc. 310-5, pp. 748-52 (Tellis Dep. 17:2–20:1; 22:23-23:8)].

[11] *Compare* [*Id.* pp. 625-6 (D. Richard Dep. II 48:17-49:14)] *with* [*Id.* p. 484 (Naquin Dep. 32:12-17)].

[12] The extensive testimony in this case shows significant additional material differences. [Doc. 386-1, pp. 2-17].

## I. BACKGROUND AND PROCEDURAL POSTURE

The Plaintiffs and putative class members are a diverse pool of independent contractor ("IC") distributors who have purchased distribution rights from three different and separately-operated subsidiaries to buy and sell products within a defined geographic area.[13] The Distributor Agreement ("DA") under which Plaintiffs operate contains numerous indicia of IC status, specifically providing that "DISTRIBUTOR shall not be controlled by COMPANY as to the specific details or manner of DISTRIBUTOR'S business." [Doc. 317, p. 4.] Importantly, however, not every distributor signed the same DA.[14] For example, close to ninety putative class members signed a DA with an arbitration agreement and class action waiver.[15] Distributors who contracted from August 1, 2006 on were treated as traditional franchisees and received a Franchise Disclosure Document. [Doc. 317-5 ¶ 3 and Ex. 1.]

Plaintiffs and putative class members include over 341 current and former IC distributors[16] who operate their businesses very differently, with significant diversity on key material facts:

(1) Some own just one territory; others own and manage multiple territories at once. [Doc. 386-1-2, pp. 6 & 11.];

(2) Some operate their distributorships completely on their own; others hire one or several employees to do some or all of the work for them. [Docs. 310-1, pp. 9–10; 317, pp. 6-7.];

(3) Some have several outside businesses; others only ever worked for their distributorship with no other outside income. [Docs. 310-1, pp. 11–12; 317, pp. 7–8.];

(4) Some buy and sell portions of their territory for six-figure profits; others have never done so. [Doc. 386-1, pp. 3-4.];

(5) Some invest six figures each year in their distributorships; others invest much less. [*Id.*];

(6) Some operate their businesses in different corporate forms. [*Id.* p. 4.];

---

[13] [Docs. 317-2 ¶¶ 6-10 and Ex. 2; 317-3 ¶¶ 6-10 and Ex. 2; 317-4 ¶¶ 6-10 and Ex. 2.]
[14] [Doc. 317-2 ¶¶ 9-10, Exs. 2, 5-6; 317-3 ¶¶ 9-10, Exs. 2, 5-6; 317-4 ¶¶ 9-10, Exs. 2, 5-6].
[15] [*Id.*].
[16] [Docs. 317-2-317-4.] The Fair Labor Standards Act ("FLSA") collective group includes 98. [Doc. 404, p. 61.]

(7)     Some report significant control over their sales, ability to profit, control over their product orders and schedules and much more; others say the exact opposite. [Docs. 310-1, pp. 20–21; 317, pp. 8–11; Doc. 386-1, pp. 10-17.][17]

Despite these significant differences, the Magistrate Judge rendered her initial Report & Recommendation on August 13, 2018, recommending that class certification be granted and decertification be denied, to which Defendants objected. [Docs. 339; 341-1.] The District Court subsequently remanded the matter back to the Magistrate Judge for further analysis "[i]n light of Fifth Circuit precedent, objections, and response." [Doc. 376, p.1.] Thereafter, the Parties attempted to mediate the case, which ultimately failed, and later submitted supplemental briefs for the Magistrate Judge's consideration. [Docs. 383, 386 & 391.] On November 6, 2020, the Court rendered the AR&R. [Doc. 404.][18] Defendants respectfully file these Objections to same.

## II.   ARGUMENT

Pursuant to 28 U.S.C. § 636(b)(1), a judge of the court shall make a *de novo* determination of those portions of the R&R to which specific objections are made.[19] As discussed more fully below, the AR&R should be rejected and reversed because: (A) the Magistrate Judge did not rigorously analyze the facts—including any differences between class members—against the elements of the legal claims and defenses in this case as required by Supreme Court and Fifth Circuit precedent; (B) Plaintiffs have not and cannot satisfy all Rule 23 requirements given the divergent record here and applicable individualized legal tests; and (C) the Magistrate Judge misapplied the facts and law when denying decertification of the FLSA claims.

---

[17] These examples are far from exhaustive. *See also, e.g.*, [Docs. 386-1; 310-7; and 317-9 (containing summaries of extensive differences in testimony between Plaintiffs by topic)].

[18] A comparison of the original R&R and the recently issued AR&R is attached hereto as **Exhibit 1**.

[19] In reviewing the objections, a judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge or, alternatively, recommit the matter to the magistrate judge with instructions. *Id.* §636(b)(1)(C).

A. Fifth Circuit Precedent Requires the AR&R To Be Set Aside

In the Fifth Circuit, courts must "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Ward,* 753 Fed. Appx. at 244.[20] This requires the court to analyze the legal elements of the underlying claims and defenses against the specific facts of the case with "exacting scrutiny." *Flecha v. Mericredit*, 946 F.3d 762, 766 (5th Cir. 2020); *Ward*, 753 Fed. Appx. at 244-246 ("it is incumbent on the district court to consider and discuss the facts of this case as well as the elements of Plaintiffs' claims."). While the Court is not permitted to engage in a "free-range merits inquiry," it cannot ignore the merits altogether because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues of the case." *Chavez,* 957 F.3d at 546 (quoting *Dukes v. Wal-Mart*, 564 U.S. 338, 351(2011)). Failure to conduct this rigorous analysis by closely analyzing the facts and law, including any actual or potential differences in class members' circumstances, constitutes reversible error. *Ward*, 753 Fed. Appx. at 244.[21] The Fifth Circuit has regularly vacated district court's class certification orders for failure to conduct this rigorous analysis as required.[22]

---

[20] *Accord Yates v. Collier,* 868 F.3d 354, 362 (5th Cir. 2017); *MD Stukenberg v. Perry,* 675 F.3d 832, 837 (5th Cir. 2012).

[21] In *Ward*, the Fifth Circuit vacated the district court's grant of class certification because (in pertinent part) the district court did not explain with specificity how commonality was satisfied, instead merely including "excerpts from various federal court cases" and an acknowledgement that it had "reviewed the pleadings and all supporting evidence." 753 Fed. Appx. at 245. The Fifth Circuit also found that the district court's "**failure to substantively address actual or potential differences in purported class members' individual circumstances and claims was troublesome, since considering dissimilarities among claimants is essential to determining whether a single common question exists.**" *Id.* at 246 (emphasis added). *See also Chavez*, 957 F.3d at 546.

[22] *See, e.g., Chavez,* 957 F. 3d (setting aside district court's class certification order); *Flecha*, 946 F.3d at 767-68 (vacating district court's class certification order because such orders must be "based on proof, not presumptions"); *Stukenberg*, 675 F.3d at 833-34 (vacating and remanding certification order, in part based on improper reliance on decisions of other courts); *Madison v. Chalmette Refining*, 637 F.3d 551, 557 (5th Cir. 2011) (reversing and remanding class certification decision because "our precedent demands a far more rigorous analysis than . . . conducted.").

The AR&R did not substantively analyze the elements of the legal claims or defenses against the facts in this case, in direct contravention of Fifth Circuit law. *See, e.g., Stukenberg*, 675 F.3d at 843-44 (in Rule 23 analysis, the court "must … reference … the elements and defenses and requisite proof for each of the proposed class claims") (emphasis added). Nowhere in the nearly sixty-four-page decision does the AR&R even cite—let alone discuss or rigorously analyze the facts against—the elements of the multi-factor test necessary to determine IC status under the Louisiana Wage Payment Act ("LWPA") or the specific elements of what constitutes an unlawful "fine," both of which are highly fact-intensive. In fact, the AR&R makes unmistakably clear that it *did not* rigorously analyze any differences between class members, despite acknowledging that some of these differences are "dispositive issues":

- "[W]hile the manner in which distributors carry out their job responsibilities will necessarily differ . . . such differences were not the focus of the inquiry before the Court." [Doc. 404, pp. 14-15.].

- "[A]s the claimants points out, the question at this point is not whether the distributors are *actually* employees under either the FLSA or Rule 23. That question must be determined later from the facts at a merits-based trial—or after appropriate dispositive motions have been filed—by applying the multi-factor tests, under either the FLSA or Rule 23 state law. *Although Flowers points to several dissimilarities* among claimants, once the class is established, dispositive issues relating to those claimants can be more appropriately handled through motion practice, which will remove the individuals who are, in fact, dissimilar before the class trial." [*Id.* p. 15 (emphasis added).]

- "[S]ome of these dissimilarities are dispositive issues which, if handled properly through motion practice, will remove the individuals to which they apply before the class trial." [*Id.* p. 34.]

The failure to analyze these acknowledged dissimilarities violates due process and completely ignores the rigorous analysis the Fifth Circuit and Supreme Court requires. *See, e.g., Ward*, 753

Fed. Appx. at 246.[23] The AR&R's solution of "motion practice, [to] remove the individuals who are, in fact, dissimilar before the class trial" [Doc. 404, p. 15] does not alleviate these due process concerns and is completely inconsistent with the whole point of Rule 23 class certification. In a class action, there is typically no discovery for absent class members.[24] There is no way to determine exactly who from the class should be excluded—let alone support a dispositive motion with summary judgment evidence. That is why Supreme Court and Fifth Circuit precedent **requires** courts to conduct a rigorous analysis of the law and facts, including any differences that may exist, at class certification to ensure common proof and issues predominate such that the claims can fairly be tried together. If dissimilarities on material facts exist, class certification must be denied.[25] Avoiding this inquiry by relying on subsequent (non-existent) motion practice is improper as a matter of law. If class certification is not denied here, the claims of all class members, including dissimilar ones, are tried together based on evidence that does not fairly apply to all of them.[26] Given this, due process dictates that class certification be denied.

B. The AR&R Must Also Be Reversed Because Plaintiffs Did Not—And Cannot—Support the Rule 23 Requirements with Competent Proof

The AR&R must alternatively be rejected and reversed because Plaintiffs have not—and cannot—support the Rule 23 requirements with competent proof *from this case* to support class

[23] "It is incumbent on the district court to consider and discuss the facts of this case, as well as the elements of Plaintiffs' claims, prior to rejecting Defendant's argument that dissimilarities . . . obviate commonality." *Id.* at 246.

[24] Discovery from absent class members in a Rule 23 case is generally impermissible. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 (1985). *See also* fn. 2, *supra*.

[25] The Court may not speculate that some future event may make class certification proper in the future. The Court must review the evidence as it exists now. *See, e.g., In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d at 318.

[26] This is particularly problematic here given that some distributors own a territory or territories with significant equity. If Plaintiffs prevail and obtain the declaratory and injunctive relief of employee status they are seeking, these class members would lose the businesses they built up without any opportunity to opt out.

certification. *Ward*, 753 Fed. Appx. at 243 (Plaintiffs' burden to prove Rule 23 requirements).[27]

*1. The AR&R's "Evidence" of Commonality Fails as a Matter of Law*

To satisfy commonality, Plaintiffs must do far more than merely present common contentions. Instead, Plaintiffs must establish with competent evidence that the "claims of every class member 'depend on a common contention . . . that is capable of class-wide resolution,' meaning that the contention is 'of such a nature … that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Stukenberg*, 675 F.3d at 838 (quoting *Dukes*, 564 U.S. at 350)). In finding commonality satisfied here, the AR&R principally relied only on common contentions—namely, that "[e]ach class member's claims arise out of Flowers' uniform policy of classifying their distributors as [ICs] and applying deductions and offsets for purported breaches . . . in violation of state law." [Doc. 404, p. 13.] This fails outright. Common classification does nothing to answer the question "in one stroke" of whether all 341-plus class members are ICs or employees under the multi-factor tests used to determine IC status. This is why circuit courts have universally held that reliance on common classification, to the near exclusion of all else, is improper as a matter of law.[28]

The AR&R then reasoned that, because Flowers uniformly classified all distributors as ICs, "Flowers cannot rely on [an individualized inquiry] argument to defeat class certification." [Doc.

---

[27] *See also Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (Plaintiffs "must prove" Rule 23 requirements "through evidentiary proof"); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("[a]ctual, not presumed, compliance with Rule 23(a) remains [] indispensable.")

[28] *See, e.g.*, *Wang v. Chinese Daily News, Inc*., 737 F.3d 538, 544-46 (9th Cir. 2013) (a presumption that class certification is appropriate with a uniform classification decision "disregards the existence of other potential individual issues that may make class treatment difficult if not impossible"); *Myers v. Hertz Corp*., 624 F.3d 537, 549 (2d Cir. 2010) ("the existence of a blanket exemption policy, standing alone, is not itself determinative of the main concern in the predominance inquiry" and instead the "employee's actual duties" are what matters); *Vinole v. Countrywide Home Loans, Inc., 571* F.3d 935, 946 (9th Cir. 2009) ("district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors relevant to the predominance inquiry."); *In re Wells Fargo Home Mortg. Overtime Pay Litig*., 571 F.3d 953, 957 (9th Cir. 2009) (same) and cases/discussion cited in Doc. 386, p. 11, n. 10.

404, p. 14.] Not so. Regardless of any common classification, the Court must still conduct its own independent rigorous analysis of the Rule 23 factors in light of the particular facts and legal elements of the claims—common classification provides no short-cut around this required analysis. *See, e.g., Ward,* 753 Fed. Appx. at 246.[29] The Fifth Circuit has held that the court has an *affirmative obligation* to consider these "differences among class members that could prevent the suit from generating 'common answers apt to drive the resolution of the litigation,'" and the failure to do constitutes an abuse of discretion. *Chavez,* 957 F.3d at 548-49.

The other contentions cited in the AR&R, including that Flowers uses the "Best Efforts" and "Good Industry Practice" provisions in the Distributor Agreement "to control the distributors" [Doc. 404, p. 16] likewise cannot support class certification because they are wholly unsupported by the evidence in this case. For one, the AR&R only cites very limited testimony to support these broad-based conclusions, including testimony from a completely different case involving a different subsidiary and different plaintiffs altogether.[30] And, when you look at evidence of control *in this case* as required, from Plaintiffs' own depositions, it is far from uniform. [Doc. 386-1, pp. 10-16.][31] The AR&R's reliance on the fact that "[a]ll distributors sign essentially the same [DA]" [Doc. 404, p. 3] also must be disregarded. It is not true. Not only were there multiple different versions of the DA at issue, but a substantial number contain materially-different terms that impact

[29] *Id.* ("[I]t is incumbent on the district court to consider and discuss the facts of this case, as well as the elements of Plaintiffs' claims, prior to rejecting Defendant's argument that dissimilarities among individual claimants obviate commonality."); *see also Stukenberg,* 675 F.3d at 843-44 (same).

[30] The AR&R relies heavily on excerpts from Chuck Rich's deposition in the *Rehberg* case taken in 2014 pertaining to North Carolina distributors with the Jamestown subsidiary.

[31] The AR&R also cites that "Flowers controls virtually all aspects of the product sales, the prices distributors can charge, . . . and the actions of distribution employees" and that "this primary issue is common to each plaintiff . . . can be answered on a class-wide basis, and leads to other common questions or law and fact." [Doc. 404, p. 13.] These conclusory assertions are also wholly unsupported and must be disregarded, especially when the actual evidence in this case shows differences abound on distributors' ability to increase sales. [Doc. 386, pp. 16-17.]

the legal claims here, such as an arbitration provision. [Doc. 317, pp. 25-26.] The Magistrate Judge has already compelled arbitration of several FLSA opt-ins' claims once, after extended briefing and an evidentiary hearing Plaintiffs contended was necessary to make this determination. [Doc. 290; 273.] To the extent Plaintiffs seek to challenge the arbitration agreements again, this presents yet another layer of individualized inquiries and proof rendering class certification improper.[32]

*2. The Varying IC Tests and Facts Necessarily Negate Commonality*

When actually looking at the multi-factor test to determine IC status under the LWPA against the facts in this case, it is clear that whether class members are ICs or employees cannot be established "in one stroke." The record is replete with examples of why that is not possible.

First, depending upon the exact DA that each distributor signed and when it was signed, the elements of the IC test under the LWPA differ. Distributors who executed DAs after August 1, 2006 were treated as franchises. [Doc. 317-5 and Ex. 1.] Pursuant to Louisiana law, these distributors can be employees under the LWPA only if Plaintiffs can demonstrate the particularized, fact-based exemption to the default rule that "a franchisee … shall [not] be deemed to be an employer of the franchisor for any purpose." LA. REV. STAT. §23:921(F)(2)-(3). For other distributors, the LWPA requires a different, non-exhaustive, five-factor test for evaluating IC status.[33] The LWPA determination "must be decided on a case-by-case basis," in which "no one

[32] The AR&R's citation to common tax treatment as "statutory employee" also fails because this, again, does nothing to answer "in one stroke" whether all class members are ICs or employees under the multi-factor tests. What is more, statutory employee status by definition is only applicable to common law ICs. [Doc. 342, p. 11.]

[33] These non-exhaustive factors include: (1) whether there is a valid contract between the parties; (2) whether the work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it; (3) whether the contract calls for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction of the principal, except as to the result; (4) whether there is a specific price for the overall undertaking . . . ; and (5) whether the duration of the work is for a specific time and not subject to termination or discontinuance at the will of either side. *M.D. Claims Group, LLC v. Anchor Specialty Ins. Co*., 2018 WL 6739066 at **3-4 (M.D.La. Dec. 24, 2018).

factor is controlling, and the court must consider the totality of the circumstances." *Hulbert v. Democratic State Central Committee of La.*, 68 So.3d 667, 670-71 (La. Ct. App., 1st Cir. 2011).[34]

When looking at the divergent facts on just two of these prongs, it is clear commonality fails. For example, the first prong requires an assessment of whether the "work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it." The testimony is all over the map on this factor. Some distributors testified that they had no control over how they serviced their distributorships and serviced them personally. Others testified they hired multiple employees to do some or all of the work for them, including on a full-time basis, and could work elsewhere and significantly profit from outside ventures. [Doc. 386-1, pp. 3-8, 16-17.] Evidence on the third prong (whether the IC is "subject to the control and direction of the principal, except as to the result") fares no better, with distributors providing materially different testimony on things such as control over hours of service, product placement, product orders, breach letters, interactions with sales management, soliciting new accounts, and many others. [*Id.* pp. 10-15.]

*3. Plaintiffs Cannot Prove Their LWPA Claims With Common Evidence*

Even if the Court were to find the IC issue capable of common class determination (it is not), the Court must still independently determine whether adjudication of the LWPA "fine" claim is subject to class-wide determination based on common evidence. The facts and law show it is not. More specifically, LA. STAT. ANN. §23:635 provides:

> No person, acting either for himself or as agent or otherwise, shall assess any fines against his employees or deduct any sum as fines from their wages. This section shall not apply in cases where the employees willfully or negligently damage goods or works, or in cases where the employees willfully or negligently damage or break the property of the employer.

---

[34] *Accord Ocampo v. Maronge*, 2017 WL 6603925 (La.Ct. App. 2017) (same).

Because "willful" or "negligent" conduct by the purported employee negates liability under the statute, adjudication of this claim is necessarily individualized *by its terms*. The AR&R, however, cited just the first sentence of this statute and then includes pages of citations to several Plaintiffs' settlement statements and testimony that they had various items deducted on a weekly basis. [Doc. 404, pp. 20-23.] The AR&R did not even quote—let alone rigorously analyze—the second sentence that the statute *shall not* apply in cases where employees willfully or negligently damage goods. [Doc. 404, pp. 19-20.] The necessarily individualized inquiries created by this second sentence make it impossible to adjudicate these claims with common proof.

In *In re FedEx*, the court reached this same conclusion, denying class certification of the LWPA "fine" claim altogether in an IC misclassification case, reasoning as follows:

> The statute prohibits the assessment of fines and whether a deduction constitutes a fine can only be determined by examining the conduct of the individual class members. There might be cases in which FedEx properly deducted wages and other instances where it was improper. The plaintiffs contend that this can be addressed at the damages stage, but whether the deduction was proper isn't a damages issue; it's an issue of liability. Unlike simple problems of calculation of damages for a driver who worked for a known period of time, this issue can't be resolved systematically because it depends on FedEx's application of its policy to individual drivers and the drivers' conduct in each instance.

*In re FedEx Ground Package System, Inc., Employment Practices Litigation*, 662 F.Supp.2d 1069, 1092-1093 (N.D.Ind. 2009).

This analysis applies with equal force here where Plaintiffs are claiming that "shrink" (missing or stolen product/goods) and "stale" (product/goods past its sell-by date) constitute impermissible "fines" under the LWPA. Whether a particular deduction for shrink was caused by the negligent or willful conduct of a distributor (in miscounting or failing to count inventory altogether, etc.) or due to no fault of the distributor (e.g., theft from the store) fundamentally

determines whether the deduction is an impermissible "fine" in the first place. [Doc. 342-1, pp. 24-25.] Just as in *FedEx*, the threshold liability (not damages) here depends upon the distributor's conduct "in each instance," rendering class treatment impossible.

Further, "not all deductions from an employee's pay are prohibited fines." *Slaughter v. Board of Supervisors S. Univ.*, 76 So.3d 438, 457 (La. Ct. App. 2011). For example, deductions made pursuant to contract or where the employee is aware of the policy for the deductions are not fines. *Id.*[35] Therefore, courts must review the individualized facts at issue to determine if any particular deduction is a "fine."[36] Moreover, not only must the alleged fine be "arbitrarily fixed and assessed," but it must also be issued as "punishment against the employee for violating a workplace rule or regulation." *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 637 (5th Cir. 2001). In order to adjudicate the "fine" claim, the Court must determine: (i) the nature of the deduction; (ii) whether the deduction was authorized by contract or other agreement; and (iii) whether the distributor's conduct in each instance was "willful" or "negligent," all the while keeping in mind that the statute must be "strictly construed." *Samson*, 242 F.3d at 637. Because these determinations rely on distributor-specific evidence, class certification is inappropriate here.

*4. Plaintiffs Cannot Establish Adequacy*

Plaintiffs also cannot establish adequacy, and the AR&R's findings to support the same are misplaced. Because there are no opt-out provisions for Rule 23(b)(2) certification, the only due process protection available to the mandatory class members is the adequacy of the class representatives in protecting their interests in the litigation under Rule 23(a)(4). Here, adequacy is

---

[35] Similarly, where a deduction from "was for the purpose of covering a loss rather than imposing a punishment," it is "not a fine." *Id.* at 457. This creates yet another individualized issue.

[36] *See, e.g., Scales v. Huntleigh USA Corp*., 2012 WL 860381, at *4 (E.D.La. 2012) (dismissing LWPA "fine" claim because particularized facts led to the inference deductions were not penal in nature).

rife with conflicts.[37] Several putative class members testified that they do not want the relief sought by the Named Plaintiffs (i.e., to be employees). [Doc. 317, pp. 33-34.] Given this, substantial conflicts of interest necessarily exist between Named Plaintiffs and the class.[38] The AR&R dismissed this evidence outright, instead relying on an inapposite, non-binding decision from California.[39] This does not satisfy the rigorous analysis required and should be rejected.

*5. Individual Evidence Overwhelms and Predominance is Not Met*

The AR&R's conclusion that predominance is satisfied also must be rejected. To determine whether predominance is satisfied, the court has an obligation to "inquire how the case will be tried, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Madison*, 637 F.3d at 556. As the Supreme Court has stated, "[a]n individual question is one where members of the proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member." *Tyson Foods v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016). That means proof of the claims as to some class members must necessarily be able to be extrapolated to other absent class members, without prejudicing any party, for predominance to be satisfied. *Amchem*, 521 U.S. at 623. <u>This cannot be done here</u>. For example, the outcome of the multi-factored IC analysis for a distributor with multiple territories, who has significantly invested in his business and hired employees to do all

[37] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997) (The adequacy requirement is designed "to uncover conflicts of interest between named parties and the class they seek to represent.")

[38] *See Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007) ("[s]ubstantial conflicts exist among the class members, raising questions about the adequacy of the lead Plaintiffs …," where the named plaintiffs sought an injunction that would shut down the investment fund in which class members wanted to continue to invest).

[39] The AR&R relies solely on a district court case in California where the court found mere "disagree[ments] with the spirit of an action" and conflicts "between those who do and do not think a lawsuit is a good idea" are not sufficient. [Doc. 404, p. 30.] **<u>This is hardly akin to a case where, as here, the prospective relief sought changes the fundamental nature of the relationship—from independent business to an hourly employment relationship.</u>**

the work for him (Bedoya) cannot fairly be extrapolated to a single territory owner who did all of the work himself and had no other income (Tellis). Plaintiffs have not proffered any trial plan to establish how trial of these individualized claims in light of these divergent facts can be accomplished without violating due process. Nor can they. This, alone, is fatal.[40]

The AR&R's conclusion that predominance is satisfied because "if Flowers misclassified plaintiffs, then the misclassification applies to every distributor making up the putative class" [Doc. 404, p. 33] is wrong as a matter of law. As the Fifth Circuit has reasoned, the "nature of this [IC] analysis suggests that in some cases [plaintiffs] might be employees" while others are independent contractors." *Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843, 848 (5th Cir. 2010).[41] This is why courts have regularly found that undue reliance on common classification is improper as a matter of law. *See* Section II(B)(1), *supra*. The AR&R's reliance on the North Carolina *Rehberg* decision, which involves different parties, different testimony, and different claims cannot provide a short circuit around the requisite rigorous analysis here.[42]

*6. A Class Action is Not Superior, and Typicality Fails*

In addition, given the vast amount of individualized proof required to adjudicate the claims and defenses here, a class action is not the superior method for adjudicating this case. Nor can typicality be satisfied when there is no common proof uniting the class. *Flecha*, 946 F.3d at 768.

*7. The Rule 23(b)(2) Class Cannot Stand*

[40] *Madison*, 637 F.3d at 555 (failure to consider how a trial on the merits would be conducted if a class were certified by identifying and analyzing substantive issues is reversible error).

[41] *See also Mario v. UPS, Inc*., 639 F.3d 942, 948 (9th Cir. 2011) ("existence of a policy classifying [supervisors] as exempt … does not necessarily establish [they] were misclassified, because the policy may have accurately classified some employees and misclassified others.").

[42] *Rehberg* involved a different state's (North Carolina) statute that did not require the type of individualized analysis the LWPA requires. The Fifth Circuit has held that primarily relying "on the conclusions of other courts" instead of rigorously analyzing the facts and law *in this case* constitutes reversible error. *Stukenberg*, 637 F.3d. at 842. <u>The same must be true here.</u>

Finally, the AR&R's certification under Rule 23(b)(2) cannot stand as it misapplied governing law. Relying on *Allison v. Citgo*, 151 F.3d 402, 413-415 (5th Cir. 1998), the AR&R concluded that "monetary relief requested by the plaintiff[s] does not predominate and is merely incidental to the requested injunctive or declaratory relief." [Doc. 404,p. 43.] Thus, certification under Rule 23(b)(2) could issue despite Plaintiffs' request for monetary damages. Post-*Allison*,[43] however, the Supreme Court expressly rejected the concept that monetary damages are recoverable in a 23(b)(2) class so long as they do not predominate over the injunctive or declaratory relief. *Dukes*, 564 U.S. at 363-64.[44] *Dukes* held that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*[45] The thrust of Plaintiffs' LWPA claims is to seek individualized damages based on various purported "deductions." To determine whether any damages were due would require the fact-finder to review specific days, specific work, and specific alleged "deductions"– which violates *Dukes*. Rule 23(b)(2) certification cannot proceed.

C. The AR&R Improperly Applied the Facts and Law to the FLSA Claims

As courts within the Fifth Circuit (including the Western District of Louisiana) have adduced, due to the "highly individualized" nature of the multi-factor "economic realities" test, [46]

---

[43] In *Dukes*, the Supreme Court directly addressed *Allison* and questioned whether *any form* of "incidental" damages was ever available under Rule 23(b)(2). *Id.* at 365-66.

[44] *Id.* (rejecting predominance test for monetary damages under (b)(2), especially given due process concerns given that (b)(2) is a *mandatory class* without the ability to opt-out).

[45] A demonstration of this occurred in *Altier v. Worley Catastrophe Response, LLC*, 2011 WL 3205229 (E.D. La. 2011). Following *Dukes*, the *Altier* court reviewed a request for Rule 23(b)(2) relief seeking monetary damages arising from alleged breaches of plaintiffs' employment contracts. While the plaintiffs relied upon ostensibly uniform contract provisions, the court held that Rule 23(b)(2) relief was unavailable, even if plaintiffs could establish the breach on a uniform class-wide basis, because the court would have to review the specifics of the contract as applied, the dates worked, and the amounts paid to make "individualized" determinations of damages, precluding Rule 23(b)(2) certification. *Id.* at *13. This same analysis applies here.

[46] The Fifth Circuit reviews the following five non-exhaustive factors as part of the economic realities test: (1) the degree of control exercised by the putative employer; (2) the extent of relative investments; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required;

IC misclassification cases like this one are not well-suited for a collective trial. *Clay v. New Tech Global Ventures, LLC*, 2019 WL 1028532, at *11 (W.D.La. Mar. 3, 2019) ("Because it requires a fact-intensive inquiry that is 'highly dependent on the particular situation presented,' courts rarely grant final certification of a collective of plaintiffs alleging they were improperly classified as [ICs].").[47]

Here, based on the varied legal tests and evidence related to multiple prongs of those tests, representative evidence does not exist. This results in the case devolving into a series of mini-trials when, for every plaintiff who testifies one way, two others will be called to say the exact opposite. This thwarts any efficiencies of collective litigation. Representative evidence is the lynchpin of any FLSA collective—the existence of it is necessary to ensure due process. As the record in this case clearly demonstrates, it does not exist here, making any all-or-nothing determination of IC or employee status that will apply to all 98 opt-ins fundamentally unfair. *See Johnson v. Big Lots, Inc.*, 561 F.Supp.2d 567 (E.D. La. 2008) (concluding, after a full bench trial, that 900+ member collective must be decertified because "the all or nothing posture of this case makes ruling the merits fundamentally unfair to both sides."). Respectfully, the AR&R misapplied the facts and law. This Court should decertify the FLSA collective action accordingly.

*1. Decertification Must Issue Under Governing Law*

---

and (5) the permanency of the relationship. *Thibault*, 612 F.3d at 848. Importantly: "[n]o single factor is determinative"—a totality of circumstances test applies. *Id.*

[47] *See also, e.g., Sanchez v. Schlumberger Tech. Corp.*, 2019 WL 7879956, at *7 (S.D. Tex. Nov. 21, 2019) (granting decertification of IC FLSA collective because "individualized claims and individualized defenses, all of which are highly fact intensive, would not only dominate but swallow and consume the entire case.") (quoting *Lagos v. Cogent*, 2014 WL 12776418, at *9 (S.D.Tex. 2014); *adopted in relevant part,* 2020 WL 519957 (S.D. Tex. Jan. 30, 2020); *Garcia v. Vasilia*, 2019 WL 3555266 (S.D. Tex. Aug. 5, 2019) (decertifying collective of 120+ uniformly classified ICs based on the economic realities test).

While the defendant files the motion for decertification, "[i]t is the plaintiffs' burden to demonstrate the[] [plaintiffs] are similarly situated." *Clay*, 2019 WL 1028532, at *10.[48] District courts within the Fifth Circuit generally consider three factors when reviewing whether Plaintiffs sustained their burden: (1) disparate factual and employment settings of the plaintiffs; (2) various defenses available to defendant, which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* Each factor compels decertification in this case. The AR&R's conclusion to the contrary was in error.

a. Common Classification Is Irrelevant, Let Alone Dispositive

The AR&R once again improperly relies heavily upon *Rehberg*, which denied decertification primarily upon the common classification of plaintiffs as ICs.[49] This analysis is contradicted by Fifth Circuit law, which requires an analysis "highly dependent on the particular situation presented." The fact that all plaintiffs were classified as ICs does not, as a matter of law, allow a court to be "less concerned" with disparate facts.[50] *Thibault,* 612 F.3d at 848. Instead, the

---

[48] **The *Clay* case, other than size of the collective, is directly on par.** [Doc. 386, pp. 24-26.] **The AR&R attempts to distinguish *Clay* by relying on a wholly inapposite decision involving a collective of eight welders, *Moresi v. Resource Energy Ventures and Construction Co.*, 2019 WL 2565634 (W.D. La. June 18, 2019) (Whitehurst, M.J.). [Doc. 404, p. 61.] Critically, in *Moresi,* the putative employer *did not contest* that all eight were misclassified as ICs, let alone point to significant differences between them**. **Rather, the core issue in that case appeared to involve a dispute about who was responsible for paying them.** Attached hereto as **Exhibit 2** is a copy of the "motion for decertification" in *Moresi*. It is five pages long, cites no evidence, and relies exclusively on inapplicable Rule 23 standards. **As Defendants explained in detail in their supplemental filings, *Clay,* on the other hand, fully supports decertification and explains why, based on the type of evidence here and the fact-intensive economic realities test, decertification is necessary. [Doc. 386, pp. 24-26.] While there are far more plaintiffs in this case than *Clay* (98 here versus 8 there), that only serves to amplify the factual differences between them, and the prejudice that will result if the case is tried collectively.** The AR&R's attempts to distinguish *Clay* fails.

[49] The AR&R notes: "Given that [d]efendants have a well-established company policy of classifying all distributors as [ICs], the court is less concerned by variations in Plaintiffs' employment circumstances." [Doc. 404, pp. 57-58 (quoting *Rehberg*).]

[50] District courts in the Fifth Circuit have repeatedly rejected reliance on common classification. *See Clay*, 2019 WL 1028532, at *13 ("[D]espite being subject to an alleged misclassification and (in many cases) signing the same agreement, if the economic realities test requires different proof and is unlikely to produce the same result for each plaintiff in the collective, certification is not appropriate."); *Moody v. Assoc. Wholesale Grocers, Inc.*, 2019 WL 6036707 (E.D.La. Nov. 14, 2019) (judge declined to rely on the common classification of opt-ins as exempt supervisors and instead decertified the collective based on differences in actual job duties performed); *Sanders v.*

relevant inquiry is, "as a matter of economic reality what [ICs] actually *do*...." *Parrish v. Premier Directional Drilling, LP*, 917 F.3d 369, 380 (5th Cir. 2019) (internal citation omitted). What Plaintiffs here actually do, as demonstrated by the record in this case, varied from plaintiff-to-plaintiff, and the "facile label" of common classification upon which the AR&R heavily relies is not germane, let alone dispositive, to that analysis. *Id.*

Here, there are disparate facts on all relevant elements of the economic realities test. [Docs. 386, pp. 23-24 (and record citations therein); 386-1.] Recent Fifth Circuit case law demonstrates that even modest variance on any of the prongs of the economic realities test may lead to divergent outcomes.[51] While the AR&R acknowledges some of those significant factual deviations (including differences in operation of businesses through corporations, multiple territory ownership, selling non-Flowers products, not even servicing the businesses themselves), it nonetheless failed to apply their significance under applicable law.[52] This is improper as a matter of law.

---

*Latshaw Drilling Company, LLC*, 2019 WL 1209769 (N.D.Tex. Mar. 14, 2019) (decertifying collective action of uniformly classified employees, rejecting reliance on common classification as exempt, and instead focusing on "actual job duties" as exercised by each opt-in); *Lipnicki v. Meritage Homes Corp.*, 2014 WL 5620603, at *3 (S.D.Tex. 2014) (noting that blanket classification decisions are insufficient to establish the similarly situated requirement). *See also Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (while alleged employer had "traditional practice of classifying its welders as ICs," the "determination of employee status is very fact dependent").

[51] *Compare Parrish*, 917 F.3d at 379, 381 (reversing summary judgment for plaintiff and ordering summary judgment for putative employer in IC action) *with Hobbs v. Petroplex Pipe & Construction*, 2020 WL 113990, __ F.3d __ (5th Cir. Jan. 10, 2020) (affirming conclusion that several pipe welders were employees based on application of individualized economic reality factors). Similarly, this Court sat on the Fifth Circuit panel in *Hopkins v. Cornerstone Am.*, 545 F.3d 388 (5th Cir. 2008). In *Hopkins*, the Court emphasized that the "most important[]" part of the IC analysis in that case was the fact that the alleged employer controlled "hiring, firing, assignment and promotion" of subordinates. *Id.* at 347. Yet in *Parrish*, the plaintiffs could not subcontract but were still found to be ICs based on the balance of the other economic reality factors. 917 F.3d at 385. Here, the record is mixed on all the relevant factors, including the use of subcontractors/helpers. [Docs. 310-6, 310-7, 317-9, 386-1.]

[52] The AR&R credits these important facts but then disregards them because "all are expected to follow the same guidelines . . . , whether they do that work themselves or contract with others to do it for them." [Doc. 404, pg. 54.] This misapplies applicable law. First, even if the "same guidelines" were "expected," facts certainly in dispute, the AR&R cannot disregard these important factual differences as immaterial. For example, whether distributors operated outside businesses to increase profits is directly relevant to the economic realities test. *See, Parrish*, 917 F.3d at 384

b. The AR&R Continues to Misapply the Facts And Law

The AR&R adds approximately three pages of Plaintiffs' proffered factual statements (without any citation to the record), and concludes that "the undersigned has painstakingly scoured the record for evidence that these similarities do not, in fact, exist and was unable to find any." [Doc. 404, pp. 50-53.] Suffice it to say that the record contains an abundance of evidence contradicting these findings.[53] In addition, the AR&R also again attempts to rely upon the designation of "statutory employees" for IRS purposes to buttress its reliance on the common IC designation to deny decertification. [Doc. 404, pp. 53-54.] This, too, fails. *See* Section II.C.1.a., *supra*.[54]

c. The AR&R Fails Entirely to Review the Individualized Defenses

On decertification, the Court must analyze the possible defenses asserted by the alleged employer "because the presentation of individualized defenses for each plaintiff would frustrate the efficiency of a collective action." *Clay*, 2019 WL 1028532, at *13-*14. Defendants have

(reviewing outside business ventures is germane to control over profit/loss); *Thibault*, 612 F.3d at 848 (same). Similarly, the fact that all distributors had the ability to choose whether to do the work themselves, or hire individuals to do it and focus on other ventures, strikes at the heart of the economic realities inquiry. *See, e.g., Garcia*, 2019 WL 3555266, at *9 (the fact that some ICs "were essentially small business managers" responsible for managing and paying their helpers while others simply chose to perform all the work personally weighed against collective consideration of their misclassification claims).

[53] For example, the AR&R noted that "Distributors arrive at Defendants' warehouses early in the morning to load their delivery trucks…. After loading their trucks, Distributors drive to Defendants' various customers on predetermined route . . ." [Doc. 404, pg. 51.] The record evidence shows a variety of testimony from distributors who set their own work hours and route order, rather than a "predetermined route." [Docs. 310-7, pp. 9-10; 317-9, pp. 9-10.] More importantly, testimony varied widely on who was actually performing the work in the first place. [Docs. 310-7, pp. 5-7; 317-9, pp. 9-10.] *See also, e.g.,* [Docs. 310-7; 317-9;386-1 (surveying extensive differences).]

[54] What *does matter* in this context is the individualized *content* of each tax return because it contains information relating to profit/loss, outside business, business expenses and investment, which varies from plaintiff-to-plaintiff, and supports decertification. "*[H]ow* plaintiffs file tax returns has limited relevance in the economic realities test. On the other hand … *what* those tax returns contain may prove useful in evaluating certain . . . factors, such as profit and loss)." *Parrish*, 917 F.3d at 388. *See also Carrell*, 998 F.2d at 334 (tax returns contained information relevant to profit and loss). For example, Plaintiffs' tax returns contain varied evidence about their profit and loss and outside business interests. *See* [Doc. 310-7, pp. 21-22.] Similarly, tax returns often contain information regarding the extent of investment in distributor's territories. *See, e.g.,* [Doc. 386, pp. 23-24 (and record citations therein)].

asserted multiple individualized defenses here such as the outside sales exemption, the Motor Carrier Act exemption, and whether certain Plaintiffs can show they personally worked in excess of forty hours. The AR&R did not examine any of these defenses in detail; indeed, the AR&R does not even mention them, let alone the elements and evidence necessary to adjudicate them. Rather, the AR&R generalizes that the Magistrate Judge was "not convinced that defendants' defenses are so individualized that collective adjudication of this claim is unworkable." [Doc. 404, pg. 59.] The AR&R further opines that "defendants will be allowed all of their asserted defenses by examining representative plaintiffs and presenting their own evidence at trial." [*Id.*] The problem is there are no "representative plaintiffs," and representative evidence on these defenses does not exist, especially given the varying record and individualized nature of the defenses at issue.

For example, the outside sales exemption applies where the "primary duty" of the plaintiff at issue "is making sales …, or obtaining orders or contracts for services…" 219 U.S.C. § 213(a); 29 CFR § 541.500.[55] Determining the "primary duty" cannot be universally divined on varying evidence, especially as the "exemption defenses are the most fact-intensive part of a [FLSA] lawsuit." *Radford v. Pevator Companies, Ltd.*, 2019 WL 7282110, at *4 (S.D.Tex. Dec. 27, 2019). Here, the record indicates that some Plaintiffs have engaged in extensive sales efforts, even admitting sales was their primary focus. [Doc. 310-7, pp. 13-19; p. 15 (Duhon: "I go out there and try to sell everything I can… And the more I sell, the more I make." )]. Others said they never tried to add new accounts to increase sales. [Doc. 310-7, p. 19 (Plaintiff Williams); *cf. id.* (testimony of

[55] In recent briefing, Plaintiffs have asserted that FLSA exemptions are "narrowly construed" against the employer." [Doc. 319, p. 44.] That position is contradicted by Supreme Court authority. *See Faludi v. U.S. Shale Solutions, LLC*, 950 F.3d 269 (5th Cir. 2020) ("[W]e must give FLSA exemptions a 'fair reading' rather than narrowly construing them against the employer.") (citing *Encino Motorcars, LLC v. Navarro,* 138 S.Ct. 1134 (2018)).

M. Crawford noting that he tripled his sales by soliciting and adding new accounts).][56] Importantly, the testimony of Duhon or Crawford does not prove that Williams is exempt under the outside sales exemption (or vice versa). If a jury cannot make a blanket determination of exempt status, as here, the collective must be decertified.[57]

Similarly, Defendants have asserted that various plaintiffs are subject to the Motor Carrier Act ("MCA") exemption to overtime.[58] In response, Plaintiffs indicated they intend to rely upon the "small vehicle exception" to the same. [Doc. 319, pg. 47.] This likewise presents insurmountable individualized issues. A very recent demonstration of the problem is set forth in *Noll v. Flowers Foods, Inc., et al.*, 2020 WL 4457769, __ F.3d __ (D. Me. Aug. 3, 2020).[59] In *Noll*, which involves distributors of a different subsidiary, the court struggled with application of the fact-intensive "small vehicle exception" to the MCA overtime exemption.[60] The *Noll* court opined that to avoid application of the MCA exemption, the plaintiffs necessarily had to demonstrate that they fell outside the scope of the MCA by: (i) personally working in excess of forty hours per week (as some distributors retained helpers to do the work); *and* (ii) using a personal vehicle to transport Defendants' product in that same week or weeks in which they exceeded forty hours of personal work. *Id.* at *5. The court then held that, despite the fact that

---

[56] Extensive differences in sales activities were previously presented to the Magistrate Judge. [Doc. 310-7, pp. 15-20.]

[57] ***See Lipnicki*, 2014 WL 5620603 at *5 (noting the court must ask, "[I]s there a strong likelihood that a juror considering the individual circumstances of all 70 opt-ins would reach the same result on the applicability of the exemption?," and then answering that question in the negative, instead holding that "[p]osing a single question to the jury in a collective action would thus undermine the interests of both [the defendant] and those opt-ins who have the strongest claims [they were not exempt]"). Notably, the *Lipnicki* decision was written by Fifth Circuit Judge Gregg J. Costa, sitting by designation, offering significant insight on how the Fifth Circuit may rule.**

[58] *See, e.g.*, [Doc. 310-1, pp. 29-31.]

[59] Defendants filed the *Noll* decision on the docket in this case on August 5, 2020. [Doc. 403.]

[60] Further background on application of the MCA exemption from the record is provided at [Doc. 310-1, pp. 29-31 (and related FNs 46-49).]

distributors signed the same DA, the individualized nature of litigating the small vehicle exemption depended upon the nature and extent of use of personal vehicles and the particular instances in which product was placed in those vehicles—subjects of varying record evidence requiring decertification. *Id.* at *6.

This analysis likewise applies here. The Fifth Circuit, like the *Noll* court, recognizes that the plaintiff bears the burden of proof on the small vehicle exemption, and that the amount of work with small vehicles must be more than *de minimis* for it to apply. *Carley v. Crest Pumping Techs., LLC*, 890 F.3d 575, 580 (5th Cir. 2018); *Rychorcewicz v. Welltec, Inc.*, 2018 WL 3559131 (S.D.Tex. 2018). Litigation of this issue necessarily involves detailed analysis of how much, if any, *each* plaintiff drove personal vehicles, and the nature and extent of transporting product in these vehicles – issues on which the record is widely disparate.[61] Thus, here, as in *Noll*, individualized application of the MCA exemption requires decertification.

Lastly, in order to be able to establish liability under the FLSA, each plaintiff must be able to establish that he personally worked in excess of forty hours, an issue significantly complicated by the fact that some plaintiffs in this case did not perform the work personally, but instead hired employees to do the work for them. [Doc. 310-7, pp. 5-7.] This likewise merits decertification.

d. Fairness and Procedural Considerations Likewise Require Decertification

Finally, and perhaps most importantly, the AR&R's complete dismissal of the fairness and procedural considerations raised by collective adjudication of IC status for this diverse group requires that the AR&R be rejected and decertification granted. The AR&R's analysis on this

[61] [Docs. 310-7 pp. 7-9] (detailing differences on use of personal vehicles and transportation of product from 25 separate depositions); 386-1 (noting significant difference in record regarding same).]

point, which was verbatim from the initial R&R, focused primarily on the fact that the parties have completed a significant amount of discovery, and thus "judicial economy" favors collective adjudication. [Doc. 404, p. 62.] Notably absent from the AR&R's analysis, however, is any acknowledgment that Defendants have rights too – as dictated by the Due Process clause.[62] These concerns were perhaps best expressed in *Johnson*, where the court reasoned:

> One of the purposes of trying several overtime pay claims in a collective action is to avoid the inefficiencies of conducting multiple individual trials on the same factual and legal issues. **These efficiency gains, however, cannot come at the expense of a defendant's ability to prove a statutory defense without raising serious concerns about due process. [The defendant] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably said to be representative of each other…**

561 F.Supp.2d at 587 (emphasis added).

This reasoning applies with equal force here. The varied record establishes that there are no representative plaintiffs and no representative "proof." Therefore, there is no way to try this case collectively without raising significant due process concerns, irrespective of any blanket "common classification" excuse.[63] Decertification of the collective must be granted accordingly.

## III. CONCLUSION

As the discussion above establishes, the AR&R must be rejected because it fails to comply with Supreme Court and Fifth Circuit law. Moreover, it is clear the AR&R reached an untenable result because, given the highly-individualized facts and legal inquiries here, class certification should be denied and decertification should be granted.

---

[62] *See, e.g., Radford*, 2019 WL 7282110, at *4 (noting collective actions may lower costs but "[t]he burden and complexity a class action imposes on the parties, the jury, and the court may frustrate these benefits.").

[63] Common classification, upon which the AR&R relied heavily to justify the "rare" step of allowing certification in this case, is insufficient. Common classification was also present in *Clay*. But the court there correctly noted that the benefits of "judicial economy achieved by a collective action" "are only realized when the [plaintiffs] are similarly situated." *Clay*, 2019 WL 1028532, at *14 (internal quotations omitted).

RESPECTFULLY SUBMITTED

/s/ *Andrew J. Halverson*
Gregory Guidry, La. Bar No. 06489
Andrew J. Halverson, La. Bar No. 31184
**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
603 Silverstone Road, Suite 102A
Lafayette, LA 70508
701 Poydras Street, Suite 3500
New Orleans, LA 70139
Telephone: 337.769.6583 / 504.648.3840
Facsimile: 504.648.3859
Email: gregory.guidry@ogletreedeakins.com

AND

* Margaret Santen Hanrahan, GA Bar No. 578314
* Michael Ray, IL Bar No. 6285109
*Benjamin R. Holland, NC Bar No. 28580
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379
Email: maggie.hanrahan@ogletree.com
michael.ray@ogletree.com
ben.holland@ogletree.com

* Admitted Pro Hac Vice

***ATTORNEYS FOR DEFENDANTS***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been filed via the Court's Electronic Case Filing System, which provides for service on all counsel of record.

This 20th day of November, 2020.

*/s/ Andrew J. Halverson*
ANDREW J. HALVERSON

45040989.1